Scott Lewis
v
Commissioner of Corrections

PRISONER

FILED
2006 APR -7 P 4:04
U.S. DISTRICT COURT
BRIDGEPORT, CONN.

3:03 CV 196 (RNC)(DFM)

March 30, 2006

Emergency Motion for a Request an Evidentiary Hearing and Speedy Relief in the Interest of Justice.

Pursuant to 28 U.S.C Section 2254(e)(2)(b), the Petitioner, Scott Lewis, now moves this Honorable Court, Chief Robert N. Chatigny, for an Emergency Evidentiary Hearing alleging the following;

1) The Petitioner asserts the failure to develop a predicate factual basis in state court concerning count three of his federal petition.

2) The Petitioner alleges the failure of the state's knowingly use of false evidence, the failure to correct the evidence and the state's misrepresentation to the court and counsel.

3) The petitioner alledges that said evidence is material and serves as a predicate basis to the issues raised in petition and, but for the constitutional error, no reasonable fact finder would have found the petitioner guilty of the underlying offense.

4) The petitioner asserts that the evidence shows that the state's attorney knew "prior to the May 8th 1995 testimony" concerning an informant who has given police information critical to the defense, that said informant was deceased[1] and unquestionably unavailable for trial.

5) The petitioner asserts that in June of 1994 the state's attorney sealed that information in the companion case, and further did not disclose this predicate fact or correct the testimony in regards to this fact during the May 8, 1995 testimony concerning the informants availability to the defense.

---

[1] Enclosed find the June 1994 transcript in the companion case and the May 8, 1995 testimony concerning the issue in this case.

9) The Petitioner asserts that said guidance clearly would have established the admissibility of the informant information and proved his claim in regards to count three of the instant federal habeas petition before this court.

## Relief Sought

The Petitioner request the court to entertain this motion with urgency for a innocent life is at stake and the error is of the "Most Serious" in a constitutional nature.

Petitioner

*Scott Lewis*

Scott Lewis 137682
900 Highland Ave EB 313
Cheshire, CT 06410

## Certification

I hereby certify that a copy of this foregoing motion was sent to Jo Anne Sulik, Assistant State's Attorney, Office of Chief State's Attorney, at 300 Corporate Place, Rocky Hill, CT 06067 on this 30th day or thereabout of March 2006.

*Scott Lewis*

```
CR6-352995              :       SUPERIOR COURT

STATE OF CONNECTICUT    :       J.D. OF NEW HAVEN

        VS.             :       AT NEW HAVEN

STEFON MORANT           :       MAY 12, 1994 - JUNE 8, 1994
```

B E F O R E:

        HONORABLE WILLIAM L. HADDEN, JR.,
                                      Judge

A P P E A R A N C E S:

        DAVID P. GOLD, ESQUIRE
        Supervisory Assistant State's Attorney

        ROBERT SWEENEY, ESQUIRE
        Attorney for the Defendant

                              VICTORINE KALISZEWSKI
                              Certified Court Reporter

STATE OF CT
v
STETSON MORANT
CR92 0352995S

(DONE)

JUNE 6, 1994

1  Tuesday. That's as best I can figure that
2  might be the prognosis, but one can never be
3  sure until we actually are at that point, but
4  we are obviously going to a close on the case.
5     Keep in mind your general instructions
6  you've had. Do nothing that's going interfere
7  in any way with your ability to make a fair and
8  impartial decision based on what goes on and
9  has gone on in this courtroom during the course
10 of the trial and nothing else.
11    All right. You're all excused. You may
12 leave. See you Monday morning at 10 o'clock up
13 on the ninth floor and then stay up there on
14 the ninth floor.
15    You may leave, please.
16 (Whereupon, the jury left the courtroom.)
17    MR. SWEENEY: Your Honor, may I place
18 something on the record?
19    THE COURT: Certainly.
20    MR. SWEENEY: As we discussed very briefly
21 in chambers, it's come to my attention that the
22 individual who was identified by Sergeant Ortiz
23 in connection with my motion for disclosure of
24 exculpatory information has died, he died in
25 July of 1992, which is probably why he hasn't
26 given any information to Ortiz in about two
27 years.

1013

```
 1         THE COURT:  That's a fair assumption.
 2         MR. SWEENEY:  But I do have a certified
 3    copy of the death certificate and what I would
 4    like to do is just mark it for identification.
 5         THE COURT:  What was the date of death
 6    according to that?
 7         MR. SWEENEY:  July 20th, 1992.
 8         And I do note the date of birth as well as
 9    the Social Security number matches the date of
10    birth and the Social Security number provided
11    by the State on their information form, and I'd
12    just like right now to mark that for
13    identification.  And with the Court's
14    permission, at some point on Monday I would
15    like to address the issue again as to -- and
16    that will depend on whether -- I'll address the
17    issue again on Monday after I've made further
18    attempts to locate this Michael Cardwell who is
19    the declarant of the statements which were made
20    to the individual that was identified by
21    Sergeant Ortiz and who has since died, but
22    right now I just wanted to put that on the
23    record and just have this marked for whatever
24    purposes.
25         THE COURT:  Any objection to this document
26    being marked?
27         MR. GOLD:  No.
```

1014

1  THE COURT: It's a certified copy of the
2  death certificate?
3  MR. SWEENEY: It is. If I can show it to
4  the Court.
5  (Handing.)
6  THE COURT: Okay.
7  MR. SWEENEY: It was obtained this morning
8  by an investigator who's been hired by the
9  client, my client's family.
10 THE COURT: It's dated today?
11 MR. GOLD: I just ought to -- perhaps it
12 should be sealed along with what I gave the
13 Clerk before that identified the person.
14 THE COURT: Well, I suppose we can. I
15 don't know whether it makes any difference.
16 MR. GOLD: Yeah, I suppose that's true
17 too.
18 THE COURT: He's dead.
19 MR. GOLD: Yeah, I suppose he needn't
20 be -- his safety --
21 THE COURT: Why don't we seal it along
22 with the other stuff.
23 MR. GOLD: There is family and so forth.
24 THE COURT: Seal it along with the other
25 information with respect to that gentleman.
26 THE CLERK: This is a Court's exhibit?
27 THE COURT: Just a minute.

1015

       Mr. Sweeney and Mr. Gold, what were the other exhibits?  There was a name and address and then there was a State Police computer printout.

       MR. SWEENEY:  I think it was all one, your Honor.

       MR. GOLD:  All one.

       THE COURT:  What did we mark that?

       THE CLERK:  Court's D.

       THE COURT:  Court's C.

       THE CLERK:  D.

       THE COURT:  Whatever.  This one is Defense Exhibit 3 for identification sealed.

       MR. SWEENEY:  I think four perhaps, your Honor.

       MR. GOLD:  I think three might have been the bond sheet.

       THE COURT:  All right.  It's four.  It's sealed.  It's a defense exhibit he offered.

       (Whereupon, Defendant's Exhibit 4 was marked for identification.)

       THE COURT:  All right.  Now, I assume you want to hustle on down to your office to get ready with your word processors, gentlemen.

       Three o'clock I want to have those requests, whatever they're going to be, in chambers and you've got three hours and 16

```
1    CASE NO: 402583           :  SUPERIOR COURT
2    STATE OF CONNECTICUT      :  JUDICIAL DISTRICT OF NEW HAVEN
3    VS.                       :  AT NEW HAVEN
4    SCOTT LEWIS               :  MAY 8, 1995
5
6
7    BEFORE:  HONORABLE GEORGE RIPLEY, JUDGE, AND A JURY
8
9
10
11
12   APPEARANCES:
13       DAVID GOLD, ESQ.
14       JOHN WILLAMS, ESQ.
15
16
17
18
19
20
21
22
23
24
25
26
27
```

1

1  THE COURT: We have the jury, but I think we
2  had a matter we had to take up in the absence of
3  the jury, do we?
4  MR. WILLIAMS: Yes, that's correct, your
5  Honor. I have some witnesses here with respect to
6  the admissibility of certain out of court
7  statements.
8  THE COURT: All right. Fine. You may
9  proceed.
10 MR. WILLIAMS: Thank you, your Honor.

                                                                    2

1           LT. FRANCISCO ORTIZ, Number 1, Union Avenue,
2    New Haven, Connecticut, having been duly sworn was examined
3    and testified as follows:
4    DIRECT EXAMINATION BY MR. WILLIAMS:
5         Q    Lt. Ortiz, how long have you been with the New
6    Haven Police Department?
7         A    I'm in my 17th year.
8         Q    And what position do you currently hold there,
9    sir?
10        A    I'm a lieutenant and I'm responsible for the Fair
11   Haven district of New Haven.
12        Q    Directing your attention to November of 1990, what
13   position did you hold at that time?
14        A    I was a detective with the police department.
15        Q    Okay.  And at that time did the New Haven Police
16   Department have in place standardized procedures for
17   registering and utilizing known and reliable informants?
18        A    Yes, sir.
19        Q    Would you tell the Court, please, what those
20   procedures were?
21        A    Individuals who came in contact or recruited
22   informants were to bring that to the attention of their
23   immediate supervisor.  Their supervisor would then meet with
24   this individual to try to ascertain their identity, their
25   background, their reliability and dependability.  And once
26   that was ascertained that this person was reliable candidate
27   to be an informant, then information would be documented,

3

1  files would be created, and they would be registered with
2  the police department and informant would be given a number,
3  a serial number of sorts, that would reflect the informant's
4  identity whenever he was being utilized, and that number
5  would be inserted in lieu of the informant's name whenever
6  there was an investigation or if they were going to receive
7  any monies or anything regarding their contributions.
8     Q    Was there a standardized procedure that was
9  followed in your department if an informant who was on that
10 registry ever produced bad information?
11    A    Yes, sir.
12    Q    What was that?
13    A    That particular informant would be flagged. The
14 department's registry, the keeper of records would somehow
15 put a notation along side that person's name so that in the
16 future if an individual ever tried to re-register this
17 person or if he came in contact with an individual, an
18 officer, they would be made aware of the fact that this
19 person was no longer reliable and that information would be
20 documented, the reason why they were not reliable, so that
21 they would not be re-registered again and perhaps mislead
22 some agent or something.
23    Q    All right. Now, directing your attention to the
24 week of November 11 of 1990, did you at that time have
25 occasion to be in contact with a known and reliable
26 informant whom you had utilized in the past and who was on
27 that registry with respect to the murder of Ricardo Turner

4

1    and Lamont Fields?
2        A    Yes, sir.
3        Q    Would you relate to the Court, please, the
4    circumstances under which that meeting occurred and what
5    happened at that meeting.
6        A    Yeah. I believe the informant reached out to me
7    at the police department and indicated that that particular
8    informant had information regarding this homicide
9    investigation that the police were working on, and he wanted
10   to speak with me regarding that information, and that he was
11   willing to forward that to the department to assist 'em in
12   working on the investigation itself.
13       Q    What then happened in that regard, sir?
14       A    I contacted the investigator, the primary
15   detective and the supervisor of that particular homicide
16   investigation and I made them aware of the fact that an
17   individual who was a known and reliable informant,
18   registered with the department, and who had a proven record
19   for reliability was willing to offer information regarding
20   the suspects possibly involved in this homicide. And I
21   arranged for them to meet, so that they could interview the
22   informant, the primary investigator and the supervisor.
23       Q    And did that meeting occur?
24       A    Yes, it did.
25       Q    All right. And were you present at that meeting,
26   sir?
27       A    No. I introduced him at the department at the

5

1 investigative services unit.  They then took him into
2 conference and they interviewed the informant, but I wasn't
3 involved at that point.  I simply introduced the informant.
4  Q    And was the detective to whom you made this
5 introduction Vaughn Maher?
6  A    Yes, sir.
7  Q    And has Detective Maher subsequently retired from
8 the department?
9  A    Yes, sir.
10  Q    And has he moved out of state?
11  A    Yes, sir.
12  Q    Now --
13          MR. WILLIAMS:  I'd like this marked for
14 identification.
15          THE CLERK:  Exhibit 30.
16          (Thereupon, item was marked as Exhibit 30 for
17 identification.)
18  Q    Showing you Exhibit 30 for identification, do you
19 recognize that as an official case incident report of the
20 New Haven Police Department?
21  A    Yes, sir.
22  Q    Concerning this particular matter?
23  A    Yes.
24  Q    And do you recognize on that the signature of
25 Detective Maher?
26  A    Yes, I do.
27  Q    All right.  And that was a document which, in the

6

1  usual procedures followed by the New Haven Police
2  Department, was prepared and filed under oath, is that
3  correct?
4       A    Yes, sir.
5       Q    And is that an official record of the New Haven
6  Police Department?
7       A    Yes, it is.
8       Q    Lieutenant, you're aware of the name of this
9  informant, is that correct?
10      A    Yes, sir.
11      Q    And is it your preference that that information be
12 kept confidential in order to protect that identity?
13      A    Yes, sir, it is.
14      Q    Now, do you -- Can you tell us when the last time
15 was that -- to the best of your recollection -- that the
16 department had any contact with that known and reliable
17 informant?
18      A    To the best of my recollection that would have
19 been throughout the latter part of 1990, or during the time
20 of this incident. Maybe 1989. I'm not sure. During the
21 time this investigation was unfolding, that was the last
22 time I was aware of the fact that he was used by the
23 department. I'm not sure when it concluded.
24      Q    To the best of your knowledge, has he subsequently
25 disappeared?
26      A    To the best of my knowledge I would say so, yes.
27      Q    And you're prepared, if the Court permits it or

7

1  requests it, to furnish to the Court, under whatever
2  conditions the Court deems appropriate, the name of this
3  individual; is that correct?
4      A   Yes, I am.
5          MR. WILLIAMS: Your Honor, that would be
6  my offer through Lt. Ortiz. I would propose at
7  that point if the Court were to permit it to
8  introduce Detective Maher's official report into
9  evidence and so I think at this point I would turn
10 the witness over to the state.
11         THE COURT: Do you have any questions of the
12 officer?
13         MR. GOLD: Just this:
14 CROSS EXAMINATION BY MR. GOLD:
15     Q   Lieutenant, when you say that he's disappeared, I
16 take it that what you're referring to is you've had no
17 additional contact with him since that time?
18     A   Correct. I have not.
19     Q   Do you know where he lives now?
20     A   No, sir.
21     Q   But might he still live in New Haven?
22     A   Yes, he might very well, yes.
23     Q   All right.
24         MR. GOLD: I have nothing else.
25 REDIRECT EXAMINATION BY MR. WILLIAMS:
26     Q   Lieutenant, this issue arose, to your knowledge,
27 during the trial about a year ago of Stefon Morant?

8

1    A    Correct.

2    Q    And at that time you came to court, did you not,
3    and furnished the Court and counsel for both the State and
4    that defendant with the name and last known address of this
5    fellow, this informant; is that correct?

6    A    A document was shown to me with that information
7    on it and I simply confirmed that's information that I was
8    aware of, yes.

9    Q    All right. And to your knowledge this informant
10   was not located or presented during that trial, is that
11   correct?

12   A    That's what I recall.

13           MR. WILLIAMS: That's all, your Honor.
14           MR. GOLD: I have nothing else.
15           (Witness excused.)
16           THE COURT: May I see that exhibit for identification, please?
21           MR. WILLIAMS: And I have an additional
22   police officer, your Honor, on the same subject.
23           THE COURT: You do. All right. Fine. We'll
24   hear him.

25

26

27

# CASE/INCIDENT REPORT

**SUPPLEMENTARY**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CASE # | 111567 | DATE OF INCIDENT 10/11/90 | DAY 05 | TIME OF INCIDENT 0434 | DATE OF REPORT 11/24/90 | APARTMENT # 2-R | TIME OF REPORT 1345 | |
| STREET # 634 | STREET NAME HOWARD AVENUE | TOWN CODE 093 | NEAREST CROSS STREET MINOR STREET | | | | | |

| | LAST NAME | FIRST NAME | SEX | RACE | DATE OF BIRTH | AGE | ADDRESS | TELEPHONE |
|---|---|---|---|---|---|---|---|---|
| CV | TURNER | RICARDO | M | B | 05 22 47 | | 634 HOWARD AVENUE, NEW HAVEN, CONNECTICUT | |
| CV | FIELDS | LAMONT | M | B | 01 11 66 | | 634 HOWARD AVENUE, NEW HAVEN, CONNECTICUT | |
| O | ORTIZ | F. SGT. PD 093 | | | | | | |
| O | McCOY | W. SGT. PD 093 | | | | | | |

REPORTING OFFICER: DETECTIVE V. MAHER  PAYROLL CODE: 4813  ASSIGNED TO: ISU

DURING THE WEEK OF NOVEMBER 11, 1990, THIS DETECTIVE WAS CONTACTED BY SGT. F. ORTIZ WHO ADVISED HE THAT HE HAD A KNOWN AND RELIABLE INFORMANT WHO HAD INFORMATION RELATIVE TO THE DEATHS OF RICARDO TURNER AND LAMONT FIELDS. SGT. ORTIZ STATED THAT THIS INFORMANT HAS WORKED WITH HIM FOR A PERIOD OF SEVERAL YEARS AND THAT HE HAS GIVEN INFORMATION RELATIVE TO HOMICIDES, ROBBERIES, BURGLARIES, AND NARCOTICS THAT HAS PROVEN TO BE TRUE AND ACCURATE AND THAT HAS RESULTED IN ARRESTS AND SUBSEQUENT CONVICTIONS IN A COURT OF LAW.

DURING THAT SAME WEEK, SGT. ORTIZ AND HIS INFORMANT DID MEET WITH SGT. W. McCOY AND THIS DETECTIVE AT THE INVESTIGATIVE UNIT OF THIS DEPARTMENT. DURING THIS MEETING, SAID KNOWN AND RELIABLE INFORMANT RELATED THE FOLLOWING FACTS AND CIRCUMSTANCES TO THESE INVESTIGATORS:

DURING THE WEEK OF OCTOBER 21, 1990 OR OCTOBER 28, 1990, HE WAS IN DISCUSSION WITH A MALE WELL KNOWN TO HIM AS MICHAEL CALDWELL. HE STATED THAT HE KNEW MICHAEL CALDWELL'S STREET NAME TO BE "BULLET" AND THAT HE HAS BEEN AN ASSOCIATE OF CARDWELL FOR SEVERAL YEARS. FURTHER, SAID INFORMANT DID IDENTIFY NEW HAVEN POLICE DEPARTMENT PHOTOGRAPH NUMBER 44065 AS BEING THAT INDIVIDUAL KNOWN TO HIM AS MICHAEL CARDWELL, AKA "BULLET". NEW HAVEN ARRESTEE PHOTOGRAPH NUMBER 44065 IS, INFACT, ONE MICHAEL CARDWELL, DATE OF BIRTH 11/20/68. DURING THIS DISCUSSION BETWEEN THE INFORMANT AND CARDWELL, CARDWELL DID TELL THE INFORMANT THAT HE DID KILL BOTH RICARDO TURNER AND LAMONT FIELDS. ACCORDING TO THE INFORMANT, CARDWELL SAID THAT HE AND HIS BROTHER VINCENT, WENT TO TURNER AND FIELDS APARTMENT TOGETHER. ONCE OUTSIDE OF THE APARTMENT, VINCENT STAYED OUTSIDE WHILE MICHAEL CARDWELL WENT INTO THE APARTMENT. VINCENT WAS SUPPOSED TO WHISTLE WHEN THERE WAS NO APPARENT ACTIVITY ON THE STREET. THIS WAS THE SIGNAL FOR MICHAEL CARDWELL THAT HE WAS CLEAR TO COMPLETE HIS INTENDED TASK. MICHAEL CARDWELL TOLD THE INFORMANT THAT HE WAS LET INTO THE APARTMENT BY RINGING THE DOORBELL AND BEING BUZZED IN. UPON WALKING UP TO THE SECOND FLOOR, TURNER'S DOOR WAS ALREADY OPEN AND HE, CARDWELL WALKED IN. ACCORDING TO THE INFORMANT, CARDWELL SAID THAT HE WALKED IN AND FOUND TURNER AWAKE IN THE BEDROOM WITH LAMONT

SIGNED: [signature]  DATE: 1-24-90  PAGES 1/2

THIS REPORT IS SIGNED UNDER THE PENALTY PROVIDED BY STATE LAW FOR MAKING A FALSE STATEMENT.

SUBSCRIBED AND SWORN TO BEFORE ME THIS ___ DAY OF ___ 19__

SIGNED ___  ☐ NOTARY PUBLIC  ☐ 1.24 CGS

Defendant's Identification Exhibit 30: Police Report Re: Confidential Informant

EXHIBIT J →

CASE/INCIDENT REPORT

CONTINUATION PAGE

111567

FIELDS ASLEEP IN THE BED. CARDWELL TOLD THE INFORMANT THAT HE SHOT FIVE TIMES, KILLING TURNER FIRST AND THEN LAMONT FIELDS WHILE HE LAYED IN BED. CARDWELL THEN IMMEDIATELY FLED MEETING HIS BROTHER VINCENT OUTSIDE. THE INFORMANT SAID THAT MICHAEL CARDWELL WAS LIVING AT THE THREE JUDGES MOTEL LOCATED ON WHALLEY AVENUE NEAR THE WOODBRIDGE TOWN LINE. HE SAID THAT MICHAEL HAD BEEN IN AND OUT OF NEW HAVEN SEVERAL TIMES SINCE THE MURDERS. THE INFORMANT NOTED THAT MICHAEL CARDWELL'S FATHER, ARNOLD SPEARS, AKA "PIGGY" AND HIS BROTHER VINCENT WERE STILL SELLING NARCOTICS IN THE CONGRESS AVENUE AND ARCH STREET AREA.

DURING THE WEEK OF NOVEMBER 11, 1990, THIS DETECTIVE DID CONDUCT RESEARCH WITH THE NEW HAVEN POLICE DEPARTMENT NARCOTICS ENFORCEMENT UNIT AND WAS TOLD THAT ARNOLD SPEARS WAS STILL INVOLVED IN THE SALE OF NARCOTICS IN THE AREA OF CONGRESS AVENUE AND ARCH STREET. FURTHER, SPEARS AND MICHAEL CARDWELL WERE ARRESTED THE PAST SUMMER PURSUANT TO AN INVESTIGATION BY THAT UNIT CONCERNING THEIR NARCOTIC INVOLVEMENT. ALSO, VINCENT WAS IDENTIFIED BY THOSE MEMBERS OF NHPD AS ANTHONY V. CARDWELL. THIS DETECTIVE DID SHOW THE INFORMANT NEW HAVEN POLICE DEPARTMENT ARRESTEE PHOTOGRAPH NUMBER 30344. SAID INFORMANT STATED THAT PHOTOGRAPH NUMBER 30344 WAS THAT INDIVIDUAL KNOWN TO HIM AS VINCENT, MICHAEL CARDWELL'S BROTHER. NEW HAVEN POLICE DEPARTMENT ARRESTEE PHOTOGRAPH NUMBER 30344 IS, INFACT, ANTHONY V. CARDWELL, DATE OF BIRTH 12/27/52.

DURING THE WEEK OF NOVEMBER 18, 1990, THIS DETECTIVE DID RESPOND TO THE THREE JUDGES MOTEL LOCATED AT 1560 WHALLEY AVENUE, NEW HAVEN, CONNECTICUT WHERE I DID SPEAK WITH THE MANAGER MR. HASMUKH JARIWALA. MR. JARIWALA SAID THAT A CARDWELL FAMILY HAD INFACT RENTED A ROOM AT THE MOTEL IN OCTOBER AND STAYED A SHORT WHILE BEFORE LEAVING ON OCTOBER 25, 1990. THIS DETECTIVE THEN RESPONDED TO THE REGAL INN LOCATED AT 1605 WHALLEY AVENUE, NEW HAVEN, CONNECTICUT. THERE, I MET THE CLERK, SANDY DHARCHOLIC, WHO STATED THAT SHE HAD A MICHAEL CARDWELL, REGISTERED TO ROOMS AT THAT LOCATION ON NOVEMBER 1, 1990, NOVEMBER 2, 1990, NOVEMBER 8, 1990 TO NOVEMBER 9, 1990, AND AGAIN ON NOVEMBER 17, 1990 TO NOVEMBER 18, 1990. THAT MICHAEL CARDWELL LISTED HIS CONNECTICUT LICENSE NU AS ZJ604/5424, EXPIRATION OF 11/20/90. THIS DETECTIVE DID CONDUCT A MOTOR VEHICLE CHECK OF THAT LICENSE NUMBER AND FOUND THAT IT DID COME BACK TO A MICHAEL CARDWELL, DATE OF BIRTH 11/20/68, OF 358 ORCHARD STREET, NEW HAVEN, CONNECTICUT. THIS DETECTIVE DID KNOW CARDWELL TO HAVE LAST RESIDED AT 358 ORCHARD STREET, NEW HAVEN, CONNECTICUT AS SAME WAS LISTED AS SUCH ON HIS MOST RECENT ARREST INFORMATION SHEET.

DURING THE WEEK OF NOVEMBER 18, 1990, DETECTIVE MAHER AND SGT. McCOY DID AGAIN MEET WITH THE KNOWN AND RELIABLE INFORMANT. THE INFORMANT SAID THAT WHILE AGAIN IN CONVERSATION WITH CARDWELL (MICHAEL) THIS WEEK, CARDWELL TOLD THE INFORMANT THAT HE KILLED TURNER BECAUSE HE DID HIM WRONG. THE INFORMANT UNDERSTOOD THIS TO IMPLY THAT CARDWELL WAS NOT HAPPY ABOUT THE CLOSE RELATIONSHIP BETWEEN TURNER AND FIELDS. THE INFORMANT SAID THAT HE WAS WELL AWARE OF CARDWELL BEING CLOSELY ASSOCIATED WITH TURNER BECAUSE OF A NARCOTIC OPERATION THAT HAS RUN BY THE TWO, BUT THE INFORMANT SAID THAT HE HAD A FEELING THAT MICHAEL CARDWELL MAY HAVE BEEN INVOLVED PHYSICALLY WITH TURNER. THE INFORMANT ALSO SAID THAT MICHAEL CARDWELL TOLD THE INFORMANT THAT THE GUN USED TO KILL BOTH TURNER AND FIELDS WAS AT HIS GIRLFRIENDS HOUSE IN NEW BRITAIN, CONNECTICUT. THE INFORMANT SAID THAT HE KNEW CARDWELL, TO HAVE A GIRLFRIEND IN NEW BRITAIN BUT DID NOT KNOW HER NAME OR WHERE SHE LIVED. THE INFORMANT ALSO SAID THAT HE BELIEVED THEY HAD A CHILD TOGETHER.

THIS REPORT IS SIGNED UNDER THE PENALTY PROVIDED BY STATE LAW FOR MAKING A FALSE STATEMENT.

SIGNED: [signature]
DATE: 11-24-90  PAGES: 2/2

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____ 19 ___

☐ NOTARY PUBLIC   ☐ 1-24 CGS
SIGNED