Scott Lewis, #137682

v

Commissioner of Corr.

Prisoner

FILED

3:03 CV 196 (RNC) (DFM)

2008 FEB 19 P 1:41

U.S. DISTRICT COURT
HARTFORD, CONN

February 12, 2008

"Request For An Evidentiary Hearing"

Pursuant to 28 U.S.C Section 2254(e)(2)(ii), the Petitioner, Scott Lewis, Moves this Honorable Court, Chief Judge Robert N. Chatigny, For an Emergency Evidentiary Hearing in the Interest of Justice:

I. BASIS

The Petitioner has "New Evidence" in support of the instant petition before the court.

(4)

COUNTS

I.    SUPPRESSION OF EVIDENCE

ON JANUARY 30th, 2007 IT WAS DISCOVERED THAT THE STATE'S KEY WITNESS, QUIL RUIZ, ADMITTED UNDER OATH THAT "HE DID IN FACT HAVE AN AGREEMENT WITH THE STATE IN EXCHANGE FOR HIS CRIMINAL TRIAL TESTIMONY AGAINST THE PETITIONER". THIS EVIDENCE CORROBORATE'S THE TESTIMONY OF FORMER LT. MICHEAL J. SWEENEY THAT'S INSTANTLY BEFORE THIS COURT, AND GOES TO ESTABLISH THE CLAIM RAISED① IN COUNT ONE OF THE INSTANT PETITION.

FOOTNOTE

1- THE PETITIONER FILED A [SECOND] STATE HABEAS APPLICATION ALLEGING THIS NEW FACT THAT WAS DENIED FEBRUARY 5, 2008. THE PETITIONER INCLUDES THE DECISION OF THAT COURT "AS REFERENCE ONLY" TO THIS COURT CONCERNING THE [EVIDENCE] IN QUESTION. (SEE PAGE 14 SECTION V OF DECISION ATTACHED).

THE RECORD BEFORE THIS COURT WOULD SHOW THAT QUIL RUIZ, DENIED[2] SUCH AN AGREEMENT AT THE PETITIONER'S CRIMINAL TRIAL, AND THIS AGREEMENT WAS ALSO AN ASPECT THAT THEN DETECTIVE SWEENEY[3] WITHHELD.

## II. PERJURY CLAIM

THE JANUARY 30, 2007 ADMISSION; MENTIONED ABOVE PROVES AND SUPPORT THE PETITIONER'S PERJURY CLAIM BEFORE THIS COURT AS WELL.[4]

FOOTNOTE

2- SEE PROBABLE CASE TRANSCRIPT DATED MARCH 16, 1995 T.P 45. CRIMINAL TRIAL TRANSCRIPT DATED APRIL 25, 1995 T.P 129-136 (ATTACHED) A2 AND A3.

3- * ALSO SEE RECORD APPENDIX J ( PETITIONER'S REPLY BRIEF TO THE STATE OF CONNECTICUT APPELLATE COURT PAGE 5) AND PETITIONER'S SUPPLEMENTAL BRIEF TO THIS COURT DATED NOVEMBER 2, 2006.

## III.    THIRD-PARTY CONFESSION

THE PETITIONER HAS "NEW EVIDENCE" THAT PLACED MICHAEL CARDWELL [5] AT THE CRIME SCENE AT THE TIME IN QUESTION. ON JUNE 9, 2005 VIA AN AGREEMENT WITH STATE PROSECUTORS; DIANE BASILICATO, A STATE'S WITNESS, IDENTIFIED MICHAEL CARDWELL AS THE PERSON SHE ENCOUNTERED "WHISTLING" PRIOR TO HEARING THE GUNSHOTS THAT CLAIMED THE DEATHS OF TURNER AND FIELD'S. SHE ALSO IDENTIFIED HIM AS SUCH IN OPEN COURT ON JANUARY 11, 2008 [6]. MICHAEL CARDWELL IS THE SUBJECT OF THE THIRD-PARTY CONFESSION BEFORE THIS COURT.

FOOTNOTE

4-  THE EVIDENCE BEFORE THIS COURT, THE FEBRUARY 22, 1996 RECANTATION OF ovil, INDICATE'S THAT Ron COOPERATED WITH THE POLICE UNDER THE PREMISE THAT HE WOULD [NOT] BE CHARGED IN THE CASE. HOWEVER, HE TESTIFIED TO THE CONTRARY AT THE TRIAL OF THE PETITIONER.

*   ALSO NOTE ON PAGE 10 SECTION II OF THE MEMORANDUM ATTACHED AS A1 DISPLAYS THAT THE PERJURY CLAIM WAS NOT CONSIDERED ON THE MERITS by THAT COURT.

IV    Relief Requested

The Petitioner claims the evidence is relevant, material and new discovered — and would serve as a predicate bases to the current issues raised before this court. The 'claims' have been fully exhausted in the Petitioner's (First) state habeas application and are cognizable before this court under 2254(E)(2)(ii).

*Scott Lewis*

Petitioner
Pro-Se
McDougal C.I
1153 East Street South
Suffield CT 06080


FOOTNOTE

5- Although the informant account claims it was Vincent that was to whistle as a signal to Michell. It was Michell that confesses to his involvement with the crime.

6- See Basilicato's criminal trial testimony dated April 25, 1995 T.P 19-23 attached. Her full testimony is before this court and her identification for purposes of this request can be referenced on page 6 section I and page 15 section VI ... of the memorandum attached A1.

(5)

# Appendix

A1 — Memorandum Dated February 5, 2008

A2 — Probable Cause Transcript 3/16/9 T.P 45

A3 — Criminal Teal Transcript 4/25/95 T.P 129 - 136.

A4 — Criminal Teal Transcript 4/25/95 Diane Basdicato T.D 1-4, 16-24

NO. CV 06 4001783S : STATE OF CONNECTICUT

SCOTT LEWIS : SUPERIOR COURT

v. : JUDICIAL DISTRICT OF TOLLAND

WARDEN : FEBRUARY 5, 2008

## Memorandum of Decision

The petitioner was tried and convicted of two counts of murder and two counts of felony

murder in 1995. He received a sentence of 120 years. The Supreme Court, while remanding the

case with orders to combine the intentional and felony murder convictions, otherwise affirmed

the convictions. *State v. Lewis*, 245 Conn. 779, 717 A.2d 1140 (1998). The petitioner filed a

petition for a writ of habeas corpus in 1999, which was tried in 2001. The court, *Zoarski, J.T.R.*,

denied the petition and the petitioner's appeal was dismissed. *Lewis v. Commissioner of*

*Correction*, 73 Conn. App. 597, 808 A.2d 1164 (2002), cert. denied, 262 Conn. 938, 815 A.2d

137 (2003). The petitioner, now pro se, has filed a second petition for habeas corpus relief.

I

The Supreme Court summarized the facts at trial as follows: "In 1990, the defendant,

Stefon Morant and Jeff Rochler were partners engaged in the sale of drugs from a house on Clay

Street in New Haven. Ovil Ruiz, the state's key witness, was involved in various aspects of the

drug operation and had known the defendant for approximately seven years. As part of this drug

operation, one of the victims, Ricardo Turner, stored drugs and drug money in his second floor

apartment at 634 Howard Avenue, New Haven. The other victim, Edward Lamont Fields, was

Turner's roommate.

1

A1

"Prior to and during the evening of October 10, 1990, Ruiz and Jose Roque, who was also involved in the drug operation, overheard a discussion between the defendant and Morant in which they discussed the possibility that Turner might abscond with the money and drugs in his apartment and leave the area. On the night of October 10, the defendant, Morant and Ruiz drove by the victims' apartment building in a rental car to conduct surveillance. Upon arriving back at the Clay Street house, the defendant told Ruiz to get certain guns that were hidden in the house. Ruiz retrieved a .38 caliber handgun and a .357 caliber handgun, and gave both weapons to the defendant.

"The defendant then put both weapons in his own vehicle, and he, Morant and Ruiz drove to Howard Avenue. They arrived at the victims' apartment building at approximately 4 a.m., and the defendant parked his car a short distance away at the corner. Upon arrival, the defendant turned to Morant and Ruiz and said, 'look, whatever happens, we keep it between us.' The defendant then told Ruiz to keep the car running while the defendant and Morant went upstairs to get the money and drugs. The defendant was armed with both guns as he and Morant walked toward the victims' apartment building.

"The building contained five apartments on three floors: two apartments on each of the first and second floors, and a single apartment on the third floor. The victims' apartment was one of the two on the second floor, located at the rear of the building. The building was secured by a locked front security door and a locked back door. Entry into the building required using an intercom system and being 'buzzed in' through the front security door by one of the tenants.

"The jury also reasonably could have found that the defendant and Morant entered the building. They then proceeded to the second floor where they entered the victims' apartment and

2

the defendant shot both victims to death with the .357 caliber handgun. They then ran through the hall, down the stairs and out the front door.

"Meanwhile, shortly after hearing several gunshots, Ruiz, who had switched to the driver's seat of the defendant's car, saw the defendant and Morant running. He made a U-turn, picked them up in front of Turner's building, and immediately drove away. The defendant was carrying a brown bag labeled 'Community Bank,' which was 'bulging' with cash, and Morant carried a blue gym bag labeled 'Puma,' which was full of drugs. At that time, the defendant was armed with the .357 caliber handgun, and Morant was armed with the .38 caliber handgun.

"As Ruiz drove away, the defendant and Morant insisted that Morant drive because Ruiz was driving erratically. Ruiz switched to the back seat, where he confirmed the contents of the bags. After a short while, the defendant asked Morant whether he thought they were dead, and Morant answered, 'don't worry about it, forget about it, they got what they deserved.' The three men then returned to Clay Street, and later that morning turned over all of the money to Rochler.

"On the same morning of October 11, 1990, Diane Basilicato, who lived in the second floor front apartment of the victims' apartment building on Howard Avenue, returned home and entered her apartment shortly after 4 a.m. She did not hear the buzzer system operate or anyone enter the building after she had entered. Within a few minutes of entering her apartment, Basilicato heard five or six loud 'bangs,' and heard two people running down the stairs and out of the building.

"Shortly thereafter, the tenant in the first floor rear apartment called the police to report hearing a disturbance and a 'loud thump' from the second floor apartment, followed by the appearance of a bullet hole in the ceiling of her apartment. The police were dispatched to the

3

building at 4:34 a.m., and arrived approximately two minutes later. The police found both the front security door and the back door locked.

"Basilicato admitted the police into the building through the use of the intercom system. Upon arrival, the police entered the second floor rear apartment and found the bodies of the victims. Turner, clad only in underwear, was lying face down on the bed. He had been shot four times, including one shot to the top of the head that split his brain into three pieces, one to his back, and one to his side. Fields, also clad only in underwear, was lying on the floor next to the bed. He had been shot twice in the back from a distance of no more than eighteen inches and had bled to death from his wounds. The ballistics investigation disclosed that all the bullets had been fired from a .357 caliber handgun. There was no gun found near the bodies of the victims.

"Several weeks after the shootings, both Ruiz and Roque saw the defendant discard the .357 caliber handgun into the Mill River under the Chapel Street Bridge in New Haven, when all three were present in the park at Chapel Street. After questioning Ruiz in January, 1991, the police searched the river near the Chapel Street park for the .357 caliber handgun that the defendant had thrown in the river, but were unable to recover it.

"At the trial, the defendant raised an alibi defense, claiming that he had worked the entire night at the Minuteman Press on Grand Avenue in New Haven, which was partly owned by Rochler. The jury found the defendant guilty of both murder and felony murder for the death of Turner and Fields." (Footnote omitted.) *State v. Lewis,* supra, 245 Conn. 782-85.

## II

The court has liberally allowed the petitioner, who is pro se, to amend his petition twice, despite the petitioner's apparent failure to effectuate timely service of the first amendment

request and the late filing of the second request. The court granted the second request for the limited purpose of allowing the petitioner to conform his pleadings to the evidence. The respondent has not responded to the second amended petition, but the court will construe the defenses in the respondent's return to the first amended petition to extend to any new claims.

In count one of the second amended petition (petition), the petitioner alleges that his criminal trial attorney, John R. Williams, rendered ineffective assistance of counsel. The petitioner claims that Williams failed to investigate other suspects - particularly Mark Smith, Milton or "Eric" Johnson, Michael Cardwell, and Vincent Cardwell - who he claims were actually responsible for the murders.

The respondent asserts in its return that the petitioner has abused the writ of habeas corpus and procedurally defaulted by failing to include all counts and claims, including the ineffective assistance of counsel claim, in his 1999 petition.  It is not necessary, however, to determine whether the petitioner's repeated filings have reached the level of abuse of the writ.[1]  It is sufficient in this case to hold that the petitioner has procedurally defaulted and he therefore must show both cause and prejudice for his failure to raise the ineffective assistance of counsel claim in his first habeas petition.  See *Duperry v. Solnit*, 261 Conn. 309, 331-32, 803 A.2d 287 (2002); *Johnson v. Commissioner of Correction*, 218 Conn. 403, 419, A.2d (1991); see also *Henderson v. Commissioner v. Correction*, 104 Conn. App. 557, 570, 935 A.2d 162 (2007) (cause and prejudice analysis applies to successive habeas petitions).

"Cause turns on whether the [petitioner] can show that some objective factor external to

---

[1]The respondent represents that the petitioner also filed another petition in 2003 involving a DNA evidence claim, and a motion to correct an illegal sentence, an appeal from the denial of which is pending in the Appellate Court.

the defense impeded counsel's efforts to comply with the State's procedural rule." (Internal quotation marks omitted.) *Thorpe v. Commissioner of Correction*, 73 Conn. App. 773, 780, 809 A.2d 1126 (2002). The petitioner claims that he had cause to delay the presentation of this claim because it was not until 2005 that Diane Basilicato, in response to further investigation by the state's attorney, identified a person who had been standing outside the apartment building near the time of the murders, and who whistled to get someone's attention, as Michael Cardwell. The petitioner contends that this evidence corroborates an informant's statement that Cardwell was involved in the murders.

This evidence is not cause for the failure to raise ineffective assistance of counsel in the first petition in 1999. The petitioner labels this evidence as "newly discovered" in count six of the petition. If the evidence was in fact newly discovered then, by definition, Williams could not have discovered it "prior to the petitioner's criminal trial by the exercise of due diligence." (Internal quotation marks omitted.) *Johnson v. Commissioner of Correction*, 101 Conn. App. 465, 470-71, 922 A.2d 221 (2007). Thus, the newly discovered evidence could not contribute to the petitioner's argument that the performance of Williams was deficient, which is an essential element of ineffective assistance. See *Ledbetter v. Commissioner of Correction*, 275 Conn. 451, 458, 880 A.2d 160 (2005), cert. denied, 546 U.S. 1187 (2006); see also *Williams v. Commissioner of Correction*, 100 Conn. App. 94, 103-04, 917 A.2d 555, cert. denied, 282 Conn. 914, 924 A.2d 140 (2007) (the deficient performance prong of an ineffective assistance claim "goes beyond a simple due diligence test . . . .").

Similarly, the newly discovered evidence would not assist in proving prejudice stemming from any ineffective assistance of counsel, because prejudice in this context is proof that "there is

6

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. If, as the petitioner contends, the identification by Basilicato was newly discovered evidence not available at the time of the criminal trial in 1995, then it could not have constituted proof that the result of the criminal trial would have been different. Thus, the petitioner cannot establish cause for his failure to raise ineffective assistance of counsel in his first petition.

Moreover, the petitioner cannot prove prejudice resulting from his procedural default by showing that he has a meritorious ineffective assistance of counsel claim. At the habeas trial, Williams understandably had only a limited memory of his actions because his representation of the petitioner had begun some sixteen years earlier and the trial had taken place approximately twelve years earlier. The petitioner produced no proof that Williams had failed to investigate any particular lead, file an appropriate motion, or take any other specific action. Williams could not remember whether or not he had shown Basilicato photographs of the person she saw on the street on the night of the murder, but there was no evidence to prove that Williams had not done so.[2] There was also no evidence that the petitioner had given Williams any specific information that he failed to pursue. On the other hand, the evidence did establish that Williams requested discovery from the state of police reports and witness statements regarding the investigation. At trial, Williams attempted to admit a police report containing statements of the informant concerning an alleged confession by Michael Cardwell that also implicated Vincent Cardwell as a lookout. See *State v. Lewis*, supra, 245 Conn. 793-809. Williams also made numerous efforts,

---

[2]Diane Basilicato testified at the habeas trial and also could not remember whether Williams had asked her to make a photo identification.

although ultimately unsuccessful ones, to locate and subpoena Michael Cardwell. Id., 796-97. Thus, from all that appears, Williams represented the petitioner competently in investigating other suspects and producing related evidence. The petitioner has failed to prove that defense counsel's representation "fell below an objective standard of reasonableness . . . ." in any specific way. *Duperry v. Solnit*, supra, 261 Conn. 335. Thus, the petitioner cannot prove prejudice from his failure to raise ineffective assistance of counsel in his first petition. For this reason, and because the petitioner has also failed to establish cause, the claim of ineffective assistance of counsel is not properly before the court. Id., 331-32.

III

In count two of the petition, the petitioner claims that there was ineffective assistance of appellate counsel because his appellate attorney, assistant public defender Lauren Weisfeld, did not adequately inform the Supreme Court that the informant had died so as to support a claim that the trial court erred in denying admission to the police report containing Michael Cardwell's alleged confession. In count four, the petitioner alleges prosecutorial misconduct because the state knowingly solicited false testimony at trial suggesting that the informant was still alive and did not inform the Supreme Court on appeal of the informant's death.

As the respondent alleges, these claims are also not properly before the court because the petitioner cannot show both cause and prejudice for his failure to include them in his first habeas petition. The petitioner presented no evidence of cause. There can be none. All of the evidence relied upon by the petitioner in support of both claims, which consists largely of the record from the petitioner's trial and that of co-defendant Stefon Morant tried before him; see *State v. Morant*, 242 Conn. 666, 701 A.2d 1 (1997); was fully available at the time of the 2001 habeas

8

hearing.

In addition, because these claims are of no merit, there is no prejudice from the petitioner's failure to raise this claim earlier. With regard to the claim of prosecutorial misconduct at trial, it is true that the informant had died before the time of the petitioner's criminal trial and that the prosecutor nonetheless solicited testimony suggesting that the informant "might . . . still live in New Haven." *State v. Lewis*, supra, 245 Conn. 796. However, the petitioner produced no evidence that the prosecutor remembered the fact of the informant's death or that the testimony was in any other way the product of knowing deceit of the court.[3]

There is also no prejudice stemming from any failure of the petitioner's appellate counsel or the appellate state's attorney, respectively, to inform the Supreme Court of the informant's death.[4] The question on appeal focused on whether the trial court had abused its discretion in denying admission to the alleged confession by Michael Cardwell to the informant, who in turn told a police officer, who in turn put the statement in a police report. The Supreme Court resolved the issue by concluding that, even assuming there were applicable hearsay exceptions for Cardwell's statement (as an admission against penal interest) and the police report (as a business record), the informant's statement to the officer did not satisfy the residual exception to

---

[3]The prosecutor was David P. Gold, who is now a judge of the Superior Court. Judge Gold was also the prosecutor in the earlier Morant trial when the death certificate of the informant, Frank Graham, was admitted as an exhibit. The petitioner made no attempt to call Judge Gold as a witness in the habeas trial or in any other way to obtain any testimony from him concerning his recollection of the informant's status during the petitioner's criminal trial.

Further, the petitioner presumably had access to the death certificate of Frank Graham as a public record at the time of his criminal trial and could have introduced it as an exhibit then.

[4]The state was represented on appeal and in all the petitioner's postconviction proceedings by assistant state's attorney Christopher T. Godialis.

9

the hearsay rule, which was the only arguably applicable exception for this statement. Id., 801. The Court first found that, at trial, the defendant did not show that the informant was unavailable. Id., 806. See also note 3 supra. This failure of proof on the defendant's part would not have been cured by the presentation of evidence on appeal by either the petitioner's appellate counsel or the state's attorney that the informant had died. The Supreme Court's task was to review the decision of the trial court, not to find facts on its own. Presentation of evidence on appeal was irrelevant to whether the trial court ruled correctly on the evidence before it.

Moreover, even if the petitioner could have shown that the informant was unavailable, he would also have to have established, in order to satisfy the residual exception, that the informant's statement was trustworthy. Id., 805. The Supreme Court, however, concluded that the petitioner failed to do so. Id., 806-09. Further, the petitioner would have to have shown that there were applicable exceptions for the police report and, more importantly, for Cardwell's statement - issues that the Supreme Court did not reach - that would have justified admission of these separate hearsay statements. Id., 802-04, 809. Thus, the petitioner has not demonstrated that, even if appellate counsel had made the Supreme Court aware of the informant's death, the outcome of the appeal would have been different. Accordingly, because the petitioner has failed to establish both cause and prejudice, counts two and four are not properly before the court.

IV

In count three of the petition, the petitioner claims that there was "newly discovered evidence" showing that his "conviction was the product of perjured testimony." The petitioner does not allege, at least in this count, that the perjured testimony came about through any intentional action by the state, or through any deficient performance by his trial counsel, but

10

instead simply alleges an unadorned newly discovered evidence count.[5]  While such a theory would support a petition for a new trial; see *Williams v. Commissioner of Correction*, supra, 100 Conn. App. 94, 100-01; it is apparently not an independent claim upon which relief can be granted in a habeas petition.  The court will, however, liberally construe the count to allege an actual innocence claim because newly discovered evidence is a component of such a claim; *Johnson v. Commissioner of Correction*, supra, 101 Conn. App. 470-71; and because the implication of the petitioner's allegations is that the conviction by the jury was inaccurate.

An actual innocence claim requires that the petitioner "establish by clear and convincing evidence that, taking into account all of the evidence — both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial — he is actually innocent of the crime of which he stands convicted. Second, [he] must also establish that, after considering all of that evidence and the inferences drawn therefrom as the habeas court did, no reasonable fact finder would find the petitioner guilty of the crime." (Internal quotation marks omitted.)  Id., 470.  In this case, the petitioner's claim concerns the testimony of Ovil Ruiz, the accomplice who supplied the key evidence of the petitioner's involvement in the murders.  The petitioner's newly discovered evidence consists of a statement by Ruiz at the 2007 habeas hearing for accomplice Stefon Morant that the prosecutor at the criminal trial had told Ruiz that, if he testified, the state would not prosecute him for the homicides.  The petitioner contends that this testimony renders false Ruiz's testimony in the petitioner's criminal trial that he had no agreement with the state.

The petitioner also relies on a letter that purports to be from Ruiz to the petitioner in which Ruiz essentially recants his trial testimony.  According to the letter and an accompanying

_____

[5]The petitioner alleges that the state suppressed this evidence in count five.

F.B.I. report, however, the letter appears to be dated in 1996 or 1998. It would appear that the petitioner had an opportunity to present this letter in his 1999 petition, which also claimed that Ruiz committed perjury. (Exhibit 43, pp. 41-45.) The petitioner has not presented any cause for failing to present this aspect of his claim in his first petition. Nor does this evidence appear to be "newly discovered." Therefore, this aspect of the claim is not properly before the court.

In any case, the claimed new evidence does not meet the standards necessary to show that the petitioner is actually innocent of either murder. Although the 2007 testimony by Ruiz from Morant's habeas hearing would in theory have provided a basis to impeach the credibility of the key state's witness in the murder trial, the testimony is suspect because it comes twelve years after the fact. Further, Ruiz pleaded the fifth amendment on cross-examination during Morant's habeas hearing and the respondent did not have an opportunity to question Ruiz about his direct examination.[6] In any event, Ruiz's testimony about a deal with the state certainly does not directly show that the petitioner did not commit these crimes.

The 1996/1998 letter is also of dubious credibility. It is unsworn. Ruiz was not available at the hearing in the present case and thus was not subject to cross-examination. Furthermore, as the Appellate Court has detailed in the appeal from the denial of Morant's petition for a new trial, Ruiz has a long history of recanting and repudiating his recantations. See *Morant v. State*, 68 Conn. App. 137, 142, 151-54, 802 A.2d 93, cert. denied, 260 Conn. 914, 796 A.2d 558 (2002). All of these factors militate against considering the letter to be reliable evidence. Id., 159.

---

[6]

The habeas court, *DeMayo, J.T.R.*, nonetheless denied the respondent's motion to strike Ruiz's testimony. (Exhibit 43, pp. 43-44.) Ruiz also pleaded the fifth amendment in the petitioner's first habeas trial. See *Lewis v. Commissioner of Correction*, supra, 73 Conn. App. 597.

Thus, the court does not find that the evidence claimed to be newly discovered demonstrates the petitioner's actual innocence of the crimes of which he stands convicted. *Johnson v. Commissioner of Correction*, supra, 101 Conn. App. 470-71. Nor does this conclusion change if the court considers "both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial." (Internal quotation marks omitted.) Id., 470. The court draws support from the fact that the jury at the petitioner's criminal trial heard Ruiz testify, listened to Williams cross-examine Ruiz over the better part of three trial days, and nonetheless apparently found him credible.[7] As the Supreme Court observed: "The cross-examination into Ruiz' mental health was extensive, and lasted the entire morning of the second day of trial and continued into the third day of trial." *State v. Lewis*, supra, 245 Conn. 790. Williams also brought out during cross-examination that, after Ruiz gave the police a statement implicating the petitioner in the homicides, Ruiz had entered into two plea agreements on unrelated charges with the same prosecutor handling the homicides and that these plea agreements called for concurrent sentences and the dropping of several charges. Thus, even without the evidence from Morant's 2007 habeas hearing, Williams effectively cross-examined Ruiz for bias in favor of the state. Cross-examination further revealed that Ruiz had a tattoo of an executioner, that he was formerly a member of the Latin Kings gang, that in prison he had started fires, acquired a homemade knife, and made threats to prison guards, and that he had told numerous lies to his mental health treaters. *State v. Lewis*, supra, 245 Conn. 790. Given these

---

[7]Similarly, the jury in Morant's trial accepted Ruiz's version of the events notwithstanding extensive and revealing cross-examination of Ruiz. *State v. Morant*, supra, 242 Conn. 683-84. As the Supreme Court pointed out in *Morant*, there was significant corroboration of Ruiz's testimony. Id., 680.

strong attacks on Ruiz on cross-examination that evidently did not cause the jury to reject his testimony, it is unlikely that the jury would have rejected his testimony with the additional testimony that the petitioner proposes.

Moreover, the state corroborated Ruiz with the statement of Jose Rocque. The jury learned that Rocque had told the police that before the incident he had heard Morant and the petitioner discuss attacking the victims, that after the murders he heard the petitioner acknowledge committing the murders, and that also after the murders he saw the petitioner take a gun that looked like a .357 caliber from the trunk of a rental car and throw it into a river near a park in New Haven.

The fact that the jury accepted Ruiz's testimony despite vigorous cross-examination, and that there was independent corroboration of this testimony, leads the court to believe that the conviction by the jury was correct and that the additional evidence proposed by the petitioner, even if wholly admissible, would not have changed the outcome of the trial. For all these reasons, the petitioner has failed to establish by clear and convincing evidence that "he is actually innocent of the crime of which he stands convicted [and that] no reasonable fact finder would find the petitioner guilty of the crime." *Johnson v. Commissioner of Correction*, supra, 101 Conn. App. 470.

V

Count five of the petition alleges that "[t]he state suppressed the impeachment evidence of a deal with the state's witness, Ovil Ruiz." The only evidence of a "deal" with Ruiz, however, came from Ruiz's testimony at the Morant habeas hearing in 2007. The court has already indicated its belief that this testimony is suspect. Moreover, the petitioner did not produce any

14

state officials at the habeas trial in the present case in an attempt to prove that the state in fact "suppressed" evidence of an agreement with Ruiz at the criminal trial. Therefore, the petitioner has failed to prove the allegations in count five.

VI

The petitioner's final claim is that newly discovered evidence establishes his actual innocence of the murders. The main item of newly discovered evidence that the petitioner cites is the identification by Diane Basilicato in 2005 of the person who had been standing outside the apartment building near the time of the murders, and who whistled to get someone's attention, as Michael Cardwell. The petitioner once again contends that this evidence corroborates the informant's statement that Michael Cardwell was responsible for the murders.

This evidence, however, does not contribute significantly to a showing of actual innocence. The evidence that Basilicato identified Michael Cardwell as the person outside the apartment who had whistled tends to contradict the informant's statement that the petitioner sought to admit, which identified the whistler as Vincent, rather than Michael, Cardwell. Further, at the habeas hearing, Michael Cardwell testified and denied any responsibility for the murders. Clearly, the new evidence does not necessarily show that the petitioner was innocent of these crimes.

The court will construe the complaint liberally to combine this evidence with the other item of newly discovered evidence that the petitioner has introduced, which is the 2007 statement of Ruiz that he had received a deal from the state to testify. As stated above, however, this evidence is of questionable credibility. It also does not show that the petitioner did not commit the murders.

15

The other evidence that the petitioner cites is not newly discovered. The police report containing the informant's statement, along with the evidence of the police detention of Eric Johnson near the scene and at about the time of the crime, were fully available at the time of trial. Although the informant's statement was inadmissible at the jury trial, that fact stems from rules designed to insure the fairness, reliability, and trustworthiness of evidence considered by the fact finder. See *State v. Lewis*, supra, 245 Conn. 800-01. Its consideration by the habeas court remains subject to the same concerns. With those concerns in mind, the court cannot credit the informant's statement.

The petitioner had a trial by a jury in 1995, a direct appeal to our Supreme Court, a full habeas hearing in 2001, and an appeal from that hearing to the Appellate Court. See also note 1 supra. The new evidence presented by the petitioner does not disturb the court's confidence in the outcome of these proceedings or in any other way establish that the petitioner "is actually innocent of the crime of which he stands convicted [and that] no reasonable fact finder would find the petitioner guilty of the crime." (Internal quotation marks omitted.) *Johnson v. Commissioner of Correction*, supra, 101 Conn. App. 470. The people of the state are now entitled to due process of law.

## VII

The petition for a writ of habeas corpus is denied. Judgment shall enter for the respondent.

It is so ordered.

_Schuman, J._

Carl J. Schuman
Judge, Superior Court

16

PROBABLE CAUSE TESTIMONY OF OVIL RUIZ DATED MARCH 16,1995

45

Q    In Waterbury, what hospital did you go to?

     MR. GOLD:  I'm going to object to it, it's irrelevant.

     THE COURT:  Sustain the objection.

MR. WILLIAMS CONTINUES:

Q    Were all of those hospitals that you were sent to from the various jails you were in?

A    Yes.

Q    What did you do for these gangs?

     MR. GOLD:  I'm going to object to that, it's irrelevant.

     THE COURT:  Sustain the objection.

Q    What were the names of the gangs?

     MR. GOLD:  Objection, relevancy.

     THE COURT:  Sustain the objection.

MR. WILLIAMS CONTINUES:

Q    Now, what-- what kind of a deal do you have with the prosecutor for giving testimony in this case?

A    I have no deal.

Q    Well, you understand that you could-- you could be called an accessory to murder?

A    If that's what happens, happens.

Q    But, you've been told that you're not going to be charged with that, haven't you?

A    I haven't been told nothin'.

Q    You haven't been told a thing?  You haven't

A26

A-?1

NO. CR6-402583

| STATE OF CONNECTICUT | ) | SUPERIOR COURT |
| VS. | ) | J. D. OF NEW HAVEN |
| SCOTT LEWIS | ) | APRIL 25, 1995 |

BEFORE:   THE HONORABLE GEORGE W. RIPLEY, Judge


A P P E A R A N C E S:

    ON BEHALF OF THE PLAINTIFF:

    DAVID GOLD, ESQ.
    Supervisory Assistant State's Attorney


    ON BEHALF OF THE DEFENDANTS:

    JOHN G. WILLIAMS, ESQ.


JACKIE GONTAREK
Court Monitor

A-3

1  THE COURT:  Good morning, ladies and
2  gentlemen.  Madam Clerk, would you call the role,
3  please?
4  [ROLE OF JURY CALLED.]
5  THE COURT:  All right, Mr. Gold.
6  MR. GOLD:  Thank you, your Honor.  Good
7  morning, ladies and gentlemen.  Diane Basilicato,
8  please.

35

1                        O V I L   R U I Z

2    of 900 Highland Avenue, Cheshire, Connecticut, having

3    been duly sworn, was examined and testified as follows:

4

5               THE COURT:  Now, your first name is what?

6               THE WITNESS:  My real name, first name is

7        Ovil Ruiz.

8               THE COURT:  Okay.  How do you spell your

9        last name?

10              THE WITNESS: R-U-I-Z.

11              THE COURT:   Okay.  And you have an alias?

12              THE WITNESS:  Yes.

13              THE COURT:  And that's what?

14              THE WITNESS:  Augustin Castro.

15              THE COURT:  Augustus.

16              THE WITNESS:  Augustin.

17              THE COURT:  Augustin.  Castro?

18              THE WITNESS:  Yes.

19              THE COURT:  How do you spell that?

20              THE WITNESS:  C-A-S-T-R-O.

21              THE COURT:  All right, Mr. Gold.

22              MR. GOLD:  Okay.  Thank you, your Honor.

23

24                    DIRECT EXAMINATION

25    BY MR. GOLD:

26       Q    Sir, I'm going to ask you to keep your voice up

27    as best you can, all right?

36

A   Yes.

Q   The address that you gave of 900 -- was it Highland?

A   Highland.

Q   And that's in what town?

A   Cheshire.

Q   And what is at that address?

A   Correctional Institution.

Q   All right.  Are you currently an inmate at the Cheshire Correctional Institution?

A   Yes.

Q   All right.  And approximately how long have you been in continuously?

A   Continuously, I've been in Cheshire going on two years already.

Q   And before that were you in other correctional institutions?

A   Yes.

Q   All right. You mention that you use a name of Augustin Castro.  You use a name Ovil Ruiz.  Do you also use another name?

A   No.  Only George Melendez.  I used that one once.

Q   You used a George Melendez?

A   Yes, sir.

Q   Now, how old are you?

A   I'm twenty-one.

129

(Whereupon, the letter was marked as

State's Exhibit Q1 for identification.)

BY MR. GOLD:

Q    Now, let me ask you some additional questions, sir.  And this is the last area I'd like to cover with you.

You testified previously that you received twelve years suspended after six, and an additional year, so you're actually doing seven years, correct?

A    Yes.

Q    Have you received any promises from me that you're going to be released early for testifying?

A    No.

Q    What promises have you received from me?

A    None.

Q    Have you received any preferential treatment or any access to early release since you've been in jail?

A    No.

Q    In fact, how do you feel -- have you gotten any access yet to the Parole Board?

A    I went once and I got denied.

Q    Okay.  You were denied by the Parole Board?

A    Yes.

Q    How long ago was that?

A    October, last October.

Q    And you're still in jail now?

A    Yes.

130

Q    Have you gotten any reduction of your sentence?

A    No.

Q    At any point during your term?

A    No.

Q    In your own opinion, do you feel that you've gotten some sort of sweetheart deal in exchange for testifying?

THE COURT:  Mr. Gold, I see you shaking your head in a negative fashion.  The jury might conclude that you were signaling.  I know --

MR. GOLD:  I was shaking at Mr. Williams, actually, your Honor.

MR. WILLIAMS:  How he could be shaking at me.  I was blowing my nose.  I wasn't even paying attention to him, to be frank.

THE COURT:  I think Mr. Gold is simply doing that as a matter of habit, and it's not to indicate that he's suggesting any kind of an answer to the witness.

MR. GOLD:  I wasn't doing it intentionally.

BY MR. GOLD:

Q    Have you received any sort of arrangement from me, Mr. Ruiz, that caused you to testify in this way?

A    No.

Q    Did you receive anything from Detective Raucci when he took your statement back in '91 that caused you

131

1    to give the information you did?

2        A    No.

3        Q    Have you at anytime since you were first

4    approached by Detective Raucci received anything that you

5    felt was such that caused you to testify or give any sort

6    of statement in any special way?

7        A    No.

8        Q    At anytime during our meetings, have I ever

9    told you what to say in response to any questions?

10           MR. WILLIAMS:  I think that this is going

11           to be a self-serving declaration by counsel, your

12           Honor.

13           THE COURT:  I suspect it is, but I'm going

14           to allow it.  I'll assume you'll inquire into it.

15    BY MR. GOLD:

16        Q    Have I ever told you anything to say when you

17    testify or anything like that?

18        A    No.

19        Q    Why are you testifying today?

20           MR. WILLIAMS:  Objection.  It's

21           irrelevant, your Honor.  The State called him as a

22           witness and put him on the stand.

23           THE COURT:   Sustained.

24           MR. GOLD:  That's all I have.  Thank you.

25           THE COURT:  Mr. Williams.

26

132

## CROSS EXAMINATION

BY MR. WILLIAMS:

    Q    Your name is not, in fact, Ovil Ruiz, is it?

    A    No.

    Q    And when you got on that witness stand this morning and you raised your right hand, and you swore to tell the truth, and then answered the very first question, what is your name with the words Ovil Ruiz you were lying, weren't you?

    A    That's the name I'm incarcerated with.

    Q    That's not your name, is it?

    A    No.

    Q    As a matter of fact, it's your little brother's name, isn't it?

    A    Yes.

    Q    Your little brother is ten years younger than you, isn't he?

    A    Yes.

    Q    And that's his name, isn't it?

    A    Yes.

    Q    You're, in fact, named after your father, aren't you?

    A    Yes.

    Q    Your father's name is Augustin Castro, Sr., isn't that correct?

    A    Yes.

    Q    And contrary to what you said on the witness

1   stand, your father, Mr. Castro, was not in the City of

2   New Haven in October of 1990, was he?

3       A    What you talking about?

4       Q    You testified in answer to Mr. Gold's questions

5   --

6       A    Uh huh.

7       Q    -- that on the night of this incident that

8   you've been making your testimony, that you went over to

9   your father's house and got a half ounce of marijuana

10  which you got high on.  In fact, your father was in New

11  York City, in Queens, that night, wasn't he?

12      A    I was talking about my stepfather.

13      Q    Because, in fact, your father, Augustin Castro,

14  Sr., has lived in Queens ever since before you were born?

15      A    Yes.

16      Q    He doesn't come to New Haven?

17      A    No.  Yes, he does.

18      Q    To visit occasionally?

19      A    Yes.

20      Q    But he's always lived in Queens?

21      A    Yes.

22      Q    And he was in Queens, as far as you know,

23  throughout the month of October of 1990, wasn't he?

24      A    Yes.

25      Q    And the name Augustin Castro, which you say you

26  don't use, as a matter of fact is also the name of your

27  child, isn't it?

134

A    I got a kid, but it's not named under my name.

Q    It is not named after you?

A    My kid got nothing to do with this case.

Q    In fact, you named your child after yourself and your father, didn't you?  Isn't that right.

A    I wish not to talk about my kid.

Q    Just answer the question.

A    No.

Q    You did not.  So, when you told people at the jail, the mental health workers and the guards at the jail that you had a child, who was also named Augustin Castro, III; that was a lie?

A    I don't tell people who my family -- if I tell somebody about my family, I only talk about my family.

Q    Well, is your answer then that you never made such a statement?  Is that what you're saying.  Mr. Castro?

A    Yes.

Q    So, you never made such a statement, is that right?

A    For your information, I don't got a son, I got a daughter.

Q    Oh, I see.  So, if you ever told somebody you had a son, that wouldn't have been the truth, is that correct?

A    That's correct.  I don't want my family to be involved in my mess.

1      Q   I see.  Now, you testified, Mr. Castro, that

2   you are serving two consecutive sentences, is that right?

3   One sentence in which you got twelve years suspended

4   after six years, and one sentence in which you got an

5   extra year, is that right?

6      A   Yes, sir.

7      Q   And you just testified many, many times in

8   answer to a long series of questions by Mr. Gold here

9   that you got no sweetheart deals, no special

10   consideration, no payoff for working for the State in

11   connection with this case, is that right?

12           MR. GOLD:  Object to the form of the

13      question.

14           THE COURT:  I'm going to sustain that.  I

15      don't think there's any employment relationship, Mr.

16      Williams.

17           MR. WILLIAMS:  Yes, I think that's right.

18      That's what he said in answer to Mr. Gold's

19      question.  I'm just going over what Mr. Gold asked.

20           MR. GOLD:  No, I still object to the

21      question.

22           THE COURT:  I think the phraseology was

23      inappropriate.  You may proceed.

24   BY MR. WILLIAMS:

25      Q   In other words, it's your claim that you didn't

26   receive anything to encourage you to make the claims that

27   you have made against Scott Lewis, is that right?

136

A    That's right.

Q    Okay.  And is that the truth?

A    It's the truth, because if it was such a sweet deal, I would have been home two years ago.

Q    I see.  Well, that, of course, was what Detective Raucci did tell you back in '91, wasn't it?

A    No, that's what I know.  Because I studied my case, and I got more than fifty percent of my time in.

Q    Detective Raucci told you back in 1991 that if you would tell him what he wanted you to say that you wouldn't have to go to jail, didn't he?

A    He didn't tell me that.

Q    He didn't tell you that?

A    No.

Q    Did you ever tell anybody that he said that to you?

A    No.  Why don't you bring Detective Raucci in?

Q    You were arrested in connection with that assault charge in January of '91?

A    Yes.

Q    And that was the case in which you received this sentence in which you got a suspended sentence after you served a total of six years, is that right?

A    Yes.

Q    And that crime for which you got the six-year sentence was an attempted execution, wasn't it?

MR. GOLD:  I object to any questions

NO. CR6-402583

| | | |
|---|---|---|
| STATE OF CONNECTICUT | ) | SUPERIOR COURT |
| | ) | |
| VS. | ) | J. D. OF NEW HAVEN |
| | ) | |
| SCOTT LEWIS | ) | APRIL 25, 1995 |


BEFORE:   THE HONORABLE GEORGE W. RIPLEY, Judge


A P P E A R A N C E S:

   ON BEHALF OF THE PLAINTIFF:

   DAVID GOLD, ESQ.
   Supervisory Assistant State's Attorney


   ON BEHALF OF THE DEFENDANTS:

   JOHN G. WILLIAMS, ESQ.


JACKIE GONTAREK
Court Monitor


A-4

1          THE COURT:  Good morning, ladies and

2    gentlemen.  Madam Clerk, would you call the role,

3    please?

4              [ROLE OF JURY CALLED.]

5          THE COURT:  All right, Mr. Gold.

6          MR. GOLD:  Thank you, your Honor.   Good

7    morning, ladies and gentlemen.  Diane Basilicato,

8    please.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

3

# D I A N E     B A S I L I C A T O

Connecticut, having been duly sworn, was examined and testified as follows:

THE CLERK:  Please state your name and address for the record.

MR. GOLD:  Just, your Honor, based on what we discussed --

THE COURT:  You need not to mention your address, just your name.

THE WITNESS:  Diane Basilicato.

THE COURT:  Spell your last name, please.

THE WITNESS:  B-A-S-I-L-I-C-A-T-O.

THE COURT:  You may be seated, ma'am. Pull your chair right up to that microphone and speak directly into it and we'll be able to hear you and it will be easier for you.  All right, Mr. Gold.

MR. GOLD:  That microphone will help you and I know you're fighting a cold, but just do the best you can.  If you'd like some water just let me know.  All right.


## DIRECT EXAMINATION

BY MR. GOLD:

Q    Could you tell us please how old you are?

A    Twenty-six.

Q    All right.  And what type of work do you do

16

## CROSS EXAMINATION

BY MR. WILLIAMS:

Q    Good morning, Ms. Basilicato.

A    Good morning.

Q    Ms. Basilicato, when you saw these bodies being carried out, can you tell us what they looked like?

A    They were bloody and --

Q    Could you see what the men were wearing?

A    Yes.

Q    What were they wearing?

A    T-shirt and boxers one of them had.  And I think the other one just had boxers on.

Q    Okay. So one of them was wearing a T-shirt and boxer shorts --

A    Right.

Q    -- and the other one was just wearing boxer shorts and nothing above the waist?

A    I believe.  I didn't really want to look.

Q    Okay.  But you were able to see that much?

A    Right.

Q    I take it that when they were carried out, they didn't didn't have any covering over their bodies, is that right?

A    No, sir, they didn't.

Q    And they were -- blood was just dripping off of the stretchers as they were carried out?

A    Yes.

1      Q     And showing you a picture which was previously

2   marked as State's Exhibit B, did you subsequently see the

3   red drops that were shown on State's Exhibit B?

4      A     Yes.

5      Q     And what was that?

6      A     Blood.

7      Q     Is that the route that the medical personnel

8   took the victims when they bring them down those stairs?

9      A     Yes.

10     Q     Did you -- so you were there as the victims

11  were taken out, correct?

12     A     Yes.

13     Q     Did you spend the rest of the night -- or the

14  early morning by then -- but did you ever spend another

15  night in that apartment there?

16     A     No.  I left that evening.

17     Q     And did you -- you moved back home or to

18  another location?

19     A     Yes.  I went to my mother's house.

20     Q     And did you ever live there another night?

21     A     Nope.

22     Q     What did you do with the stuff you had inside?

23     A     I sent for it -- I had friends go and get it.

24              MR. GOLD:  Thank you, ma'am.  Mr.

25  Williams.

26              THE COURT:  Mr. Williams.

27

Q     Okay.  Do you recall about what time it was that this happened, that they were taken out?

A     No.  It was -- I had talked to police officers for maybe a half hour.  I'm not sure how long it was.

Q     Now, you had gotten home from your night job at about what time?

A     4:00 o'clock.

Q     4:00 o'clock that morning?

A     Right.

Q     And did you then go out to do some errands or something of that sort, or you went straight home?

A     After I left work I did laundry.

Q     Okay.  So you did the laundry on the way home?

A     Right.  Yup.

Q     And so then when you came home you arrived at four or a little after four with your laundry?

A     It was a little before four.

Q     A little before four.

A     Right.

Q     And when you say "little" you're talking about in the range of five minutes or so?

A     No, I'd say it was about quarter to four, ten of four.

Q     Is that right?

A     Yes.

Q     Okay.  And did it take you a while to get into the house?

18

1       A    Yes.

2       Q    Okay.  And you actually got into your apartment

3   and sat down at precisely 4:01, didn't you?

4       A    Right.

5       Q    And you know that because you looked at a

6   clock?

7       A    Right.

8       Q    And it was three or four minutes after that

9   that you heard these bangs, is that correct?

10      A    Right.

11      Q    Now, when you got home that night, I guess you

12  had -- what did you do park your car in front of the

13  place?

14      A    Yes, in the street.

15      Q    And that was your custom, was it not?

16      A    Yes.

17      Q    And you had to then carry your laundry into

18  your apartment from your car, correct?

19      A    Right.

20      Q    And as you did that, you encountered somebody,

21  didn't you?

22      A    Yes.

23      Q    And that was a woman, is that correct?

24      A    I met a gentleman first.

25      Q    Okay.  First you met a woman, then you met a

26  man -- first you met a man, then you met a woman, right?

27      A    Right.

Q    And the man you encountered was -- he was right in front of your --

A    He was across the street from my apartment.

Q    And was he just standing there or what he walking down the street or what was he doing?

A    He was whistling, trying to get somebody's attention in one of the houses over there.  That's how I noticed him.

Q    So he was standing on the sidewalk, was he?

A    Yes.

Q    When you say he was trying to get somebody's attention in one of the houses, were you able to tell -- I guess you could tell he was trying to get somebody's attention because of the way he was whistling, is that right?

A    Right.

Q    The type of whistle like you're trying to attract somebody's attention?

A    Yes.

Q    Could you tell what house he was whistling at?

A    No.

Q    Okay.  And this gentleman appeared to you to be Hispanic, is that correct?

A    Yes.

Q    Okay.  And can you give us further description of him?

A    He was probably about 5'7", black hair, medium

built, probably in his late twenties, early thirties.

Q    And did you have any communication directly with him?

A    Yes.  He -- when he was whistling, he turned around and he seen me and I had like two bags of laundry and he said, "Do you need help?"  And I said, "No, that's okay."  Then I put the club on my steering wheel and I was getting my stuff out and he came over and asked me for a cigarette.  So, I gave him one.  And at that time, that's when the woman approached from my side of the street, and she, I guess, knew the gentleman, and she started talking to both of us, and she asked me to take her to get drugs, and I said, "No."  And they started talking to each other and they started walking away and I rapidly went in my building.

THE COURT:  What was it she said to you?

THE WITNESS:  She asked me if I could get her drugs or knew where she could get drugs.

THE COURT:  If you could get her drugs?

THE WITNESS:  Yes.

BY MR. WILLIAMS:

Q    Now, this woman that you encountered, you subsequently ascertained that she was a Ms. Pearson, is that correct?

A    I had no idea of her name.

Q    Did you -- the police located her shortly thereafter, didn't they?

21

1      A    I believe so, because I told them which

2   direction she had walked in and they had found both of

3   them.

4      Q   Okay.  But you didn't yourself learn

5   subsequently that she was --

6      A   No.

7      Q   Okay.  You didn't get her name?

8      A   No, sir.

9      Q   Now, she indicated to you that she wanted you

10  to go take her to get some crack, isn't that right?

11     A   I think she said coke.

12     Q   Coke.  Okay.  And I guess she observed that you

13  had your car then, right?

14     A   Yes.

15     Q   But you declined the opportunity to assist --

16     A   I told her I was tired and I wanted to go

17  inside.

18     Q   Okay.  At that point she started talking to

19  this man that you had seen standing there whistling,

20  right?

21     A   Yup.

22     Q   And did you overhear any of their conversation?

23     A   No.  As soon as they started walking away, I

24  left.

25     Q   Okay.  And it appeared to you, did it not, that

26  the two of them were in the process of making some kind

27  of a transaction between the two of them?  Or to be

1    precise, did she seem like she was a hooker and he was

2    going to be a customer?  Fair statement?

3         A    No.

4         Q    That was not your conclusion?  In any event,

5    the two of them had a conversation and they walked off

6    down the street together, is that right?

7         A    Yeah.  They seemed like they knew each other

8    previously to that moment.

9         Q    And when they walked off down the street, which

10   way did they go?

11        A    They went towards -- I don't know the cross

12   street.  They went towards the pharmacy.

13        Q    Let me see if I can place it in terms of larger

14   distances.  Howard Avenue runs roughly from Yale New

15   Haven Hospital to City Point, does it not?

16        A    Right.

17        Q    Which direction, Yale New Haven or City Point?

18        A    They went towards City Point.

19        Q    Towards City Point?

20        A    Right.

21             THE COURT:  Mr. Williams, you want the

22        map?

23             MR. WILLIAMS:  Oh, that's all right, your

24        Honor.  It's more trouble than it's worth.  I think

25        we have that vision in our minds now.  On the map it

26        would be towards the right as you face it?

27             THE WITNESS:  Right.

BY MR. WILLIAMS:

    Q    And how far had -- did you see how far they walked before you actually got inside the building?

    A    Yes.  They walked to -- I can't remember the name of the street -- there's a cross street there.  They walked towards -- up to the cross street and then as I was walking up, they had turned around and were heading back, so I just went inside.

    Q    Okay.  And, did you yourself recognize any one of those two from before?

    A    No.

    Q    Okay.  Did there come a time when you attempted to make an identification of either one of them?

    A    No.

    Q    Were you subsequently shown any photographs by the police?

    A    No.

    Q    Of males?

    A    Of males?  Not to identify the Hispanic gentleman.

    Q    Okay.  Fair enough.  Now, you mentioned that you knew Mr. Turner by name, is that right?

    A    Yes.

    Q    Incidentally, at that point, how long had you been living in that apartment?

    A    Til that day, ten months.

    Q    Ten months.  So you've been living there since

1    January?

2         A    Yeah.

3         Q    More or less.

4         A    More or less, yeah.

5         Q    And had he been living there the same period of

6    time also?

7         A    I believe he was there before me.

8         Q    Okay.  Now, the other man, whose name you

9    didn't know, you subsequently were told was named Lamont

10   something or other, is that right?

11        A    Yes.

12        Q    The police told you that, is that right?

13        A    That and the paper.

14        Q    And the newspaper also.  And even though you

15   didn't know his name, you had seen him there before also,

16   isn't that right?

17        A    Yes.

18        Q    And over how long of a period of time had you

19   seen him there?

20        A    Couple months, maybe.  I've only seen him maybe

21   two times, two or three times.

22        Q    And you didn't know whether he was living with

23   Mr. Turner or simply visiting him, is that a fair

24   statement?

25        A    Right.

26        Q    Now, you had observed, hadn't you, that Mr.

27   Turner had a tremendous number of people going in and out

CERTIFICATION

I CERTIFY THAT A COPY OF THE FOREGOING REQUEST WAS MAILED TO JO ANNE SULIK AT 300 CORPORATE DRIVE ROCKY HILL, CT 06067 ON THIS 12th DAY OF FEBRUARY 2008.

PETITIONER

Scott Lewis