SCOTT T. LEWIS

PETITIONER

PRISONER

3:03 CV 196 (RNC)
(DFM)

FILED

2008 JUN 25 P 12:07

U.S. DISTRICT COURT
BRIDGEPORT, CONN.

JUNE 24, 2008

V.

COMMISSIONER OF CORRECTION

RESPONDENT

" MOTION FOR LEAVE TO EXPAND "
THE RECORD TO INCLUDE
THE ATTACHED DOCUMENTS

PURSUANT TO RULE 7(a) OF THE RULES GOVERNING
2254 CASES THE PETITIONER HEREBY REQUEST
TO EXPAND THE RECORD TO INCLUDE THE ATTACHED
DOCUMENTS

BASIS FOR REQUEST

1)    PURSUANT TO THIS COURT'S ORDER DATED
April 11, 2003 THE RESPONDENT WAS ORDERED
TO SHOW CAUSE AND RESPOND TO THE PETITION.

(1)

2) THE RESPONDENT RESPONSE WAS FILED July 31, 2003 AND ENTERED August 1, 2003.

3) THE RESPONDENT IN IT'S ANSWER PROVIDED THIS COURT WITH SEVERAL APPENDICES THAT EFFECTUATED THE RECORD.

4) THE RESPONDENT HOWEVER DID NOT PROVIDE THIS COURT WITH:

   A) THE PETITIONER'S APPENDIX TO HIS BRIEF ON DIRECT APPEAL.

   B) THE TRANSCRIPT REFERENCES TO THE INFORMANT'S DEATH IN THE CO-COMPANION CASE.

RELEVANCE

THE ISSUE ON WHETHER A THIRD-PARTY CONFESSION WAS PROPERLY EXCLUDED IS BEFORE THIS COURT. THE SUPREME COURT OF CONNECTICUT FOUND THAT THE INFORMANT WAS NOT SHOWN TO BE UNAVAILABLE AND THE RECORD IN MORANT

WAS BEREFT OF ANY EVIDENCE ON THAT MATTER. (SEE SUPREME COURT OPINION AT APP. A PAGE'S 806.)

## Relief

THE PETITIONER REQUEST TO EXPAND THE RECORD TO INCLUDE THE EVIDENCE FROM THE MORANT PROCEEDING THAT ESTABLISHES THE INFORMANTS DEATH.

Scott Lewis, # 137682
MAC DOUGAL CORRECTIONAL INST.
1153 EAST STREET SOUTH
SUFFIELD, CT 06080

## Certification

I CERTIFY THAT A FOREGOING COPY OF THE FOREGOING REQUEST WAS MAILED TO JO ANNE SULIK AT 300 CORPORATE PLACE ~~DRIVE~~ ROCKY HILL, CT 06067 ON THIS 24th DAY OF JUNE 2008.

Scott Lewis

# Appendix

A - Petitioner Motion For Reconsideration Dated August 31, 1988

B - Petitioner Appendix[1] To Brief on Direct Appeal.

C - The Missing Portion of the Morant Proceeding That Establishes The Informants Death with the Certification Page of Those Proceedings.

D - The Petitioner's Offer of Proof at the Criminal Trial Concerning the Informants Availability.

E - Relevant Page of Supreme Court Decision

Footnote

1 - This is a portion of the Appendix Filed Thats Relevant To Said Request. The Petitioner is Without the Full Appendix.

S.C. 15323

STATE OF CONNECTICUT

v.

SCOTT LEWIS

SUPREME COURT

NEW HAVEN JUDICIAL DISTRICT
AUGUST 31, 1998

## MOTION FOR RECONSIDERATION AND REARGUMENT EN BANC

Pursuant to P.B. § 71-5, the defendant in the above-styled case respectfully move for reconsideration and for reargument en banc of this court's decision in State v. Scott Lewis, 245 Conn. 779    (1998), released August 4, 1998.

### BRIEF HISTORY

The defendant was convicted of murder and felony murder. He appealed, and on January 14, 1998 this Court heard oral argument. On August 4, 1998 the Court issued its decision affirming the defendant' convictions and sentences for murder, and remanding his case with directions to vacate the felony murder sentences.

### SPECIFIC FACTS

The defendant respectfully suggests that the court's decision is premised upon a misperception of the relevant facts and law, as well as misunderstanding the defendant's claims, and that the full court should address the defendant's claims on appeal. This is especially true as to the constitutional issues involving the defendant's denial of a fair trial and his rights to confrontation and to present his defense.

As to the limitations on the right of cross-examination of Ovil Ruiz, the court has overlooked important facts. For example, the court reports that the defendant was prevented from offering a court docket sheet "purporting" to show that the state's key witness, Ovil Ruiz, had been

1

found incompetent to stand trial in February of 1991. In fact, the document did not purport to show Ruiz's incompetence; it did show that he was incompetent. The court also overlooks the import of the time of his incompetence. The significance of Ruiz'incompetence at that time is that it was then that he implicated the defendant, and the defendant was entitled to have his jury made aware of this fact.

It is unclear why the court addresses this claim as an evidentiary matter, when in fact the defendant's constitutional rights to confront and cross-examine the witnesses against him, as well as his right to present a defense, are implicated by the rulings here. The docket sheet in question bore the name "Augustine Donald a/k/a Ovil Ruiz." It is unclear why the trial court or this court questions its application to this witness, especially since the witness himself acknowledged that it referred to him. No offer of proof was necessary.

Finally, the defendant does challenge the court's ruling that the notes were not hospital records; of course they were. It is unclear why the court reports otherwise. Thus, because the court appears to have misunderstood the defendant's claims and to have limited its analysis to an evidentiary matter, the full court should consider this claim.

As to the third party admission, the claim implicates the defendant's constitutional right to present a defense. The court overlooks both the necessity and the trustworthiness of the exculpatory evidence in this case. The declarant here was unavailable; the court confuses the record.

The court seems to have crafted a new limitation on the constitutional right to present a defense, as well as a new limitation on an accused's right to present evidence tending to show his innocence; the

2

full court should address this issue.

As an evidentiary matter, it is unclear how the court could have reached its determination that the defendant failed to establish the unavailability of the informant and the trustworthiness of the statements. The record was not "bereft of evidence" relating to Morant's trial; rather, the informant was dead. The full court should therefore address this issue, as well. Finally, the standard does not require that the corroboration element clearly indicate the trustworthiness of the statement but rather requires that there be some corroboration. That element was more than amply present here.

As to the court's failure to charge on self-defense, the court correctly recites the applicable law, but misapplies it to the relevant facts. The court erroneously assumes that the defendant was engaged in robbing the victims, but this was not necessarily the case. There was no forced entry into the victim's apartment; according to Ruiz the defendant and victim were drug business partners. By the state's evidence from Ruiz, the victim was holding the defendant's property, and the defendant went to retrieve it. There was <u>no</u> evidence that the defendant displayed a weapon prior to his attempt to reclaim what was his, and the victim may well have responded to the defendant's demand for return of his property with an act making him the initial aggressor. As the court notes, it is bound to view the evidence in the light most favorable to giving the requested instruction, but it has not done so in this case. Instead, it makes new law based on a misapplication of facts. The full court should address this issue.

As to the missing witness instruction, the defendant respectfully

3

suggests that the court misunderstands Raucci's importance, and that this colors its flawed analysis of the issue. Raucci was the only person who would have been in a position to rebut Roque's claims that his statement was coerced and fabricated, and Rochler's testimony that he gave Raucci information concerning the defendant's alibi <u>years</u> before the trial, and was told to keep quiet about it. He was the only one who could deny that he was himself a drug dealer and criminal.[1] He was also the only one who could rebut Morant's claim that he had been forced to implicate the defendant. None of this was cumulative, and the court has overlooked it all.

As to the reasonable doubt instruction, the defendant suggests that the fact that this court has consistently upheld similar instructions is not a basis upon which to rely where the instruction is constitutionally deficient, and that this court ought to give thorough review to the claim.

<u>SPECIFIC GROUNDS</u>

The defendant moves for reargument en banc and reconsideration of the issues presented on appeal because constitutional rights are implicated, because the court has crafted new limitations on those rights as to certain claims, and determined that self-defense does not apply in certain instances, which the defendant respectfully suggests is a legislative determination to make; the court has also misconstrued the relevant facts. For these reasons, the full court should consider this case.

---

[1] The likelihood of this continues to grow as information is developed.

4

## LEGAL GROUNDS

This motion is brought pursuant to Practice Book Section 71-5 and the defendant's right to effective assistance of counsel on appeal.

THE DEFENDANT-APPELLANT
SCOTT LEWIS

BY: *Lauren Weisfeld*
LAUREN WEISFELD JURIS NO. 401789
ATTORNEY AT LAW
OFFICE OF THE CHIEF PUBLIC DEFENDER
121 ELM STREET
NEW HAVEN, CT 06510
789-7477
His Attorney

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing has been faxed and mailed to Christopher Godialis, Juris No. 409699, Office of the Chief State's Attorney, 300 Corporate Place, Rocky Hill, CT 06067, 860 258-5807, fax 258-5828, and mailed to the defendant, this 31st day of August, 1998.

*Lauren Weisfeld*
Lauren Weisfeld
Attorney at Law

5

CR6-352995                   :        SUPERIOR COURT

STATE OF CONNECTICUT         :        J.D. OF NEW HAVEN

VS.                          :        AT NEW HAVEN

STEFON MORANT               :        MAY 12, 1994 - JUNE 8, 1994


B E F O R E:

> HONORABLE WILLIAM L. HADDEN, JR.,
>                                    Judge


A P P E A R A N C E S:

> DAVID P. GOLD, ESQUIRE
> Supervisory Assistant State's Attorney
>
> ROBERT SWEENEY, ESQUIRE
> Attorney for the Defendant
>
>
> VICTORINE KALISZEWSKI
> Certified Court Reporter

652

S E R G E A N T    F R A N C I S C O    O R T I Z,
Badge Number 408, New Haven Police Department, One Union
Avenue, New Haven, Connecticut, having been duly sworn, was
examined and testified as follows:

DIRECT EXAMINATION BY MR. GOLD:

        Q.    Sergeant, sometime back in late 1990 or 1991
did you alert then Detective Vaughn Maher to the fact that
an informant that you knew may have some information
concerning what was then the unsolved homicide at 634 Howard
Avenue?

        A.    Yes, sir.

        Q.    And in doing that did you provide to then
Detective Maher the name of that informant and allow
Detective Maher to debrief that informant for any
information he might have about the homicide?

        A.    Yes, sir.

        Q.    All right.  Now, have you and Detective Maher,
who was up here, I believe, last week, had an opportunity to
recall through your collective recollection the name of that
informant?

        A.    That is correct, yes.

        Q.    I'm going to show you a piece of paper in the
upper left-hand corner of which is provided a name and some
15 or so lines down from there is provided a home address,
do you see that?

        A.    Yes, I do.

Q.   Does this piece of paper set forth the correct name of the informant that provided -- that you alerted Detective Maher to the existence of?

A.   Yes, it does.

Q.   And does it also set forth some 15 lines down the last known address to you of that informant?

A.   Yes, sir.

MR. GOLD:  Your Honor, I am now handing to Mr. Sweeney the piece of paper which Sergeant Ortiz was referring to.  What I have turned over is a printout which gives the name, address, some descriptive information.  It is information kept by the Department of Corrections, which counsel, perhaps, can use. It is the most up-to-date information Correction's have.  I have also, on that same sheet of paper, turned over the State Bureau of -- the State Police record of this informant, which counsel can use or not as he sees fit, both in locating the informant and in determining what use, if any, he will make of him should counsel find the informant.

THE COURT:  Don't you think there should be something of record, sealed record, indicating the name and identity of the alleged informant so that at a later date if the defense claims they were misled or something by

A120

1    this whole thing, there'll be no question as to

2    who it was that the information was given to

3    Mr. Sweeney about?

4         MR. GOLD:  Well, then what I'll do at a

5    recess, or tonight, I'll do a copy of that or

6    run the same printout again, put a copy under

7    seal which we can mark as a Court's exhibit and

8    it will be preserved for any Appellate purpose.

9         THE COURT:  All right.  Run it off and

10   make a copy when you get a chance and label

11   that as the next Court Exhibit C, I guess it

12   will be.

13        THE CLERK:  D.

14        THE COURT:  Now, Mr. Sweeney, is there

15   anything you want to ask the Sergeant?

16        MR. SWEENEY:  Just one brief question,

17   just for the record.

18   CROSS-EXAMINATION BY MR. SWEENEY:

19        Q.   Sergeant, can you approximate the last time you

20   spoke to the individual in what's been handed over to me?

21        A.   The last conversation we had was about three

22   years ago.

23        Q.   And you've had an opportunity to look at the

24   piece of paper that the State just handed to me, is that

25   correct?

26        A.   Yes, sir.

27        Q.   And do you have any other information or any

A121

655

1  additional information, other than what's contained on here,

2  that might help in locating this person?

3      A.   No, sir, I don't.

4      Q.   Thank you.

5          MR. SWEENEY:  I have nothing further.

6          THE COURT:  Anything further?

7          MR. GOLD:  No.

8          THE COURT:  Thank you, Sergeant.

9          THE WITNESS:  Yes, sir.

10         THE COURT:  Now, are we ready to proceed

11     with the cross-examination by Mr. Sweeney?

12         MR. SWEENEY:  Yes, your Honor.  And

13     obviously I know we've talked about this in

14     chambers, but obviously this is the information

15     I'm going to give to the investigator in an

16     attempt to find this person.  I assume that

17     goes without saying.

18         MR. GOLD:  Can we approach before this

19     continues?

20     (Whereupon, a brief discussion was held

21         off the record.)

22         THE COURT:  Bring the jury back, please.

23     (Whereupon, the jury entered the courtroom.)

24         THE COURT:  Go ahead, Mr. Sweeney, please.

25         MR. SWEENEY:  Thank you, your Honor.

26  CROSS-EXAMINATION BY MR. SWEENEY:

27      Q.   Good afternoon, sir.

A122

1       A.   Good afternoon.

2       Q.   Sir, we've never spoken before right now, have

3  we?

4       A.   No.

5       Q.   And I've never spoken with you, I've never

6  talked to you at all, is that correct?

7       A.   No.

8       Q.   Mr. Roque, I guess the bottom line is that when

9  you talked to the police and when you came here into court

10  you have said very unequivocally or you have said clearly

11  that my client did not have anything to do with the murder,

12  isn't that correct?

13       A.   Yes.

14       Q.   That's what you said here today, correct?

15       A.   Yes.

16       Q.   And that's even what you told the police, isn't

17  that correct?

18       A.   Yes.

19       Q.   Or what was in this transcript that we heard.

20  And if I could just direct your attention to page eight of

21  the transcript, and am I correct when I read, "To me it

22  wasn't Stef"?

23       A.   Yes.

24       Q.   And that's what you said then, right?

25       A.   Yes.

26       Q.   And that's what you're saying now?

27       A.   Yes.

CR6-352995                          :          SUPERIOR COURT

STATE OF CONNECTICUT                 :          J.D. OF NEW HAVEN

VS.                                  :          AT NEW HAVEN

STEFON MORANT                        :          MAY 12, 1994 - JUNE 8, 1994


B E F O R E:

        HONORABLE WILLIAM L. HADDEN, JR.,
                                  Judge


A P P E A R A N C E S:

        DAVID P. GOLD, ESQUIRE
        Supervisory Assistant State's Attorney

        ROBERT SWEENEY, ESQUIRE
        Attorney for the Defendant


                        VICTORINE KALISZEWSKI
                        Certified Court Reporter

DONE for alibi

JUNE 3, 1994

1012

Tuesday.  That's as best I can figure that might be the prognosis, but one can never be sure until we actually are at that point, but we are obviously going to a close on the case.

Keep in mind your general instructions you've had.  Do nothing that's going interfere in any way with your ability to make a fair and impartial decision based on what goes on and has gone on in this courtroom during the course of the trial and nothing else.

All right.  You're all excused.  You may leave.  See you Monday morning at 10 o'clock up on the ninth floor and then stay up there on the ninth floor.

You may leave, please.

(Whereupon, the jury left the courtroom.)

MR. SWEENEY:  Your Honor, may I place something on the record?

THE COURT:  Certainly.

MR. SWEENEY:  As we discussed very briefly in chambers, it's come to my attention that the individual who was identified by Sergeant Ortiz in connection with my motion for disclosure of exculpatory information has died, he died in July of 1992, which is probably why he hasn't given any information to Ortiz in about two years.

1013

THE COURT:  That's a fair assumption.

MR. SWEENEY:  But I do have a certified copy of the death certificate and what I would like to do is just mark it for identification.

THE COURT:  What was the date of death according to that?

MR. SWEENEY:  July 20th, 1992.

And I do note the date of birth as well as the Social Security number matches the date of birth and the Social Security number provided by the State on their information form, and I'd just like right now to mark that for identification.  And with the Court's permission, at some point on Monday I would like to address the issue again as to -- and that will depend on whether -- I'll address the issue again on Monday after I've made further attempts to locate this Michael Cardwell who is the declarant of the statements which were made to the individual that was identified by Sergeant Ortiz and who has since died, but right now I just wanted to put that on the record and just have this marked for whatever purposes.

THE COURT:  Any objection to this document being marked?

MR. GOLD:  No.

1014

THE COURT:  It's a certified copy of the death certificate?

MR. SWEENEY:  It is.  If I can show it to the Court.

(Handing.)

THE COURT:  Okay.

MR. SWEENEY:  It was obtained this morning by an investigator who's been hired by the client, my client's family.

THE COURT:  It's dated today?

MR. GOLD:  I just ought to -- perhaps it should be sealed along with what I gave the Clerk before that identified the person.

THE COURT:  Well, I suppose we can.  I don't know whether it makes any difference.

MR. GOLD:  Yeah, I suppose that's true too.

THE COURT:  He's dead.

MR. GOLD:  Yeah, I suppose he needn't be -- his safety --

THE COURT:  Why don't we seal it along with the other stuff.

MR. GOLD:  There is family and so forth.

THE COURT:  Seal it along with the other information with respect to that gentleman.

THE CLERK:  This is a Court's exhibit?

THE COURT:  Just a minute.

1015

Mr. Sweeney and Mr. Gold, what were the other exhibits?  There was a name and address and then there was a State Police computer printout.

MR. SWEENEY:  I think it was all one, your Honor.

MR. GOLD:  All one.

THE COURT:  What did we mark that?

THE CLERK:  Court's D.

THE COURT:  Court's C.

THE CLERK:  D.

THE COURT:  Whatever.  This one is Defense Exhibit 3 for identification sealed.

MR. SWEENEY:  I think four perhaps, your Honor.

MR. GOLD:  I think three might have been the bond sheet.

THE COURT:  All right.  It's four.  It's sealed.  It's a defense exhibit he offered.

(Whereupon, Defendant's Exhibit 4 was marked for identification.)

THE COURT:  All right.  Now, I assume you want to hustle on down to your office to get ready with your word processors, gentlemen.

Three o'clock I want to have those requests, whatever they're going to be, in chambers and you've got three hours and 16

1016

minutes to get it done, assuming one has waited up till now.

     MR. GOLD:  May the record show the Court is smiling?

     THE COURT:  No, the Court is gritting its teeth which makes it look like its smiling.

     Recess.

     MR. SWEENEY:  I consider myself fortunate that I'm getting out of the courtroom on my own power.

     THE COURT:  Mr. Sweeney, say nothing.

(Whereupon, court was adjourned for the day.)

1    minutes to get it done, assuming one has waited

2    up till now.

3        MR. GOLD:  May the record show the Court

4    is smiling?

5        THE COURT:  No, the Court is gritting its

6    teeth which makes it look like its smiling.

7        Recess.

8        MR. SWEENEY:  I consider myself fortunate

9    that I'm getting out of the courtroom on my own

10   power.

11       THE COURT:  Mr. Sweeney, say nothing.

12   (Whereupon, court was adjourned for the day.)

10

minutes to get it done, assuming one has waited

up till now.

MR. GOLD:  May the record show the Court

is smiling?

THE COURT:  No, the Court is gritting its

teeth which makes it look like its smiling.

Recess.

MR. SWEENEY:  I consider myself fortunate

that I'm getting out of the courtroom on my own

power.

THE COURT:  Mr. Sweeney, say nothing.

(Whereupon, court was adjourned for the day.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CASE NO: 402583                :  SUPERIOR COURT

STATE OF CONNECTICUT           :  JUDICIAL DISTRICT OF NEW HAVEN

VS.                            :  AT NEW HAVEN

SCOTT LEWIS                    :  MAY 8, 1995


BEFORE:  HONORABLE GEORGE RIPLEY, JUDGE, AND A JURY


APPEARANCES:

    DAVID GOLD, ESQ.

    JOHN WILLAMS, ESQ.

1                                                                           1

THE COURT:  We have the jury, but I think we
had a matter we had to take up in the absence of
the jury, do we?

MR. WILLIAMS:  Yes, that's correct, your
Honor.  I have some witnesses here with respect to
the admissibility of certain out of court
statements.

THE COURT:  All right.  Fine.  You may
proceed.

MR. WILLIAMS:  Thank you, your Honor.

1                 LT. FRANCISCO ORTIZ, Number 1, Union Avenue,

2    New Haven, Connecticut, having been duly sworn was examined

3    and testified as follows:

4    DIRECT EXAMINATION BY MR. WILLIAMS:

5          Q    Lt. Ortiz, how long have you been with the New

6    Haven Police Department?

7          A    I'm in my 17th year.

8          Q    And what position do you currently hold there,

9    sir?

10         A    I'm a lieutenant and I'm responsible for the Fair

11   Haven district of New Haven.

12         Q    Directing your attention to November of 1990, what

13   position did you hold at that time?

14         A    I was a detective with the police department.

15         Q    Okay.  And at that time did the New Haven Police

16   Department have in place standardized procedures for

17   registering and utilizing known and reliable informants?

18         A    Yes, sir.

19         Q    Would you tell the Court, please, what those

20   procedures were?

21         A    Individuals who came in contact or recruited

22   informants were to bring that to the attention of their

23   immediate supervisor.  Their supervisor would then meet with

24   this individual to try to ascertain their identity, their

25   background, their reliability and dependability.  And once

26   that was ascertained that this person was reliable candidate

27   to be an informant, then information would be documented,

3

1    files would be created, and they would be registered with
2    the police department and informant would be given a number,
3    a serial number of sorts, that would reflect the informant's
4    identity whenever he was being utilized, and that number
5    would be inserted in lieu of the informant's name whenever
6    there was an investigation or if they were going to receive
7    any monies or anything regarding their contributions.
8        Q    Was there a standardized procedure that was
9    followed in your department if an informant who was on that
10   registry ever produced bad information?
11       A    Yes, sir.
12       Q    What was that?
13       A    That particular informant would be flagged.  The
14   department's registry, the keeper of records would somehow
15   put a notation along side that person's name so that in the
16   future if an individual ever tried to re-register this
17   person or if he came in contact with an individual, an
18   officer, they would be made aware of the fact that this
19   person was no longer reliable and that information would be
20   documented, the reason why they were not reliable, so that
21   they would not be re-registered again and perhaps mislead
22   some agent or something.
23       Q    All right.  Now, directing your attention to the
24   week of November 11 of 1990, did you at that time have
25   occasion to be in contact with a known and reliable
26   informant whom you had utilized in the past and who was on
27   that registry with respect  to the murder of Ricardo Turner

4

1    and Lamont Fields?

2        A    Yes, sir.

3        Q    Would you relate to the Court, please, the

4    circumstances under which that meeting occurred and what

5    happened at that meeting.

6        A    Yeah.  I believe the informant reached out to me

7    at the police department and indicated that that particular

8    informant had information  regarding this homicide

9    investigation that the police were working on, and he wanted

10   to speak with me regarding that information, and that he was

11   willing to forward that to the department to assist 'em in

12   working on the investigation itself.

13       Q    What then happened in that regard, sir?

14       A    I contacted the investigator, the primary

15   detective and the supervisor of that particular homicide

16   investigation and I made them aware of the fact that an

17   individual who was a known and reliable informant,

18   registered with the department, and who had a proven record

19   for reliability was willing to offer information regarding

20   the suspects possibly involved in this homicide.  And I

21   arranged for them to meet, so that they could interview the

22   informant, the primary investigator and the supervisor.

23       Q    And did that meeting occur?

24       A    Yes, it did.

25       Q    All right.  And were you present at that meeting,

26   sir?

27       A    No.  I introduced him at the department at the

5

1    investigative services unit.  They then took him into

2    conference and they interviewed the informant, but I wasn't

3    involved at that point.  I simply introduced the informant.

4        Q    And was the detective to whom you made this

5    introduction Vaughn Maher?

6        A    Yes, sir.

7        Q    And  has Detective Maher subsequently retired from

8    the department?

9        A    Yes, sir.

10        Q    And has he moved out of state?

11        A    Yes, sir.

12        Q    Now --

13             MR. WILLIAMS:  I'd like this marked for

14        identification.

15             THE CLERK:  Exhibit 30.

16             (Thereupon, item was marked as Exhibit 30 for

17    identification.)

18        Q    Showing you Exhibit 30 for identification, do you

19    recognize that as an official case incident report of the

20    New Haven Police Department?

21        A    Yes, sir.

22        Q    Concerning this particular matter?

23        A    Yes.

24        Q    And do you recognize on that the signature of

25    Detective Maher?

26        A    Yes, I do.

27        Q    All right.  And that was a document which, in the

6

1    usual procedures followed by the New Haven Police

2    Department, was prepared and filed under oath, is that

3    correct?

4         A    Yes, sir.

5         Q    And is that an official record of the New Haven

6    Police Department?

7         A    Yes, it is.

8         Q    Lieutenant, you're aware of the name of this

9    informant, is that correct?

10        A    Yes, sir.

11        Q    And is it your preference that that information be

12   kept confidential in order to protect that identity?

13        A    Yes, sir, it is.

14        Q    Now, do you -- Can you tell us when the last time

15   was that -- to the best of your recollection -- that the

16   department had any contact with that known and reliable

17   informant?

18        A    To the best of my recollection that would have

19   been throughout the latter part of 1990, or during the time

20   of this incident.  Maybe 1989.  I'm not sure.  During the

21   time this investigation was unfolding, that was the last

22   time I was aware of the fact that he was used by the

23   department.  I'm not sure when it concluded.

24        Q    To the best of your knowledge, has he subsequently

25   disappeared?

26        A    To the best of my knowledge I would say so, yes.

27        Q    And you're prepared, if the Court permits it or

7

1  requests it, to furnish to the Court, under whatever

2  conditions the Court deems appropriate, the name of this

3  individual; is that correct?

4      A     Yes, I am.

5          MR. WILLIAMS:  Your Honor, that would be

6  my offer through Lt. Ortiz.  I would propose at

7  that point if the Court were to permit it to

8  introduce Detective Maher's official report into

9  evidence and so I think at this point I would turn

10  the witness over to the state.

11          THE COURT:  Do you have any questions of the

12  officer?

13          MR. GOLD:  Just this:

14  CROSS EXAMINATION BY MR. GOLD:

15      Q     Lieutenant, when you say that he's disappeared, I

16  take it that what you're referring to is you've had no

17  additional contact with him since that time?

18      A     Correct.  I have not.

19      Q     Do you know where he lives now?

20      A     No, sir.

21      Q     But might he still live in New Haven?

22      A     Yes, he might very well, yes.

23      Q     All right.

24          MR. GOLD:  I have nothing else.

25  REDIRECT EXAMINATION BY MR. WILLIAMS:

26      Q     Lieutenant, this issue arose, to your knowledge,

27  during the trial about a year ago of Stefon Morant?

*[handwritten annotation]* GOLD KNEW HE WAS DECEASED? AS OF 6-3-94

8

1 A Correct.

2 Q And at that time you came to court, did you not, and furnished the Court and counsel for both the State and that defendant with the name and last known address of this fellow, this informant; is that correct?

6 A A document was shown to me with that information on it and I simply confirmed that's information that I was aware of, yes.

9 Q All right.  And to your knowledge this informant was not located or presented during that trial, is that correct?

12 A That's what I recall.

13  MR. WILLIAMS:  That's all, your Honor.

14  MR. GOLD:  I have nothing else.

15  (Witness excused.)

17  THE COURT:  May I see that exhibit for identification, please?

22  MR. WILLIAMS:  And I have an additional police officer, your Honor, on the same subject.

24  THE COURT:  You do.  All right.  Fine.  We'll hear him.

25

26

27

806                    AUGUST, 1998            245 Conn. 779

State v. Lewis

The informant's statements do not satisfy the requirements of admission under the residual exception to the hearsay rule. Contrary to the defendant's assertion in the trial court; see footnote 16; he did not show that the informant was unavailable. The defendant could have obtained the informant's name and last known address from Ortiz; and the sole fact that the informant had not been produced by the defense in Morant's trial one year previously, after having learned the informant's name and address, falls far short of establishing that reasonable efforts to locate him for this trial; see *State* v. *Lopez*, supra, 239 Conn. 75; would have been unsuccessful. The record is bereft of any evidence regarding what efforts, if any, Morant made at that time, and regarding any efforts by this defendant to locate the informant for this trial.

In addition, the evidence before the trial court could not support a finding of the trustworthiness of the statements. Contrary to the defendant's assertion, there was insufficient evidence of any close relationship between the informant and Cardwell so as to suggest that Cardwell would have confided in the informant that Cardwell had killed the victims. The only evidence of their relationship was that the person known as "Bullet" was "well known to [the informant] as Michael Caldwell,"[24] and that "[the informant] has been an associate of Cardwell for several years."[25] Moreover, whatever trustworthiness value there might have been in Ortiz' description of the informant as "reliable" was minimal at best, and in Ortiz' testimony permitting the inference that his

---

[24] Thus, we do not know from this characterization whether this meant that Cardwell was "well known" to the informant in the sense of being a close friend, or whether Cardwell was simply "well known" to the informant by his name in the sense that the informant well knew his name to be Michael Cardwell.

[25] Thus, we do not know what kind of association—business, social, criminal, or some combination of the three—the informant and Cardwell enjoyed, nor how close that association was.

# CERTIFICATION

I, SCOTT LEWIS, HEREBY CERTIFY THAT A COPY OF THE FOREGOING WAS MAILED TO JO ANN SULIK AT 300 CORPORATE DRIVE PLACE, ROCKY HILL, CT 06067 ON THIS 24th DAY OF JUNE 2008

Scott Lewis