Scott Lewis, # 137682                                    PRISONER

Vs                                          3:03 CV 196 (RNC) (DFM)

Commissioner of Corr.

                                        August 28, 2008

FILED
2008 SEP -5 P 12:19
U.S. DISTRICT COURT
BRIDGEPORT, CONN.

"Revised① Request to Supplement the

Appendix In Support of A Request For An

Evidentiary Hearing Dated February 12, 2008 And

Filed February 19, 2008; And Leave To Expand

The Record To Include The Foregoing Attached

Documents.


FOOTNOTE

1- The Petitioner Recently Filed the above Document
To The Court Dated August 8, 2008 — The Document
Was Returned To The Petitioner by The Clerk For
Lack of Signature August 22, 2008. The Petitioner
Thereafter Revised The Document To Include The
Transcript of Testimony Dated January 30, 2007 of
Ovil Ruiz, And Served Notice With The State.

## BASIS

THE PETITIONER FILED A REQUEST FOR AN EVIDENTIARY HEARING PURSUANT TO 28 U.S.C. SECTION 2254 (e)(2)(ii) CLAIMING " NEWLY DISCOVERED EVIDENCE, AND PURSUANT TO RULE 7(b) OF THE RULES GOVERNING 2254 CASES TO "EXPAND THE RECORD".

## ARGUMENT

THE TRANSCRIPT OF EVIDENCE LENDS SUPPORT TO THE CREDIBILITY, RELIABILITY AND TRUSTWORTHINESS OF THE EVIDENCE PRESENTED TO THIS COURT AS A BASIS TO THE CLAIMS [2] RAISED BEFORE THIS COURT IN THE INSTANT PETITION.

THE EVIDENCE WAS GIVEN IN OPEN COURT [3] UNDER OATH ON DECEMBER 3, 2007, JANUARY 30TH, 2007 AND JANUARY 11TH, 2008. THE EVIDENCE IS RELEVANT TO THE CURRENT ISSUES BEFORE THIS COURT.

## FOOTNOTES

2 - THE CLAIMS BEFORE THIS COURT ARE PERJURY, SUPPRESSION OF EVIDENCE AND EXCLUSION OF EVIDENCE OF A THIRD-PARTY CULPRIT.

3 - THIS TRANSCRIPT REPRESENTS THE REVISIONS MADE TO THE INSTANT MOTION.

THE [SUPPRESSION OF EVIDENCE CLAIM IN COUNT ONE] OF THE INSTANT PETITION IS PREMISED ON THE OCTOBER 25, 1999 TESTIMONY OF MICHEAL SWEENEY[4].

IN SAID TESTIMONY AT T.P 15 LINE 20 THROUGH T.P 18 LINE 9; THAT EVIDENCE SUGGESTED THAT THE STATES KEY WITNESS, CARL RUIZ, WAS TOLD BY POLICE HE WOULD [NOT] BE PROSECUTED IF HE HAD COOPERATED WITH THE POLICES INTENTION TO FABRICATE AND FRAME THE PETITIONER FOR SAID CRIMES.

THE "NEW EVIDENCE" OBTAINED IN THE JANUARY 30TH, 2007[5] TESTIMONY AT T.P 52-57 AS WELL AS THE TESTIMONY AT DECEMBER 3, 2007 T.P 31 LINE 24 THROUGH T.P 43 LINE 12 IS THEREBY CORROBORATIVE OF THE TESTIMONY DATED OCTOBER 25, 1999 AND RELEVANT TO THE ISSUE.

FOOTNOTES

4- THIS TESTIMONY IS HEREBY ATTACHED AS EXHIBIT B'; AS WELL IT IS ATTACHED TO COUNT ONE OF THE PETITION AND THE FULL TRANSCRIPT WAS FILED WITH THE COURT ON 7-28-2003 W/ DOCKET ENTRY 12 AND 13.

5- THIS TESTIMONY IS HEREBY ATTACHED AS EXHIBIT F.

THE [PERJURY CLAIM IN COUNT TWO] OF THE INSTANT PETITION IS PREMISED ON THE F.B.I REPORT (INTERVIEW OF CIVIL RUIZ DATED FEBRUARY 22, 1996. IN SAID INTERVIEW AT PAGE 7 LINE 5 RUIZ CLAIMED TO "CUT A DEAL" TO GIVE UP LEWIS... FOR THE DOUBLE HOMICIDE. THE EVIDENCE OBTAINED IN THE JANUARY 30, 2007 TRANSCRIPT AT T.P. 52-57 AS WELL AS THE TESTIMONY AT DECEMBER 3, 2007 T.P 31 LINE 24 THROUGH T.P 43 LINE 12 IS THEREBY CORROBORATIVE AND RELEVANT TO THE ISSUE BEFORE THIS COURT.

THE [THIRD-PARTY CULPRIT CLAIM IN COUNT THREE] OF THE INSTANT PETITION IS PREMISED ON AN ALLEGED CONFESSION BY MICHEAL CARDWELL TO AN INFORMANT. THE INFORMANT ACCOUNT CLAIMED THAT VINCENT CARDWELL WAS TO "WHISTLE AS A SIGNAL" TO CARRY OUT THE TASK. THE JANUARY 11, 2008 EVIDENCE DEMONSTRATES THAT IT WAS MICHEAL CARDWELL, THE CONFESSOR, THAT WAS SEEN WHISTLING AT THE CRIME SCENE, ON THE NIGHT IN QUESTION, AT THE TIME'S IN QUESTION.

This testimony dated January 11, 2008 at T.P. 14 Line 7 through T.P. 37 Line 27 is corroborative and relevant to the issues before this court.

## Conclusion

The Petitioner, Scott Lewis, asserts that the said " Newly Discovered Evidence" is material to the issues before this court and thus satisfy the conditions under 2254 (e)(2)(ii) for consideration toward the merits.

## Relief

The Petitioner request that he be granted a hearing to present the evidence or the evidence be made a part of the expanded record for consideration of the merits.

## Footnote

6. This testimony is attached as Exhibit E.

(5)

Submitted by

Scott Lewis

## Appendix

A - Testimony of December 3, 2007

B - "                    October 25, 1999

C - F.B.I Interview Dated February 22, 1996

D - Informant Account

E - Testimony of January 11, 2008

F - Testimony of January 30th 2007.

G - Previous Filing Returned Documentation

TSR-CV06-4001783-S                    :        SUPERIOR COURT

LEWIS, SCOTT                          :        TOLLAND JUDICIAL DISTRICT

      VS.                           :        AT ROCKVILLE, CONNECTICUT

WARDEN, STATE PRISON                  :        DECEMBER 3, 2007


# E X C E R P T



B E F O R E:

THE HONORABLE CARL J. SCHUMAN

SUPERIOR COURT JUDGE


A P P E A R A N C E S:

    SCOTT LEWIS, Pro se Petitioner (Ordering party)

    CHRISTOPHER T. GODIALIS, ESQ., Attorney for the Respondent





Donna L. Hite
Court Recording Monitor



1    THE COURT:  I think we probably should start with

2    the Lewis matter.  I apologize for any inconvenience

3    to anyone, but I'm hopeful that the Lewis matter

4    won't be as long as the other.

5        MR. WILLIAMS:  Thank you, Your Honor.  Since I'm

6    subpoenaed in the Lewis matter, I --

7        THE COURT:  I see.

8        MR. WILLIAMS:  -- appreciate that.

9        THE COURT:  Good morning, Mr. Williams.

10       MR. WILLIAMS:  Good morning, Your Honor.

11       THE COURT:  All right.  Good morning, Mr. Lewis.

12       THE PETITIONER:  Good morning.

13       THE COURT:  And Mr. Godialis.

14       MR. GODIALIS:  Good morning, Your Honor.

15       THE COURT:  Any preliminary matters before we

16   start?

17       MR. GODIALIS:  None that I'm aware of.

18       THE PETITIONER:  I just want to know if I can get

19   these handcuffs off.

20       THE COURT:  All right.  I believe I did order

21   them off --

22       THE PETITIONER:  Yes.

23       THE COURT:  -- last time.

24       THE PETITIONER:  Yes, sir.

25       THE COURT:  All right.  Then I'll order them off

26   this time.  Marshal?

27       (Petitioner's handcuffs removed)

1  reasons to be back or can be addressed more quickly

2  than the others.  So if you don't object to calling

3  these witnesses, Mr. Godialis, then I'll allow Mr.

4  Lewis to call either Mr. Williams or Chief Ortiz.

5       MR. GODIALIS:  Very well, Your Honor.

6       THE PETITIONER:  Yes, Mr. Williams, please.

7       THE COURT:  All right.

8       (Witness takes stand)

9       THE CLERK:  Please raise your right hand.  Do you

10  solemnly swear or solemnly and sincerely affirm, as

11  the case may be, that the evidence you shall give

12  concerning this case shall be the truth, the whole

13  truth, and nothing but the truth, so help you God or

14  upon penalty of perjury?

15       THE WITNESS:  I do.

16       THE CLERK:  Can you please state your name, spell

17  your last name and state your business address for

18  the record.

19       THE WITNESS:  My name is John R. Williams, W-i-l-

20  l-i-a-m-s, 51 Elm Street, New Haven, Connecticut

21  06510.

22       THE CLERK:  Thank you.

23       THE COURT:  Good morning Mr. Williams.

24       THE WITNESS:  Good morning, Your Honor.

25       THE COURT:  Mr. Lewis.

26

27

J O H N   R.   W I L L I A M S, of 51 Elm Street, New Haven,

Connecticut 06510, having been duly sworn, was examined and

testified as follows:

DIRECT EXAMINATION BY MR. LEWIS:

    Q    Good morning, Mr. Williams.

    A    Good morning.

    Q    Can you please tell the court what do you do

professionally?

    A    I'm a lawyer.

    Q    How long have you practiced law here in Connecticut?

    A    Since the end of 1967, beginning of 1968.

    Q    Are you licensed to practice law in any other state?

    A    No.

    Q    And are you a member of any legal organizations or

boards within Connecticut?

    A    Yes, I am.  I'm a member of the Connecticut Criminal

Defense Lawyers' Association, the Connecticut Bar Association,

the Connecticut Trial Lawyers' Association.  I'm also a member

of the American Bar Association, the National Association of

Criminal Defense Lawyers, and the American Association for

Justice, and the National Lawyers' Guild.

    Q    So you're admit that you're a very experienced

criminal trial lawyer.

    A    I think that's fair to say.

    Q    Have you had occasion during the course of your

career to litigate against members of the New Haven Police

Department?

1    Q    And what was that address on that police report, if

2    you don't mind?

3    A    On that report, the address is 210 Rosette Street in

4    New Haven.  R-o-s-e -- it's spelled R-o-s-s-e-t-t-e, but I

5    think it's only got one "s" if I remember it.

6    Q    Can you also list for the court the names of the

7    arrestees in that particular report?

8    A    Well, Mr. Cardwell was the -- was arrested.  And also

9    a fellow by the name of Milton Johnson and a man named Lavern

10    Grant.

11    Q    Now the individual named Milton Johnson, can you

12    indicate what the middle initial is?

13    A    "E."

14    Q    "E?"  Thank you.

15         THE PETITIONER:  May I have that marked for a

16         full exhibit, Your Honor?

17         THE COURT:  Any objection?

18         MR. GORDIALIS:  No, Your Honor.

19         THE COURT:  Full exhibit.

20    DIRECT EXAMINATION BY MR. LEWIS (continuing):

21    Q    Now, Mr. Williams, you testified that you didn't

22    recall whether or not you asked Ms. Basilicato to identify a

23    photo array containing Michael Cardwell to see if she can

24    verify that the was the person?

25    A    I didn't testify about that, but I don't have any

26    memory one way or the other.

27    Q    You don't have any memory about that?  Okay.  Was it

1    your defense to attempt to introduce the informant report,

2    though?  Do you remember that?

3        A    Yeah.  I think that the defense was along the lines

4    of the -- showing my age -- the defense in *State versus Murray*

5    *Gold* that somebody else did it.

6                THE PETITIONER:  Just for the record -- just so I

7            can keep up -- we got Exhibits 10 through 22 as full

8            exhibits?  Am I correct?

9                THE CLERK:  That's correct.

10               THE PETITIONER:  I would ask now to mark for

11           exhibit transcripts of the criminal trial dated 3-3-

12           1995 and 3-16-1995.  I think this will be Exhibit 22?

13               THE CLERK:  Twenty-three.

14               THE PETITIONER:  Twenty-three?  Thank you.

15               THE CLERK:  Are there individual ones or --

16               THE COURT:  There are two separate ones?

17               THE PETITIONER:  Yes.

18               THE CLERK:  Okay.  So 23 and 24.

19               THE PETITIONER:  Twenty-three and twenty-four?

20           Which one will be 23?  March 3rd?

21               THE CLERK:  March 3, 1995 is 23 and March 16,

22           1985 is 24.

23   DIRECT EXAMINATION BY MR. LEWIS (continuing):

24       Q    Mr. Williams, during the trial did you cross-

25   examination state's witness Ovil Ruiz?

26       A    Yes, I think so.

27       Q    Can you take a look at the March 3rd transcript --

32

1     A    Yes.

2     Q    -- transcript page 75?  I think I have it marked in a

3  -- a yellow marker on it.

4     A    You have it marked.  Yes, you do.  Mm-hmm.

5     Q    Can you review the testimony of Ovil Ruiz on that

6  particular date?  March 3, 1995, transcript --

7     A    Anything in particular?  You want me to review the

8  part you marked on page 75?

9     Q    Yeah.  It's transcript page 75 the last question --

10    A    I've read that.

11    Q    -- through transcript page 76.

12    A    Yeah.  Would you want me to read that now?

13    Q    Yes.

14    A    Or just read it --

15    Q    If you could read that into the record?

16    A    -- read it to myself?

17    Q    Can you read it into the record, if you don't mind?

18    A    (As read) Question: "Did you make any agreement with

19  the state of Connecticut before giving the testimony at the

20  Morant trial that you would get any kind of benefit as a

21  result of your cooperation?"  And the objection to that

22  question was overruled, and I asked the question again.  "Did

23  you have an agreement with the state before you gave your

24  testimony at the Morant trial by which you hoped to obtain any

25  benefits for yourself as a result of your cooperation."

26     The answer was no.

27     Q    He gave the answer no.  Can you now turn to the

1    transcript dated March 16, 1995?  Transcript page 45 through

2    46, which is also referenced by the yellow marker.

3        A    Correct.

4        Q    And may you read from those pages as well?

5        A    All right.  Oh, I think that -- was that March 3rd, a

6    hearing on probable cause transcript?  Must have been.

7        Q    Well, this one -- the one I'm asking now -- the first

8    one was March 3rd.

9        A    Right.  I see that -- no, they're both Judge

10    Fracasse.  All right.

11        Q    This one is March 16th.

12        A    All right.  Yeah.  These are both HPC transcripts.

13        Q    Right.

14        A    'Cuz I noted that it's Judge Fracasse and the trial

15    judge was Judge Ripley.  All right.  So page 45, (as read)

16    Question: "Now what kind of a deal do you have with the

17    prosecutor for giving testimony in this case?"

18        Answer: "I have no deal."

19        Question: "Well, you understand that you could be called

20    an accessory to murder."

21        Answer: "If that's what happens, it happens."

22        Question: "But you've been told that you're not gonna be

23    charged with that, haven't you?"

24        Answer: "I haven't been told nothin'."

25        Question: "You haven't been told a thing?  You haven't

26    been told that if you testify here you're not gonna be

27    prosecuted?"

1    Answer: "If I had such a deal, I wouldn't be in jail.  I'm

2    maxin' out."

3    Q    Thank you.

4            THE PETITIONER:  Your Honor, may I mark those as

5    full exhibits at this particular time?  Those are the

6    probable cause transcripts in the criminal matter --

7            THE COURT:  Yes.  I will --

8            THE PETITIONER:  -- regarding testimony.

9            THE COURT:  -- admit them in full, but --

10           THE PETITIONER:  I'm coming to that.

11           THE COURT:  Yeah.  I don't see anything related

12   to ineffective assistance of counsel as to the trial

13   here --

14           THE PETITIONER:  Oh, I'm sorry --

15           THE COURT:  -- that could not have been raised in

16   the earlier petition.

17           THE PETITIONER:  -- I'm sorry.  In regards to the

18   last two questions, these questions go to count three

19   of the -- the perjury count.  In regards to the last

20   two questions by Mr. Williams.  I'm sorry for that

21   oversight, Your Honor.  The ineffective assistant

22   account was in regards to the investigation of the

23   Cardwell information, which I'm finished on that.  I

24   should have alerted Your Honor.  I apologize.

25           THE COURT:  All right.  Those transcripts may be

26   admitted in full.

27           THE PETITIONER:  I also have the transcript dated

1    April 25th and April 27th.  May I have these admitted

2    as well?

3         THE COURT:  May be marked.

4         THE PETITIONER:  Just for my records, that would

5    be 25 and 26, if I'm not mistaken?

6         THE CLERK:  That's correct.

7  DIRECT EXAMINATION BY MR. LEWIS (continuing):

8    Q    Mr. Williams, can you read from the transcript dated

9  April 25, 1995 -- transcript page 130 through 131?

10    A    (As read) Question: "In your own opinion do you feel

11  that you've gotten some sort of sweetheart deal in exchange

12  for testifying?"  And then there's colloquy -- "Have you" --

13  oh, I'm sorry, this is not me testifying.  I think this is Mr.

14  Gold testifying, isn't it?

15    Q    Yes.  I'm sorry.  That's the direct examination of

16  David Gold.  Yes.

17    A    Right.  And you want me to read --

18    Q    Yes.

19    A    And, um -- and then Mr. Gold asked again if he (as

20  read) "...received any sort of arrangement from me, Mr. Ruiz,

21  that caused you to testify this way?"

22    Answer: "No."

23    Question: "Did you receive anything from Detective Raucci

24  when he took your statement back in '91 that caused you to

25  give the information you did?"

26    Answer: "No."

27    Question: "Have you at any time since you first approached

1   by Detective Raucci received anything that you felt was such

2   that caused you to testify or give any sort of statement in

3   any special way?"

4      Answer: "No."

5      Q   Thank you.

6          THE PETITIONER:  May those be marked as full

7        exhibits?

8          THE COURT:  Mr. Williams, could you help me by

9        telling me the date of that transcript?

10         THE WITNESS:  Yes, Your Honor.  This is April 25,

11       1995, and I was reading from pages 130 and 131.

12         THE COURT:  And Mr. Gold was testifying?

13         THE WITNESS:  Mr. Gold was questioning the

14      witness Ovil -- Orville (as spoken) Ruiz.

15         THE COURT:  I see.  Yes.  And that one is the

16      full exhibit?  Were you going to ask for something

17      from the 4-27 transcript, Mr. Lewis?

18         THE PETITIONER:  Uh, no.  I get this -- that's

19      pretty much the same thing.

20         THE COURT:  I see.  I'll admit that in full -- 25

21      and 26.

22         THE PETITIONER:  Thank you.  I now have the

23      transcript of January 30, 2007, which we talked about

24      earlier with Mr. Godialis regarding the testimony of

25      Ovil Ruiz at the recent hearing.  I would ask to mark

26      it as an exhibit for identification at this

27      particular time depending on Mr. Godialis' objection.

1        THE COURT: It may be marked.

2        MR. GODIALIS: Your Honor --

3        THE COURT: I just marked it. I didn't admit it.

4        MR. GODIALIS: No, I --

5        THE COURT: But I'll hear what you have to say.

6        MR. GODIALIS: I'm just concerned that none of

7   what's happened in about the last fifteen minutes has

8   anything to do with the claim of ineffective

9   assistance of Mr. Williams. He's sitting there

10  reading from trial transcripts questions that were

11  asked by various folks. And I -- I don't know when

12  we're gonna get to the point.

13       THE PETITIONER: Your Honor, I don't know if Mr.

14  Godialis missed it, but I said the, um -- as far as

15  the ineffective assistance claim in regards to the

16  Cardwell information, I think I was done with that

17  and this was going into count three in regards to the

18  perjury information. And I was just asking Mr.

19  Williams to recite to the court some specific

20  instances in which I intend to prove to this court

21  that Mr. Ruiz committed perjury in that he was the

22  trial lawyer in that given matter.

23       MR. GODIALIS: Well, that -- but that's not

24  what's happening. What's happening is Mr. Williams

25  is being handed transcripts and being asked to read

26  various things from it for no apparent reason.

27       THE COURT: Mr. Lewis, Mr. Ruiz testified, I

believe, in 1995.

THE PETITIONER:  Yes, sir.

THE COURT:  Why didn't you raise this claim in your first habeas?  You can't just keep filing habeases.

THE PETITIONER:  Again, Your Honor, I did raise a perjury claim, but the evidence in which I intend to prove that claim has just been discovered.  It's newly discovered.  It's not the same evidence, Your Honor.  This isn't -- it's a different evidence.

THE COURT:  And what is it that you just discovered?

THE PETITIONER:  Well, if you -- if you recall Mr. Williams reciting the transcript, Mr. Ruiz denied having to deal with the state in exchange for his testimony.

THE COURT:  Right.

THE PETITIONER:  The testimony I just offered right now, Mr. Ruiz admitted having to deal with the state in exchange for his testimony.  And I think that's proof of perjury.  And Mr. Ruiz was a material witness in this case.  And that evidence was not available until last year.

THE COURT:  All right.  I'll allow --

THE PETITIONER:  Throughout the history of this case, he's denied it.  He just admitted it --

THE COURT:  Right.  I -- I followed that

testimony.  Of course, it has to -- you have to -- if

you have newly discovered evidence, you have to show

why you couldn't have obtained it with due diligence

in your earlier proceeding, but --

THE PETITIONER:  Well, Your Honor, I think I can

argue that point at the time it's being argued.  As

Mr. Godialis knows, Mr. Ruiz has continually pled the

Fifth Amendment every time this matter has comin' up.

So we had no way of eliciting that from Mr. Ruiz.

And as you know, Mr. Ruiz is unavailable today.  I

tried to seek his testimony through a subpoena at the

mental health place that he was at, but he's long

gone from there.  So the only thing I had left was

the testimony that Ruiz gave in the Morant matter in

January of 2007, which I think Mr. Godialis had an

obligation to turn over to me in that he did finally

admit that he had a plea agreement.

However, I was able to get the transcript through

another source.  And the transcript proves the point

that myself and Mr. Williams has been trying to prove

for over a decade.  And I think it's material in

regards to Mr. Ruiz.  Again, without his testimony

there could have been no conviction in this case.  He

was a material witness and his deal with the state

played to his -- his motive to testify.

THE COURT:  When you say "the Morant matter,"

what do you mean?  That case was tried in '94 or '95

1    as well.

2         THE PETITIONER:  Yes.  When I say "the Morant

3    matter," I mean the habeas that was just recently

4    heard in 2007.  January -- I think that transcript is

5    dated January 30, 2007.  And in the course of that

6    proceeding, Mr. Ruiz admitted that he had a deal with

7    the state in exchange for his testimony at my

8    criminal trial.  And that establishes the perjury

9    count in which I brought before this court.

10         THE COURT:  I do follow what you're saying.  Mr.

11    Godi- --

12         MR. GODIALIS:  That's -- that's not what the

13    transcript says.  It can come in as a full exhibit.

14         THE COURT:  All right.

15         MR. GODIALIS:  Mr. Ruiz asserted his Fifth

16    Amendment privilege at that proceeding.  What I'm

17    questioning is why it's necessary to have Mr.

18    Williams sit there and read from transcripts about

19    something that Mr. Lewis is trying to prove that has

20    nothing to do with Mr. Williams.

21         THE COURT:  That appears to be true as well.

22    Does that -- do you have any further questions

23    concerning what Mr. Williams did?

24         THE PETITIONER:  Um, well, Your Honor, I think

25    the part that Mr. Williams played in this has

26    exhausted.  But, with all due respect, I would just

27    ask (indiscernible) for the court if you can have Mr.

1    Williams just read this one particular -- this last

2    time evidence into the record in regards that he was

3    the trial lawyer at that particular time.

4        THE COURT:  All right.  I'll admit the --

5        THE PETITIONER:  And -- and I don't have Ruiz

6    here available.

7        THE COURT:  All right.  And do we have this

8    January 30, 2007, transcript?  Is that --

9        THE WITNESS:  I'm holding it in my hand, Your

10   Honor.

11       THE COURT:  You're holding it.

12       THE CLERK:  That was marked at -- for 27.

13       THE WITNESS:  Yes.  It's exhibit 27 for ID.

14       THE COURT:  That's marked Exhibit 27.  There's no

15   objection, so that's a full exhibit.  And I will ask

16   Mr. Williams to be good enough to read the applicable

17   portion.

18       THE PETITIONER:  Now that exhibit would be

19   Exhibit 27 --

20       THE COURT:  Yes.

21       THE PETITIONER:  -- if I'm not mistaken?

22   DIRECT EXAMINATION BY MR. LEWIS (continuing):

23    A   Mr. Lewis, where -- what would you like me to read?

24    Q   Just one second.  Can you read transcript page 7,

25   lines 1 through 18?

26    A   (As read) Question: "Are you worried that the state

27   of Connecticut might prosecute you for this homicide?"

December 3, 2007

1    Answer: "No, because they told me that -- that if I

2   cooperate, then nothing was going to happen to me."

3    Question: "Who told you that?"

4    Answer: "Huh?  Dave Gold."

5    Question: "Did he tell you before you testified at the

6   trials of Morant and Lewis?"

7    Answer: "I mean it was all good and -- all good and dandy

8   when, um -- when I testified against them.  And then when I

9   went to the feds, now all of a sudden indeed they want to

10  prosecute me on something else.  That's why I got the -- I --

11  I pled -- I plead the Fifth."

12    Question: "So once it became clear to the state's

13  attorney's office that you were going to go from a prosecution

14  witness to a defense witness, they started to threaten you

15  with prosecution."

16    Answer: "Yeah."

17    Q    Transcript page 9, line 12 through 10, line 6.

18    A    (As read) Question: "And you say that you had a

19  promise or a representation from David Gold, the prosecutor,

20  before the Morant --

21    "Objection."

22    Question: "What was the promise, if anything, that you had

23  from David Gold before you testified for the state in the

24  trials of Morant and Lewis?"

25    Answer: "That if I testified, I will receive leniency

26  against myself first and -- and the actual crime."

27    Question: "When you say the actual crime, do you mean the

1    killings on Howard Avenue?"

2        Answer: "Yes."

3        Question: "And did you understand that to mean that the

4    state of Connecticut wouldn't prosecute you for any

5    involvement you may have had in that?"

6        Answer: "Because I was the only state witness."

7        Question: "Did Mr. Gold tell you that he would not

8    prosecute you for the homicide?"

9        Answer: "Yes."

10            THE PETITIONER:  I have no further questions for

11            this witness, Your Honor.

12            THE COURT:  All right.  Cross-examination.

13   CROSS-EXAMINATION BY MR. GODIALIS:

14        Q    Mr. Williams, good morning.

15        A    Good morning.

16        Q    Earlier when you testified that you learned some

17   information in this case from Attorney Emanuel based on

18   conversations with him --

19        A    Yes.

20        Q    -- could you tell us approximately when those took

21   place?

22        A    Uh, it was Thursday or Friday of this week on the

23   telephone.

24        Q    This week.

25        A    This past week.

26        Q    Is any of the information that you testified to that

27   you learned from him in those conversations something that you

1    knew prior to those conversations?

2        A    I did not.  I was shocked quite frankly.

3        Q    And with respect to the third party defense strategy

4    at trial, what information exactly was it that you were trying

5    to get in at trial?

6        A    The informer claimed that this fellow -- who I see

7    his name is Caldwell (as spoken) -- had confessed to him to

8    having committed the murder, as I remember.

9        Q    And that's what you wanted to get in.

10       A    Yes.

11       Q    But the informant did not implicate himself in the

12   murder.  (Indiscernible).

13       A    Correct.

14       Q    Thank you.

15              MR. GODIALIS:  I have no further questions.

16              THE COURT:  One moment.  Any redirect?

17              THE PETITIONER:  Yes, Your Honor.

18              THE COURT:  Go ahead, sir.

19   REDIRECT EXAMINATION BY MR. LEWIS:

20       Q    Mr. Williams, the information in which we just spoke

21   about -- Mr. Godialis was questioning you on, who did an

22   informant claim confessed to the murders?

23       A    It was this fellow Michael Caldwell.

24       Q    Michael Cardwell.  And is that the person that you

25   were actually looking for at the time of trial?

26       A    Well, I was looking for both of them, to tell you the

27   truth.

1    Q    Did you ever find out who the informant was?

2    A    No.  I think he -- I see here in one of these police

3    reports it seems that he was described as somebody named

4    Bullet.  But I -- I don't -- I shouldn't be so positive.  The

5    truth is I don't really remember.

6    Q    Right.  Bullet is actually the nickname of Michael

7    Cardwell.

8    A    Oh, I see.  Okay.

9    Q    So you don't have no recollection of who the actual

10    informant were -- was, so to speak.

11    A    I -- I really don't have any memory.  This is a long

12    time ago.

13    Q    In fact, you now learned that the death of the

14    informant was actually withheld from you.

15    A    Yes.

16              THE PETITIONER:  I have no further questions.

17              THE COURT:  All right.  Any recross?

18              MR. GODIALIS:  Nothing, Your Honor.

19              THE COURT:  All right, Mr. Williams.  Thank you

20         very much.

21              THE WITNESS:  Thank you, Your Honor.

22              THE COURT:  I'll take whatever exhibits you still

23         have.

24              THE WITNESS:  Oh.  This was for identification.

25         The others are full.

26              THE COURT:  All right.

27              THE WITNESS:  All right.  Thank you, Your Honor.

1          THE PETITIONER:  Okay.

2          THE COURT:  We'll let you know, obviously.  All

3    right.  I think that's it for this case for today.

4          MR. GODIALIS:  Thank you, Your Honor.

5          THE COURT:  Stand in recess till two o'clock.

6              *        *        *        *        *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

| TSR-CV06-4001783-S | : | SUPERIOR COURT |
| LEWIS, SCOTT | : | TOLLAND JUDICIAL DISTRICT |
| VS. | : | AT ROCKVILLE, CONNECTICUT |
| WARDEN, STATE PRISON | : | DECEMBER 3, 2007 |

## Certification

I hereby certify that the foregoing is a true and accurate transcription of the trial in the above-entitled matter, heard in Superior Court at Rockville, Connecticut on December 3, 2007, before the Honorable Carl J. Schuman, Superior Court Judge.

Dated at Storrs, Connecticut this 23rd day of May, 2008.

*Donna L. Hite*

Donna L. Hite, Transcriptionist

Sweeny

DOCKET NO: 398736                    :    SUPERIOR COURT

MORANT, STEFON                       :    JUDICIAL DISTRICT

VS.                                  :    OF NEW HAVEN

STATE OF CONNECTICUT                 :    OCTOBER 25, 1999


BEFORE:    THE HONORABLE JON C BLUE, JUDGE


APPEARANCES:

                    Attorney for the Plaintiff:
                        Michael A Fitzpatrick, Esq.
                        out of Bridgeport, CT

                    Attorney for the Defendant:
                        Michael Dearington, Esq.
                         of New Haven and
                       Christopher Godalis, Esp.
                         `Chief States Attorney


                            DORICE G. FARRELL
                            Court Recording Monitor



OCT 25, 1999
TESTIMONY OF M. SWEENY

\* \* \* \*

TESTIMONY OF MICHAEL J. SWEENEY

THE COURT: Sir, I think you probably don't have to be quite as close to the microphone as you are. It's amplification power is - appears to be exemplary. So, go ahead.

MR. FITZPATRICK: Thank you, Your Honor.

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q    Good afternoon, Mr. Sweeney.

A    Good afternoon.

Q    Mr. Sweeney, would you tell us what you currently do for a living?

A    I'm presently a registered nurse at Connecticut Hospice and also Yale-New Haven Hospital.

Q    And how long have you been engaged in that profession?

A    Approximately seven years, sir.

Q    And during the last seven years, have there been occasions when you've been outside the United States?

A    Yes, there is.

Q    And where and when did that occur?

A    I left - I was employed by the United Nations for the International Police Task Force. I left in February - excuse me, January of 1998 and I returned in February of '99.

A1

Raucci exactly what he told me - he knew nothing about it, had no knowledge, had not been there, and didn't know what we were talking about.

Q     And what happened then?

A     Detective Raucci continued to question him.  He started giving him quite a few facts about the case, so I thought that the questioning was not going appropriately, so I told Detective Raucci to step out of the room.

Q     And did you step out of the room with Detective Raucci?

A     Yes, I did.

Q     And what happened at that point?

A     I told him to knock it off, that he was telling this person more about the case.  In fact, he was detailing the whole case to him, and that was not the way to do it, to interview him properly and don't tell him anything about the case.  Let him tell you, if he's involved.

Q     What happened next?

A     He said he would do that.

Q     And after that, what happened?

A     We went back into the room.  He told the suspect that he would let him go, although he was arrested on an arrest warrant, that he wanted him to tell him about the case, that he was driving the car that night, that it was in his best interest to tell what happened, give a detailed statement as to his participation and also the other two, and that it would go good for him.  He wouldn't have to

A7

testify in Court, and Detective Raucci would let him go that night.

Q    What - I'm sorry.  I didn't mean to cut you off.

A    The - Mr. Ruiz started then changing his statement.  He stated that he was first, the initial aspects of it, he didn't know what kind of car was involved.  In fact, he told Detective Raucci that he never drove the car. He said that he couldn't drive well.  Detective Raucci had previously told him where it occurred, and he described the building.  He told the person that he knew where he got the guns from.

Q    This was Detective Raucci telling Ruiz?

A    Right.  He mentioned Clay Street, the whole scenario about guns in a gym bag.

Q    This is Detective Raucci again?

A    This is what he was telling the person during his interview, which I stopped and I had him go outside and I told him knock it off.

Q    So you went out in the hallway a second time with Detective Raucci?

A    That's correct.

Q    And tell us again, please, what you told Detective Raucci when you went out into the hall.

A    I told him to knock it off, to do it right, don't tell this person, don't tell this person parts of the case and then five minutes later let him parrot what you're saying and take it as fact.  I said this is not the way

A8

you're gonna do it.  So Detective Raucci - I let him go back in the room.  I did not go back in on the second or third time, as I was in charge of the shift and I was preoccupied with other things.  I was either called out, whatever- but I had gone to do something else and Detective Raucci was in the room for a period of time.  He come out and he put his hands up.  He said that this person wants to give the whole case up.

Q    What did you do at that point?

A    So I told him "Let's go in and listen to it."  So he and I went in to listen to the case, and the person, Mr. Ruiz, - you want the whole - what he said?  Mr. Ruiz said that he had been driving the car that night, it was a BMW. That he had driven to Howard Avenue.  Well, first they went to Clay Street.  They obtained two guns in a gym bag, put it in the trunk of the car and then went to Howard Avenue where this Stefon Morant and his partner took the bag and went up into the apartment.  He heard shots.  They came back to the car and they drove off and they went back to Fair Haven.

Q    What happened next?

A    So then I asked Detective Raucci to step out of the room and I sat alone with this person, and I asked him, I told him that a lot of what he was saying - a lot of information had been given to him, that he was not being released that night, that anything he does say we're going to investigate.  We're going to try to back up.  If he's lying, he'll be in more serious trouble than he is now, and

A9

I don't want to hear what this Detective was telling you. I
said that if it's the truth, we're going to take a statement
from you. If it's not, we're not. So I says "Were you
telling me the truth? Are you truthful in stating that these
two persons were there and you drove the car?" And he
stated that no, he was not. He was not telling the truth.

    Q    What happened next?

    A    I asked him why he was giving this statement. He
said because Detective Raucci said he was gonna let him go,
and that the information he did give, he knew nothing. He
didn't know where this man lived. He didn't know what kind
of house he lived in, that it was all information gathered
from Detective Raucci. I left the room at this point. I
confronted Raucci. I said "Listen, this is not a game we're
playing. I told you to stop this, that now he's telling me
that what he's saying you told him. Basically he got all
the information from you. Not that you told him what to
say, but everything he said you gave him." And I said
"We're not taking a statement like that."

    He said he wanted another interview with him. I
says "Alright. Go on in there and interview him again." He
went in for a short period of time and he came back out, and
he said "Now, Mr. Ruiz wants to just say that he overheard
these two people talking about the case, that he wasn't
present." So at that point, it was getting late. I didn't
want to lose. I knew this person was going in the cell
block, and this, in fact, might be true, so I told him to

FD-302 (Rev. 3-10-82)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription _____2/22/96_____

      OVIL RUIZ, Date of Birth March 9, 1974, after being
advised of the identity of the interviewing agents and the
purpose of the interview, and after being advised of his
constitutional rights and waiving same, provided the following
information:

      RUIZ is currently incarcerated by the State of
Connecticut on First Degree Assault charges and is eligible to be
released from prison sometime in 1996.  The Assault First Degree
charges stem from a shooting which RUIZ committed in 1990.

      RUIZ stated that his real name is AUGUSTINE CASTRO and
that he took the name OVIL RUIZ when he started selling drugs in
New Haven in the late 1980's and early 1990's.  OVIL RUIZ is
actually the name of his younger brother.  He utilized this name
because if arrested he could remember the name easily.  RUIZ
stated that he was born in New York City, New York on March 9,
1974, and that prior to his incarceration, he resided at his
girlfriend's house, 428 Ferry Street, New Haven, Connecticut.  He
has also resided at his father's house at 109-07 Liverpool
Street, Jamaica, Queens, New York, and at his mother's house at
an unknown number on Fifth Avenue, New Haven, Connecticut.

      RUIZ stated that prior to his arrest, he sold cocaine
and other drugs for CHUCK (Last Name Unrecalled)(LNU) on James
Street, New Haven.  CHUCK, in turn, received the drugs from FRANK
PARESE.  RUIZ also sold drugs for SCOTT LEWIS, who also received
drugs (cocaine) from PARESE.  RUIZ also admitted picking up drugs
for GLENN WHALEN from PARESE and dropped off drugs to other
customers of PARESE.

      RUIZ stated that PARESE used intermediaries like
himself because "white guys" like PARESE are not totally trusted
in the Fair Haven drug community.  According to RUIZ, PARESE also
used SCOTT LEWIS, RAUL LUCIANO, and ARMANDO LUCIANO as
intermediaries to sell drugs.

      RUIZ stated that he testified as a witness against
SCOTT LEWIS in a murder trial concerning the double homicide of

Investigation on __2/22/96__ at __New Haven, Connecticut__

File # 194C-NH-32550 302-3

by  SA RONALD K. BARNDOLLAR
    SA BRIAN DONNELLY/bd                Date dictated __2/22/96__

135

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

F.B.I  2-22-96

FD-302a (Rev. 11-15-83)

194C-NH-32550

Continuation of FD-302 of   **OVIL RUIZ**                                      , On   **2/22-23/96**, Page   2

RICK TURNER and former New Haven Alderman (First Name Unrecalled) (FNU) FIELDS, who were shot to death in October, 1990. SCOTT LEWIS and STEPHAN MORANT were convicted at trial of the double murder.

RUIZ was asked to describe in detail the day of the murders and he advised as follows:

RUIZ had been selling cocaine from a house on Clay Street (he believed to be either number 149 or 150) in New Haven from 12 midnight until 8 AM on the "graveyard shift". After getting off from his "shift", RUIZ met with JOSE ROQUE, who was driving a rental car which had been rented by JEFF (LNU). JEFF (LNU) is the owner of Minuteman Press on Grand Street, New Haven, and is a white male associate of FRANK PARESE.

RUIZ and ROQUE then drove around town and smoked "reefer" and met with several females, including a Hispanic girl named EDNA, EG (the girlfriend of a Hispanic male known as "Red Dog", and a girl named AWELDA MARRENGO from Ferry Street, New Haven. RUIZ and ROQUE stayed with the girls until about noon, when they left the girls to meet their "crew" on Exchange Street, New Haven.

RUIZ left the Exchange Street area about 6 PM and returned to the afore-mentioned Clay Street address, where he met with JOSE APONTE, "POPITO", and "POPITE". While at Clay Street, RUIZ played dice with several individuals until about 10 PM, when SCOTT LEWIS and STEPHAN MORANT arrived.

Shortly after their arrival, LEWIS and MORANT began arguing about PARESE's control of the drug dealing in the Fair Haven area. The arguing continued for about an hour with MORANT questioning whether PARESE's "crew" was working in MORANT's drug distribution area. MORANT also expressed concern about a possible "contract" on his life by PARESE. MORANT was also suspicious about RUIZ's dealings with PARESE and questioned RUIZ directly about that. After talking about PARESE, the discussions changed to questions about RICK TURNER, an individual who reportedly acted as a "banker" for many of the drug dealers in New Haven. According to RUIZ, TURNER was selected to be the "banker" because he had been arrested only once by the police. TURNER allegedly held monies for LEWIS, MORANT, and PARESE. These discussions became heated, with MORANT going "crazy" and yelling, while LEWIS paced back and forth without saying much.

156

FD-302a (Rev. 11-15-83)

194C-NH-32550

Continuation of FD-302 of __OVIL RUIZ_____ .On __2/22-23/96.__ Page __3__

     At approximately midnight, while RUIZ was standing outside the Clay Street location, PARESE came by and spoke about TURNER. After PARESE left, MORANT yelled to RUIZ, "Get the guns. We're going to the Hill." In response to this, RUIZ took a .357 caliber revolver from beneath the kitchen sink and a .38 caliber revolver which was hidden in a vent at the Clay Street house. LEWIS took the .357 revolver and MORANT the .38 revolver. They placed one gun under the car seat and the other gun beside the front seat prior to driving to the Hill section of New Haven in another rental car. RUIZ, LEWIS, and MORANT drove from Fair Haven to the Hill, via Long Wharf, eventually arriving at TURNER's house on Howard Avenue. The three sat in the parked car near the house and watched the house for a while. They circled the block a few times and eventually left the area for a few hours.

     RUIZ, LEWIS and MORANT drove to Adeline Street and bought "reefer" which they smoked while they drove around the Hill area. At around 2 AM or 3 AM, they went to an "after hours" bar on Hallock Street for drinks. When they left the bar, they drove to TURNER's house. LEWIS and MORANT exited the vehicle, each armed with a revolver, and entered TURNER's residence. RUIZ remained in the car and kept the motor running. While MORANT and LEWIS were in TURNER's residence, a Hispanic female named MILLIE, who was known to RUIZ, walked down the street and stopped to talk with RUIZ. They continued to converse while she stood alongside the car. RUIZ then heard gunshots coming from TURNER's residence. The sound caused MILLIE to fall to the ground looking for cover. Shortly after hearing the gunshots, RUIZ saw both LEWIS and MORANT exiting TURNER's house. One of them was carrying a Puma gym bag and the other carried a bank deposit bag. LEWIS and MORANT jumped into the waiting rental car and RUIZ drove away from the area and returned to Clay Street in Fair Haven. Later that evening, RUIZ recalled, LEWIS and MORANT commented something about doing "what they had to do".

     Regarding the whereabouts of the murder weapons, RUIZ claimed the .357 was thrown into the Mill River under the Chapel Street Bridge about a month after the shootings at a time when the police were conducting raids in the city. The other weapon, a .38 revolver was recovered by police when they raided the home of JOSE APONTE's mother in Hamden, Connecticut, during the fall of 1990.

     RUIZ stated that he was subsequently arrested by New Haven Police Detective VINNY RAUCCI for a shooting and decided to cooperate and furnish information about the TURNER/FIELDS

FD-302a (Rev. 11-15-83)

194C-NH-32550

Continuation of FD-302 of __OVIL RUIZ__ _____ , On __2/22-23/96__, Page __4__

homicides. RUIZ said he told the above facts to Detective RAUCCI
and subsequently to New Haven Prosecutor DAVID GOLD, which
resulted in RUIZ testifying at several hearings and trials, which
concluded in guilty verdicts against LEWIS and MORANT.

When asked more pointedly about his testimony, RUIZ
told interviewing agents that he had not been completely truthful
in his testimony. RUIZ stated he told both Detective RAUCCI and
Prosecutor GOLD during trial preparations that under no
conditions would he, RUIZ, name FRANK PARESE in any testimony.
RUIZ professed a great fear of PARESE and that RAUCCI and GOLD
agreed RUIZ could testify leaving PARESE's name out.

RUIZ told interviewing agents that he had done a great
deal of drug dealing for PARESE and was very aware of PARESE's
ruthless tactics and feared for his life from any PARESE
retaliation.

Interviewing agents then told RUIZ that PARESE had
recently been taken down by the FBI and was currently under
indictment for drug trafficking. It was pointed out that the FBI
wasn't afraid of FRANK PARESE. RUIZ began to cry. RUIZ was then
asked if he was afraid of Detective VINNY RAUCCI. When he
answered tearfully in the affirmative, RUIZ was told of RAUCCI's
recent suspension/arrest and that the FBI wasn't afraid of RAUCCI
either. RUIZ began crying more forcefully then, losing his
composure. RUIZ stated he has been living for five years with a
terrible secret which he could no longer contain.

After regaining his composure, RUIZ stated that he had
lied under oath about SCOTT LEWIS and STEPHAN MORANT being
involved in the aforementioned homicides and the LEWIS and MORANT
were innocent of those murders. RUIZ stated he knew who
committed the murders because he was there and LEWIS and MORANT
were not there and had been framed. RUIZ stated his testimony
was essentially true but that he had substituted the names of
LEWIS and MORANT for the identities of the real killers. RUIZ
stated that FRANK PARESE was behind the murders. Thereafter,
RUIZ provided the following details:

RUIZ stated he first met FRANK PARESE in the late
1980's, when RUIZ was approximately 15 or 16 years old, when RUIZ
was attempting to steal PARESE's car from in front of PARESE's
home in Branford, Connecticut. PARESE caught RUIZ in the act of
stealing his car and yelled at RUIZ, saying something like "Don't
I pay you enough already?" RUIZ understood this to mean that
PARESE was paying Hispanics to distribute drugs. After calming

129

FD-302a (Rev. 11-15-83)

194C-NH-32550

Continuation of FD-302 of   OVIL RUIZ _____ , On   2/22-23/96. Page   5

down, PARESE asked RUIZ where he was from. After a short
conversation, PARESE gave RUIZ his telephone number, saying "I
might need you", and indicating he might want to use RUIZ for
some illegal activity.

RUIZ described himself as an enforcer for drug dealers
and admitted to having shot "18 or 19" persons in various drive-
by shootings and drug debt collections. RUIZ recalled their oft-
used warning "If you don't pay, we spray!"

RUIZ stated he had no contact with PARESE until 1989,
at which time RUIZ had been delivering drugs for GLEN WHALEN for
some time. RUIZ had shot a Hispanic male in the legs for WHALEN
and that shooting victim is now known as "Crippled Bert". RUIZ
recalled meeting PARESE for a second time after committing that
shooting.

RUIZ stated that about four months after that second
meeting, PARESE talked with RUIZ about "putting together a shop",
meaning expanding RUIZ' role in PARESE's drug distribution
network. Already, RUIZ had been distributing cocaine to, and
collecting money from the Island Boys for PARESE through WHALEN.

RUIZ stated he eventually worked his way up in PARESE's
network by keeping tabs on various drug distribution gangs for
PARESE and reporting back to PARESE. PARESE subsequently named
RUIZ a "trustee" in the early 1990's. RUIZ recalled PARESE told
him that because he wasn't Italian, RUIZ couldn't be a member of
his (PARESE's) organization but that he could be accommodated in
a parallel organization.

RUIZ stated he had reached such a level of trust with
PARESE that he was included in meetings, held both in the Annex
area near Lighthouse Park, New Haven, and also in Rhode Island,
with PARESE's drug suppliers, who were referred to as "Italians
from Rhode Island".

RUIZ described the two white males as follows: one was
slim and well-built; the other was fat, with gray hair and wore
dark glasses. RUIZ never learned the full names of the Italians
but believes their last names may have been PIRELLI (phonetic).

At the above-described meetings, money collections from
drug dealers were discussed. RUIZ recalled one discussion with
the Italians regarding young drug dealers. The Italian
characterized them as follows: "When the bull grows up, as it
gets stronger, it grows balls. If you don't cut the balls off,

,24

FD-302a (Rev. 11-15-83)

194C-NH-32550

Continuation of FD-302 of  __OVIL RUIZ_____ . On __2/22-23/96__. Page ___6___

it grows horns". RUIZ understood this analogy to indicate the
need to keep these underling dealers in check periodically to
prevent them from becoming too strong and a threat to the
operation.

In this regard, PARESE and the Italians from Rhode
Island dispensed discipline in unusual means. Instead of killing
off those debtors, which is somewhat common among such groups,
PARESE had those debtors "set up" by the police and sent to jail.

RUIZ stated that with respect to the FIELDS/TURNER
homicides, most of his story is true, except that LEWIS and
MORANT were not present. The actual homicides involved ARMANDO
and RAUL LUCIANO, FRANK PARESE, RUIZ, and a Colombian known only
as "Loco". On the night of the killings, the aforementioned
individuals got into a vehicle owned by PARESE and drove to the
Hill section of New Haven. The LUCIANOs, PARESE, and "Loco" went
into the FIELDS house and killed FIELDS and TURNER. TURNER was
not the intended target of the murderers but was killed because
he was there at the time and they didn't want any witnesses.
RUIZ waited outside in PARESE's car while the killings took
place. The story about MILLIE hearing the shots was fabricated
to provide additional witnesses.

RUIZ believes that one of the murder weapons, the .357
revolver used by PARESE, may be in the possession of JEFF (LNU)
of Minuteman Press because JEFF has stored important items
(drugs, cash, etc.) for PARESE in the past, utilizing a safe
located in the basement of the store.

RUIZ advised that some time after the double homicide,
he was present at RAUL LUCIANO's condominium in Hamden,
Connecticut, at which time he observed New Haven Police
Department (NHPD) Detective VINCENT RAUCCI present there. RAUCCI
was talking and drinking with PARESE while PARESE was counting
"drug money".

RUIZ stated he has personally picked up drugs from
PARESE's house in Branford, Connecticut when RAUCCI was present
and involved in the transaction. On still another occasion, RAUL
and ARMANDO LUCIANO, PARESE, and Det. RAUCCI were present in a
cemetery off the Boulevard in New Haven at which time PARESE
pointed a gun at RUIZ and told him "I can kill you and get away
with it".

Sometime after the double homicide, RUIZ agreed to help
"set up" LEWIS and MORANT to be arrested for the crime. RUIZ

140

FD-302a (Rev. 11-15-83)

194C-NH-32550

Continuation of FD-302 of   OVIL RUIZ                                    , On   2/22-23/96 , Page   7

stated he met with Det. RAUCCI to plan the "set-up". During his
meetings with RAUCCI, RUIZ was told that in order to make the
story more credible, RUIZ was to shoot an "enemy", a drug dealer
competitor, after which shooting, RUIZ would be arrested by
RAUCCI. Following his arrest, RUIZ would cooperate with RAUCCI
and cut a deal to give up LEWIS and MORANT for the double
homicide. RUIZ was told that for him to give up evidence on a
double homicide after being busted on anything less that a
shooting, he would not be believed. RUIZ stated that LEWIS was
being "set up" because LEWIS owed PARESE a great deal of drug
trafficking money which he hadn't paid.

        According to RUIZ, RAUCCI was not only involved in the
"set-up" of LEWIS and MORANT, but is also major partner in
PARESE's drug distribution operation. RUIZ recalled, as
mentioned earlier, seeing RAUCCI on at least two occasions with
PARESE meeting with the Italians from Rhode Island. RUIZ
believes that PARESE and RAUCCI may have been involved in the
"setting up" of the following drug dealers: ARNOLD BELL, the
KETCHUM brothers, ANDRE CURRY, (FNU) FIELDS, and a black male
known as "Nitro".

        RUIZ stated that, in addition to "setting up" LEWIS and
MORANT, he is currently being asked to "set up" his cousin, JOSE
REYES, for the shooting murder of a prostitute that occurred
behind Wilbur Cross High School in 1990. RUIZ stated he knows
PARESE shot and killed the prostitute because RUIZ was present at
the time and witnessed the shooting. RUIZ stated that PARESE has
beaten women in the past. RUIZ stated he is willing to testify
falsely again because if he does not, he could be killed by GLEN
WHALEN's son who is presently serving time with RUIZ at the
Bridgeport Correctional Center.

        OVIL RUIZ, whose true name is AUGUSTINE CASTRO, has
also used the aliases of GEORGE MELENDEZ, OVIL CASTRO, and HIRAM
CASTRO.

/141

## CODING/INCIDENT REPORT

### SUPPLEMENTARY (HOMICIDE)

| | | | | | |
|---|---|---|---|---|---|
| 111567 | 10/11/90 | 05 | 0434 | 11/24/90 | 1345 1345 |
| 634 | HOWARD AVENUE | 2-R | | 093 | MINOR STREET |

| | LAST NAME | FIRST NAME | SEX | RACE | MO | DAY | YR | ADDRESS/PHONE |
|---|---|---|---|---|---|---|---|---|
| CV | TURNER | RICARDO | M | N | 05 | 22 | 47 | 634 HOWARD AVENUE, NEW HAVEN, CONNECTICUT |
| CV | FIELDS | LAMONT | M | N | 01 | 11 | 66 | 634 HOWARD AVENUE, NEW HAVEN, CONNECTICUT |
| O | ORTIZ | F. SGT. PD 093 | | | | | | |
| O | McCOY | W. SGT. PD 093 | | | | | | |

| | |
|---|---|
| REPORTING OFFICER | 4813  DETECTIVE V.1 |
| ASSGN. | ISU |

DURING THE WEEK OF NOVEMBER 11,1990, THIS DETECTIVE WAS CONTACTED BY SGT. F. ORTIZ WHO ADVISED THIS DETECTIVE THAT HE HAD A KNOWN AND RELIABLE INFORMANT WHO HAD INFORMATION RELATIVE TO THE DEATHS OF RICARDO TURNER AND LAMONT FIELDS. SGT. ORTIZ STATED THAT THIS INFORMANT HAS WORKED WITH HIM FOR A PERIOD OF SEVERAL YEARS AND THAT HE HAS GIVEN INFORMATION RELATIVE TO HOMICIDES, ROBBERIES, BURGLARIES, AND NARCOTICS THAT HAS PROVEN TO BE TRUE AND ACCURATE AND THAT HAS RESULTED IN ARRESTS AND SUBSEQUENT CONVICTIONS IN A COURT OF LAW.

DURING THAT SAME WEEK, SGT. ORTIZ AND HIS INFORMANT DID MEET WITH SGT. W. McCOY AND THIS DETECTIVE AT THE INVESTIGATIVE UNIT OF THIS DEPARTMENT. DURING THIS MEETING, SAID KNOWN AND RELIABLE INFORMANT RELATED THE FOLLOWING FACTS AND CIRCUMSTANCES TO THESE INVESTIGATORS:

DURING THE WEEK OF OCTOBER 21,1990 OR OCTOBER 28,1990, HE WAS IN DISCUSSION WITH A MALE KNOWN TO HIM AS MICHAEL CARDWELL. HE STATED THAT HE KNEW MICHAEL CARDWELL'S STREET NAME TO BE "BULLET" AND THAT HE HAS BEEN AN ASSOCIATE OF CARDWELL FOR SEVERAL YEARS. FURTHER, SAID INFORMANT DID IDENTIFY NEW HAVEN POLICE DEPARTMENT PHOTOGRAPH NUMBER 44065 AS BEING THAT INDIVIDUAL KNOWN TO HIM AS MICHAEL CARDWELL, AKA "BULLET". NEW HAVEN ARRESTEE PHOTOGRAPH NUMBER 44065 IS, INFACT, ONE MICHAEL CARDWELL,

DATE OF BIRTH 11/20/68. DURING THIS DISCUSSION BETWEEN THE INFORMANT AND CARDWELL,
CARDWELL DID TELL THE INFORMANT THAT HE DID KILL BOTH RICARDO TURNER AND LAMONT FIELDS.
ACCORDING TO THE INFORMANT, CARDWELL SAID THAT HE AND HIS BROTHER VINCENT, WENT
TO TURNER AND FIELDS APARTMENT TOGETHER. ONCE OUTSIDE OF THE APARTMENT, VINCENT
STAYED OUTSIDE WHILE MICHAEL CARDWELL WENT INTO THE APARTMENT. VINCENT WAS SUP-
POSED TO WHISTLE WHEN THERE WAS NO APPARENT ACTIVITY ON THE STREET. THIS WAS THE
SIGNAL FOR MICHAEL CARDWELL THAT HE WAS CLEAR TO COMPLETE HIS INTENDED TASK.
MICHAEL CARDWELL TOLD THE INFORMANT THAT HE WAS LET INTO THE APARTMENT BY RINGING
THE DOORBELL AND BEING BUZZED IN. UPON WALKING UP TO THE SECOND FLOOR, TURNER'S
DOOR WAS ALREADY OPEN AND HE, CARDWELL, WALKED IN. ACCORDING TO THE INFORMANT,
CARDWELL SAID THAT HE WALKED IN AND FOUND TURNER AWAKE IN THE BEDROOM WITH LAMONT

| | | | |
|---|---|---|---|
| | | DATE | 11-24-90 |  PAGES  1/2 |
| | SIGNED | | |
| | SUBSCRIBED AND SWORN TO BEFORE ME | | |
| | THIS | | DAY OF | 19 |
| | SIGNED | | |
| □ NOTARY PUBLIC | | | □ 1-24 CCS |

Defendant's Identification Exhibit 30: Police Report Re: Confidential Informant

CASE/INCIDENT REPORT

CONTINUATION PAGE

111567

FIELDS ASLEEP IN THE BED. CARDWELL TOLD THE INFORMANT THAT HE SHOT FIVE TIMES, KILLING TURNER FIRST AND THEN LAMONT FIELDS WHILE HE LAYED IN BED. CARDWELL THEN IMMEDIATELY FLED MEETING HIS BROTHER VINCENT OUTSIDE. THE INFORMANT SAID THAT MICHAEL CARDWELL WAS LIVING AT THE THREE JUDGES MOTEL LOCATED ON WHALLEY AVENUE NEAR THE WOODBRIDGE TOWN LINE. HE SAID THAT MICHAEL HAD BEEN IN AND OUT OF NEW HAVEN SEVERAL TIMES SINCE THE MURDER. THE INFORMANT NOTED THAT MICHAEL CARDWELL'S FATHER, ARNOLD SPEARS, AKA "PIGGY" AND HIS BROTHER VINCENT WERE STILL SELLING NARCOTICS IN THE CONGRESS AVENUE AND ARCH STREET AREA.

DURING THE WEEK OF NOVEMBER 11,1990, THIS DETECTIVE DID CONDUCT RESEARCH WITH THE NEW HAVEN POLICE DEPARTMENT NARCOTICS ENFORCEMENT UNIT AND WAS TOLD THAT ARNOLD SPEARS HAS STILL INVOLVED IN THE SALE OF NARCOTICS IN THE AREA OF CONGRESS AVENUE AND ARCH STREET. FURTHER, SPEARS AND MICHAEL CARDWELL WERE ARRESTED IN THE PAST SUMMER PURSUANT TO AN INVESTIGATION BY THAT UNIT CONCERNING THEIR NARCOTIC INVOLVEMENT. ALSO, VINCENT WAS IDENTIFIED BY THOSE MEMBERS OF NEU AS ANTHONY V.CARDWELL. THIS DETECTIVE DID SHOW THE INFORMANT NEW HAVEN POLICE DEPARTMENT ARRESTEE PHOTOGRAPH NUMBER 30344. SAID INFORMANT STATED THAT PHOTOGRAPH NUMBER 30344 WAS THAT INDIVIDUAL KNOWN TO HIM AS VINCENT, MICHAEL CARDWELL'S BROTHER. NEW HAVEN POLICE DEPARTMENT ARRESTEE PHOTOGRAPH NUMBER 30344 IS, INFACT, ANTHONY V.CARDWELL, DATE OF BIRTH 12/27/52.

DURING THE WEEK OF NOVEMBER 18,1990, THIS DETECTIVE DID RESPOND TO THE THREE JUDGES MOTEL LOCATED AT 1560 WHALLEY AVENUE, NEW HAVEN, CONNECTICUT WHERE I DID SPEAK WITH THE MANAGER MR. HASMUKH JARIWALA. MR. JARIWALA SAID THAT A CARDWELL FAMILY HAD INFACT RENTED A ROOM AT THE MOTEL IN OCTOBER AND STAYED A SHORT WHILE BEFORE LEAVING ON OCTOBER 25,1990. THIS DETECTIVE THEN RESPONDED TO THE REGAL INN LOCATED AT 1605 WHALLEY AVENUE, NEW HAVEN, CONNECTICUT. THERE, I MET THE CLERK, SANDY DWARCHOLIC, WHO STATED THAT SHE HAD A MICHAEL CARDWELL REGISTERED TO ROOMS AT THAT LOCATION ON NOVEMBER 1,1990 TO NOVEMBER 8,1990 TO NOVEMBER 9,1990, AND AGAIN ON NOVEMBER 17,1990 TO NOVEMBER 18,1990. THAT MICHAEL CARDWELL LISTED HIS CONNECTICUT LICENSE NO. AS 216075427. EXPIRATION OF 11/20/90. THIS DETECTIVE DID CONDUCT A MOTOR VEHICLE CHECK OF THAT LICENSE NUMBER AND FOUND THAT IT DID COME BACK TO A MICHAEL CARDWELL, DATE OF BIRTH 11/20/68, OF 358 ORCHARD STREET, NEW HAVEN, CONNECTICUT. THIS DETECTIVE DID KNOW CARDWELL TO HAVE LAST RESIDED AT 358 ORCHARD STREET, NEW HAVEN, CONNECTICUT AS SAME WAS LISTED AS SUCH ON HIS MOST RECENT ARREST INFORMATION SHEET.

DURING THE WEEK OF NOVEMBER 18,1990, DETECTIVE HAIER AND SGT. McCOY DID AGAIN MEET WITH THE KNOWN HAD RELIABLE INFORMANT. THE INFORMANT SAID THAT WHILE AGAIN IN CONVERSATION WITH CARDWELL (MICHAEL) THIS WEEK, CARDWELL TOLD THE INFORMANT THAT HE KILLED TURNER BECAUSE HE DID HIM WRONG. THE INFORMANT UNDERSTOOD THIS TO IMPLY THAT CARDWELL WAS NOT HAPPY ABOUT THE CLOSE RELATIONSHIP BETWEEN TURNER AND FIELDS. THE INFORMANT SAID THAT HE WAS WELL AWARE OF CARDWELL BEING CLOSELY ASSOCIATED WITH TURNER BECAUSE OF NARCOTIC OPER-ATION THAT WAS RUN BY THE TWO. BUT THE INFORMANT SAID THAT HE HAD A FEELING THAT MICHAEL CARDWELL MAY HAVE BEEN INVOLVED PHYSICALLY WITH TURNER. THE INFORMANT ALSO SAID THAT MICHAEL CARDWELL TOLD THE INFORMANT THAT THE GUN USED TO KILL BOTH TURNER AND FIELDS WAS AT HIS GIRLFRIENDS HOUSE IN NEW BRITAIN, CONNECTICUT. THE INFORMANT SAID THAT HE KNEW CARDWELL TO HAVE A GIRLFRIEND IN NEW BRITAIN BUT DID NOT KNOW HER NAME OR WHERE SHE LIVED. THE INFORMANT ALSO SAID THAT HE BELIEVED THEY HAD A CHILD TOGETHER.

SIGNED _____

DATE 11-24-90 PAGES ____ OF ____

THIS ____ DAY OF ____ 19 ____

☐ NOTARY PUBLIC   ☐ SWORN   ☐ 1-24 CGS

THIS REPORT IS BEING MADE ON THE PENALTIES PROVIDED BY STATE LAW FOR MAKING A FALSE STATEMENT.

| TSR-CV06-4001783-S | : | SUPERIOR COURT |
|---|---|---|
| LEWIS, SCOTT | : | TOLLAND JUDICIAL DISTRICT |
| VS. | : | AT ROCKVILLE, CONNECTICUT |
| WARDEN, STATE PRISON | : | JANUARY 11, 2008 |

B E F O R E:

THE HONORABLE CARL J. SCHUMAN

SUPERIOR COURT JUDGE

A P P E A R A N C E S:

     SCOTT LEWIS, Pro se Petitioner (Ordering party)

     CHRISTOPHER GODIALIS, Attorney for the Respondent

Donna L. Hite
Transcriptionist

1    THE COURT:  Good morning, marshal, ladies and

2    gentlemen.  This is a continuation of the hearing in

3    the matter of Scott Lewis versus the Warden.  I see

4    Mr. Lewis and Mr. Godialis.  Any preliminary matters

5    before we hear any further evidence?

6        MR. GODIALIS:  None that I'm aware of, Your

7    Honor.

8        THE COURT:  All right.

9        MR. LEWIS:  Just want the -- can you just --

10       THE COURT:  I will order that on the ground that

11   I've ordered it in the past and there've been no

12   problems.  So I'll order the handcuffs removed.

13       (Marshal removes handcuffs)

14       All right.  Do you have any further evidence, Mr.

15   Lewis?

16       MR. LEWIS:  Uh, yes, Your Honor.  Before I get to

17   the evidence, though, first I want to extend my

18   apologies to the court.  I sent a supplemental brief

19   handwritten.  It was kind of sent in the draft form.

20       THE COURT:  All right.

21       MR. LEWIS:  And what I did is I wrote a exact

22   supplement brief.  It's a little neater this time.  I

23   would wonder if I could replace this one I have for

24   the court to make it easier to read?

25       THE COURT:  Okay.

26       MR. LEWIS:  I also have a neater copy for Mr.

27   Godialis as well.

1   apartment within that building?

2       A   Mr. Turner.

3       Q   Mr. Turner.

4       A   And Mr. Fields.

5       Q   And how long -- how well did you know Mr. Ricardo

6   Turner?

7       A   Um, just like a neighborly hello, goodbye.  That's

8   about it.

9       Q   How long did you reside at 634 Howard Avenue prior to

10  Mr. Turner being executed?

11      A   I believe it was eleven months.

12      Q   Eleven months?

13      A   Yeah.  I moved out the next day, yes.

14      Q   So you had occasion to see people visit that building

15  --

16      A   Correct.

17      Q   -- for eleven months?  Do you remember anything about

18  the morning of October 11, 1990?

19      A   Um, prior to the incident?

20      Q   Prior to the shooting?  Yes.

21      A   Um, yes.  From -- do you want me to go -- to talk

22  about when I arrived home that morning?

23      Q   Just explain to me what you remember about that day.

24      A   Okay.  I remember arriving home.  I don't remember

25  what time I arrived home.  I was approached outside by someone

26  asking for a cigarette prior to going in the house.  And went

27  in the house, watched TV for a little while, and -- and the

1    incident occurred.

2        Q    How long from the time that you encountered someone

3    in front of -- you say your apartment building --

4        A    Yes.

5        Q    -- did the shots ring out after that?

6        A    Probably a hour maybe.

7        Q    And hour after you encountered the person

8    (indiscernible)?

9        A    To the best of my knowledge, yes.

10       Q    To the best of --

11       A    I really don't remember how long it was, but I was

12   home for a bit.

13       Q    Okay.

14            MR. LEWIS:  Can I offer a photo of Mr. Turner as

15       an exhibit?

16            THE COURT:  Yes.  Show it to Mr. Godialis.

17            MR. GODIALIS:  I -- I don't know if that's Mr.

18       Turner, but I suppose we could see what Mr. Lewis

19       wants to do with (indiscernible).

20            THE COURT:  You could ask the witness.  Marshal,

21       if you would show it to the witness.

22            (Witness reviews)

23   DIRECT EXAMINATION BY MR. LEWIS (continuing):

24       A    Yeah, that's him.

25            Q    Did you identify that individual as Mr. Ricardo

26   Turner?

27       A    Yeah.

1    Q    Did you also know, uh --

2         MR. LEWIS:  Your Honor, can we mark that as a

3    full exhibit?

4         MR. GODIALIS:  No objection, Your Honor.

5         THE COURT:  Exhibit 33, full.

6    DIRECT EXAMINATION BY MR. LEWIS (continuing):

7    Q    Did you also have occasion to meet Mr. Turner's

8    roommate, Mr. Lamont Fields?

9    A    Um, I didn't see him as often as Mr. Turner.  Maybe

10   only one or two times.

11   Q    But if you were shown a photo, would you be able to

12   recognize him?

13   A    Only from -- having to do with this trial.  I

14   probably -- I wouldn't recognize him prior to that, but --

15        MR. LEWIS:  Your Honor, I would like to offer a

16   photo of Mr. Fields.

17        THE COURT:  All right.  Show it to Mr. Godialis

18   and then the witness.

19   DIRECT EXAMINATION BY MR. LEWIS (continuing):

20   A    I've seen those pictures before, sir.

21   Q    Is that the person you remember as Mr. Fields?

22   A    As far as I know.  I've seen those photos in the

23   past, so yes.

24   Q    Okay.

25        MR. GODIALIS:  If I may just inquire, then.

26        THE COURT:  You may.

27   CROSS-EXAMINATION BY MR. GODIALIS:

1    A   Ms. Basilicato, do you recognize that as a photo of

2 Mr. Fields or do you recognize that as a photo that you've

3 seen before?

4    A   Well, just I didn't know Mr. -- Mr. Fields that well,

5 so that photo, even if I did know him, the one or two times

6 that I seen him in the past, it does resemble him.  Yes.

7    Q   But you're not sure that it's him?

8    A   I didn't see him that much.  I knew Mr. Turner much,

9 much more but -- yes.

10    Q   Is that a photo that you were shown --

11    A   Yes.

12    Q   -- during the criminal trials?

13    A   I've seen it before in the past.  Yes.

14    Q   Okay.

15         MR. LEWIS:  May I offer it as a full exhibit,

16     Your Honor?

17         THE COURT:  Your position, Mr. Godialis?

18         MR. LEWIS:  No objection, Your Honor.

19         THE COURT:  All right.  Full exhibit 34.

20 DIRECT EXAMINATION BY MR. LEWIS (continuing):

21    Q   Ms. Basilicato, you said at the time of 1990 you were

22 twenty-one years old.  Is that correct?

23    A   Uh, yeah.  Twenty-two.

24    Q   And today you're possibly thirty-eight?

25    A   Thirty-nine.

26    Q   So it's been seventeen years since the last time

27 these events took place?

1  A Yes.

2  Q Do you recall being interviewed by the New Haven

3 police regarding this information?

4  A Yes.

5  Q If you don't mind, may I show you a interview

6 conducted by the New Haven police --

7  A Sure.

8  Q -- that you gave to hopefully refresh your memory

9 'cuz I know it's been such a long time.

10  A Yes.

11  Q If that would help you?

12  A Sure.

13    MR. GODIALIS:  Well, objection, Your Honor.  The

14    witness hasn't been asked anything yet.

15    THE COURT:  Sustained.

16 DIRECT EXAMINATION BY MR. LEWIS (continuing):

17  Q Well, do you have any -- do you recall specifically

18 what you told the police on the night in question concerning

19 what you observed on the evening in question?

20  A Yes, I remember.

21  Q Do you remember it in detail?

22  A Seventeen years of details, I can do my best.  Yes, I

23 have a good memory, so....

24  Q What about what you testified to at the criminal

25 trials in 1995 and 1994?  So if I was to tell you that you

26 testified at the criminal trials that the shots you heard ring

27 out occurred within minutes after encountering this individual

1  before entering your apartment, would that refresh your

2  memory?

3          MR. GODIALIS:  Objection, Your Honor.

4          THE COURT:  Sustained.

5          MR. GODIALIS:  This is not proper direct

6      examination.

7          THE COURT:  Sustained.

8  DIRECT EXAMINATION BY MR. LEWIS (continuing):

9     Q   Ms. Basilicato, this morning you testified that it

10 was approximately a hour that -- from the time that you seen

11 this individual entering into your building and the time that

12 the shot was fired?

13    A   Yeah, approximately.  I just -- I remember putting

14 away laundry and, you know, I mean, I don't remember how long

15 it was.

16    Q   Right.  Could that possibly be inconsistent with your

17 trial testimony?

18    A   It's been a long time.  I -- I really don't know.

19          MR. LEWIS:  Well, would I be able to present this

20      witness with her trial testimony, Your Honor, to

21      refresh her memory on that?

22          THE COURT:  I think at this point it's been

23      established that the witness is not sure, so I'll

24      allow it.

25          MR. LEWIS:  I'd like to offer this as Exhibit 35.

26          THE COURT:  Well, I thought you were just trying

27      to refresh her recollection.  That wouldn't go into

1    evidence as a full exhibit.

2        MR. LEWIS:  Right.  Just for identification

3    purposes at this time?

4        THE COURT:  All right.

5        MR. GODIALIS:  The witness' trial testimony, Your

6    Honor, just for the record, is -- is a full exhibit

7    and it's --

8        THE COURT:  I see.  All right.  It's already a --

9        MR. GODIALIS:  The only -- the only question I

10   would have is whether we're gonna go through her

11   entire trial testimony again or whether we're going

12   to get to something that has to do with this habeas.

13       THE COURT:  That's a fair question.

14       MR. LEWIS:  Well, Your Honor, it has a lot to do

15   with this habeas.  First, the testimony that she's

16   giving today that she encountered this person a hour

17   prior to hearing the shots is a little inconsistent

18   with the testimony at the criminal trial.  And I

19   don't think that she's intentionally trying to be

20   incorrect.  You know, it has been seventeen years.

21   Mr. Godialis has argued all along that the history of

22   this case is -- is such that, you know, some memories

23   are faded.  You know.  And I'm just asking her to

24   refresh what -- to view what she told the police in

25   hopes of maybe refreshing her memory to being more

26   accurate in regards to what she told to police or

27   what she remembers telling the police.

1        THE COURT:  Well, several things, Mr. Lewis.
2    First is I think you're acknowledging -- it's
3    unlikely that her memory today would be more accurate
4    than it was in 1995.  But second of all, we're not
5    retrying this case.  Do you have anything that's
6    relevant to the habeas petition?
7        MR. LEWIS:  Yes.
8        THE COURT:  And by case, I mean, we're not
9    retrying the criminal case.
10       MR. LEWIS:  I'm not asking you to retry the
11   criminal case.  I'm asking that this witness' memory
12   be refreshed by what she told the police back in 1990
13   and her testimony today is relevant to the matters at
14   issue today.
15       THE COURT:  All right.  I did say that I'll allow
16   her to see the police report or whatever it is to
17   refresh her recollection.
18       MR. LEWIS:  I appreciate that, Your Honor.
19       THE COURT:  All right.  So marshal, if you'd show
20   her the report.  But I want to remind you that we're
21   not retrying the criminal case and --
22       THE WITNESS:  Thank you.
23       THE COURT:  -- I want you to get to what's
24   relevant to the habeas petition.
25   DIRECT EXAMINATION BY MR. LEWIS (continuing):
26   Q   The relevant pages I'm asking you to read, Ms.
27   Basilicato, are pages 19 through 23, if I'm not mistaken.

1    A    Okay.

2         (Witness reading)

3    Q    Before I ask you that question --

4         MR. LEWIS:  Again, Your Honor, may she be shown

5    Exhibit 19 which is already a full exhibit in this

6    case --

7         THE COURT:  For what purpose, sir?

8         MR. LEWIS:  -- as an -- as an interview which is

9    conducted by the police on the night in question that

10   she gave regarding, again, the events in question.

11        THE COURT:  Purposes of refreshing her

12   recollection?

13        MR. LEWIS:  Yes, Your Honor.  Your Honor, this is

14   the criminal trial testimonies.

15        THE COURT:  Right.

16        MR. LEWIS:  I would like to have this marked as a

17   full exhibit.  Mr. Godialis made the representation

18   that it was already in evidence, but, according to my

19   notes, it's not.

20        THE COURT:  I see.  What day of the trial is

21   that?

22        MR. LEWIS:  This is -- excuse me -- dated

23   April 25, 1995.

24        THE COURT:  I thought that was --

25        THE CLERK:  I think that's 25, Your Honor.

26        THE COURT:  -- It's already in.

27        MR. LEWIS:  Twenty-five?

1          MR. GODIALIS:  It's Exhibit 25, Your Honor.

2          THE COURT:  Right.

3          MR. LEWIS:  Okay, I'm sorry.  You're correct.  I

4      stand corrected.

5          (Witness reading)

6  DIRECT EXAMINATION BY MR. LEWIS (continuing):

7      Q   Did you -- does that refresh pretty much what you

8  told the police on the night in question?

9      A   Yes.

10     Q   Do you take issue at what you told the police on that

11 night in question?

12     A   Do I take issue with it?  No.

13     Q   I mean, is that something that didn't take place

14 or....

15     A   No, that's -- what I told the police is what took

16 place that evening.

17     Q   Okay.  Did you tell the police that you arrived home

18 at about 4:01 on the night in question?

19     A   Yeah.  Well, I'm trying to see if it says I arrived

20 home at 4:01 or say I looked at the clock at 4:01 once I was

21 inside.

22     Q   Right.  Once you was inside.

23          MR. GODIALIS:  Your Honor, I object.  This is

24      just rehashing all of Ms. Basilicato's trial

25      testimony.  I don't understand what the point of it

26      is.

27          THE COURT:  I don't either, quite frankly.

1    MR. LEWIS:  Your Honor --

2    THE COURT:  Yes, sir.

3    MR. LEWIS:  -- with all due respect, I'm just

4    asking Ms. Basilicato what time she arrived home.

5    She gave testimony earlier that she heard the shots a

6    hour after encountering the individual, which would

7    definitely be inconsistent with the time of the

8    deaths in this questioning.  And, you know, with all

9    due respect, I think she's entitled to, you know,

10   have her memory refreshed and, of course, entitled to

11   have the answers in the correct manner that are

12   consistent with what we know what time the crimes

13   took.  Obviously, she couldn't have said a hour after

14   she arrived home.  That would mean the murders woulda

15   took place at 5:00.

16   THE COURT:  Well, Mr. Lewis, you can argue at the

17   end of the case perhaps, but this is twelve years

18   after the witness' testimony, it's sixteen years

19   after this incident occurred.  The witness' memory is

20   -- cannot expect it to be as precise.  You can ask

21   her what she remembers.  There are some exhibits here

22   from the criminal trial, some of the police reports.

23   But you can't ask her to change her testimony.

24   MR. LEWIS:  Okay.

25   THE COURT:  So let's get on with what is in the

26   habeas petition.

27   MR. LEWIS:  I understand.

DIRECT EXAMINATION BY MR. LEWIS (continuing):

1  Q   Do you remember telling the police that when you

2  entered in your apartment moments before encountering this

3  individual, that you noticed the clock said 4:01 a.m.

4  A   Mm-hmm.

5  Q   And how much longer after that did you hear the

6  gunshots?

7  A   It wasn't much longer.

8  Q   It wasn't much longer?

9  A   No.  I just sat down and started watching TV.

10  Q   Right.  You sat down and started watching TV?

11  A   Yep.

12  Q   And within ten, fifteen, twenty minutes you heard the

13  gunshots?

14  A   Yeah.

15  Q   Thank you.  Is that something that you will ever

16  forget -- that event?

17  A   No.

18  Q   And you have been asked to testify concerning this

19  case on numerous occasions.  Is that correct?

20  A   Yes.

21  Q   Just a quick question.  Prior to you arriving in

22  court this morning, you were contacted by the State's

23  Attorney's Office?

24  A   Correct.

25  Q   And did they provide you with a ride to come to court

26  or you just come to court on your own?

1    A    Um, well, if I needed transportation, they would have

2    gotten me here, but I drove myself.

3    Q    Okay.  Did you discuss any of your testimony or your

4    expected testimony with the state's attorney this morning?

5    A    No.  I actually didn't even know why I was coming

6    here today until I arrived, so....

7    Q    Okay.  But you knew it had something to do with the

8    night in question.

9    A    Yes.

10   Q    Is that correct?

11   A    Yes.

12   Q    Okay.  Let me -- can I just ask you just to take, you

13   know -- like the judge said, it's been seventeen years --

14   A    Um-hmm.

15   Q    -- and I understand how memories fade in seventeen

16   years.

17   A    True.

18   Q    I just ask you to take the time and try to visualize

19   that night in question.  Can you take another look at the

20   photo of 634 Howard Avenue?

21   A    Sure.

22   Q    And just focus on that building, you coming home with

23   your laundry --

24   A    Mm-hmm.

25   Q    -- and the individual that you saw prior to entering

26   in your building.

27   A    Mm-hmm.

1  Q   Are you there with me?

2  A   Yes.

3  Q   Is your mind there?

4  A   I'm there.

5  Q   And can you describe what it is that you actually see

6  at that moment?

7  A   The -- describe the gentleman or what took place?

8  Q   The gentleman and what took place.

9  A   Yes.  There was a gentleman across from where I had

10 parked, which was across the street from this building -- 634.

11 Um, and he was whistling trying -- as in a way to get

12 somebody's attention, which drew my attention to him because

13 it was early in the morning.  I got my stuff outta the car --

14 I was getting my stuff outta the car and I guess he noticed me

15 and asked if I needed help.  And I said no 'cuz I had two

16 large trash bags with laundry.  I said no.  Um, he bummed a

17 cigarette.  I started gettin' my stuff, gettin' outta the

18 truck.  I put my club on the wheel of my truck to lock it.

19 Started walkin' and then a woman approached.

20 Q   Now, let me stop you for a second.

21 A   Sure.

22 Q   When you say he bummed a cigarette, where is it that

23 he asked for the cigarette?  On what location?

24 A   He came towards me.  Sorry.

25 Q   He came towards you?

26 A   Yeah.  Yeah, I didn't move -- I didn't move away from

27 the area of my vehicle.

**January 11, 2008**

```
 1      Q    Okay.

 2      A    So he came towards me.

 3      Q    So he went away from whistling --

 4      A    Yeah.

 5      Q    -- at a particular building and approaches you.

 6      A    Correct.

 7      Q    And he asked you for a cigarette.

 8      A    Correct.

 9      Q    Did you give him a cigarette?

10      A    Yes.

11      Q    And did you have conversation with him?

12      A    He just asked me if I needed help and I said no.  He

13 said can I have a cigarette.

14      Q    Okay.

15      A    And that was it.  And then the female approached and

16 kinda took his attention away and --

17      Q    And were you on the porch when he asked you --

18      A    No.

19      Q    -- for a cigarette?  No?

20      A    I was still by the vehicle.

21      Q    Okay.  Were you able to actually -- you made eye

22 contact with this individual?

23      A    What do you mean?

24      Q    Were you able to see any of --

25      A    Yeah.

26      Q    -- his physical description?

27      A    Yes.  Yeah, he came --
```

1    Q    Did you remember what his physical description was?

2    A    I remember he had dark hair.  And he was probably

3    about four inches taller than me -- probably about five seven,

4    five eight.

5    Q    Okay.

6    A    Um, he's -- he had feather -- layered hair -- dark

7    layered hair, a little bit of a mustache.

8    Q    Okay.

9    A    He spoke English.  I remember that.  That's about it.

10    Q    Do you remember anything about maybe his complexion?

11    A    Um, you know, medium -- fair.

12    Q    When you say medium, are you saying, like, brown skin

13    like me or light -- lighter skin?

14    A    No, more like mine.

15    Q    More like your complexion?  Okay.  Did you say he

16    spoke English pretty --

17    A    Perfect.

18    Q    -- pretty well?

19    A    Yeah.

20    Q    Okay.  And you said he had feathered hair?

21    A    Yes.

22    Q    Did you recall whether he had any parts in his hair

23    or anything to that nature?

24    A    Yeah.  It was kinda like layered, parted in the

25    middle.

26    Q    Okay.  What -- can you just give me a greater

27    explanation of what do you mean by layered?

1    A    Oh, I'm sorry. Um, like mine. It's just, you know,

2    it's -- it wasn't short, it wasn't curly, it was just -- you

3    know, his hair was, you know, combed back --

4    Q    Okay.

5    A    -- in other words. Sorry.

6    Q    Okay. Were -- at the time of the criminal trials did

7    the police ever ask you to make an attempt to identify that

8    individual?

9    A    Yeah, that night they asked me.

10    Q    They asked you to try to identify that specific

11    individual?

12    A    Yeah. The individual that approached me outside.

13    Correct.

14    Q    They did do that.

15    A    Yes.

16    Q    And were you able to identify that individual?

17    A    I gave them a description --

18    Q    Okay.

19    A    -- of him, yes.

20    Q    Did they -- did they show you any pictures that

21    matched that description?

22    A    Oh, God. I looked at so many pictures later after

23    that. Yeah, I believe I did, um, look at a bunch of pictures

24    in regards to him, yes.

25    Q    Okay. On that particular -- can you take a look at

26    your trial testimony again in the criminal exhibit? I think

27    it's page -- may I see that transcript right quick? Oh, I'm

1  sorry.

2              THE COURT:  I have a --

3              MR. LEWIS:  I have it.

4              THE COURT:  All right.

5  DIRECT EXAMINATION BY MR. LEWIS (continuing):

6      Q   I'm sorry, Ms. Basilicato.

7      Q   Could you look at -- take a look at page 23 of this

8  exhibit, lines -- start with line 11 down through line 20 if

9  you don't -- if you don't mind.

10             (Witness reading)

11     A   Okay.

12     Q   Does that refresh your memory of what you told -- or

13  what you testified to in 1995?

14     A   Yeah.  Oh, this is from 1995, not from the initial

15  one.  Okay.

16             (Witness continues to read)

17             MR. GODIALIS:  Your Honor, can I just be heard,

18        please?

19             THE COURT:  Yes.

20  DIRECT EXAMINATION BY MR. LEWIS (continuing):

21     A   I'm sorry.  Thank you.

22             MR. GODIALIS:  I'm trying to be patient here, but

23        it seems to me that what we're doing is asking Ms.

24        Basilicato in 2008 the same questions that Mr.

25        Williams asked her in 1995 at the criminal trial.

26        Those are a matter of record.  The most -- most we're

27        going to find out is that, you know, she doesn't

1   remember or -- or -- or it's wrong about what she

2   testified to in -- in 1995.  But the trial testimony

3   is what it is and I don't know what the variance

4   between her testimony today and what it was then has

5   to do with the allegations in this habeas.  Still.

6       THE COURT:  I -- I don't either.  And there was

7   no showing that the witness needed her recollection

8   refreshed, so if you want to rely on the trial

9   transcript, it is an exhibit.

10      MR. LEWIS:  Yes, I understand that, Your Honor.

11  But I also want to give Ms. Basilicato the benefit of

12  the doubt in regards to her accuracy and her

13  testimony today before this court because I

14  understand that the judge is the trier of fact here

15  and the judge is gonna be looking at her credibility

16  as a issue in regards to whatever evidence -- new

17  evidence she has to offer that wasn't represented at

18  the criminal trial.  And I believe that answers that

19  she may have now that may seem to be a little

20  inconsistent with the answers she gave at the

21  criminal trial and in the police reports will go to

22  her credibility.

23      THE COURT:  Well, it's twelve years later so it's

24  very difficult for someone to remember all these

25  details.

26      MR. LEWIS:  Well, I'm glad Your Honor --

27      THE COURT:  Let me ask you this, Mr. Lewis.  Are

1    we gettin' to the --

2        MR. LEWIS:  Yes, we are, Your Honor.

3        THE COURT:  -- are we gettin' to the more recent

4    identification?

5        MR. LEWIS:  Yes, we are.

6        THE COURT:  Is that -- is that your point here?

7        MR. LEWIS:  I'm trying to lead up to that Your

8    Honor.

9        THE COURT:  All right, let's get there.

10       MR. LEWIS:  May I just ask that one final

11   question in regards to what she just reviewed?

12       THE COURT:  All right.

13   DIRECT EXAMINATION BY MR. LEWIS (continuing):

14   Q    Ms. Basilicato, when you testified in 1995, does your

15   testim- -- did your testimony reflect that you were never

16   shown photos by the police to identify the gentleman you

17   encountered that morning?

18   A    Yeah.  That document just said I was not.

19   Q    Does that refresh your memory a little bit in regards

20   to things that went -- took place?

21   A    Yeah.

22   Q    So is that a true statement or --

23   A    That is a true statement, yes.

24   Q    The criminal trial testimony --

25   A    Yes.

26   Q    -- is a true statement?

27   A    Yes.  Correct.

25

1    Q    So just that, um -- it's a fact that the police never

2    showed you the photos in an attempt to identify this

3    individual.  Is that correct?

4    A    Yes.

5    Q    Now did there come a time when you was asked to

6    identify this individual?

7    A    To give a description of him or identify --

8    Q    Subsequent to the criminal trials, did there come a

9    time later on down the line that you were asked by Mr.

10    Dearington to make an attempt to identify the person you

11    encountered prior to interview in your home that morning?

12    A    I honesty can't recall, Mr. Lewis.  I apologize.

13    Q    Well, did you, in fact, meet with Mr. Dearington on

14    June 9, 2005, to view some photos?

15    A    Yes.  In East Haven.

16    Q    You did?  Okay.  Let me -- one more question before

17    we get to that.

18    A    Sure.

19    Q    Did defense counsel ever ask you during the criminal

20    trials to attempt to identify the individual that you seen

21    prior to entering your house?  Not at the criminal trial.  I'm

22    talking about prior to the actual trials.  Were you ever

23    contacted by any defense counsel?

24    A    I couldn't even tell you who the defense counsel was,

25    honestly.  So....

26    Q    So would that be a yes or a no?

27    A    I don't know his name so I couldn't tell you if he

1  contacted me.  I didn't make any -- besides these statements

2  right here, I have not spoke to anyone about the case, so....

3      Q   So you never spoke to Attorney John Williams about

4  this case?

5      A   I don't remember, Mr. Lewis.

6      Q   You don't remember?

7      A   Sorry.

8      Q   Okay.

9          MR. LEWIS:  Can I show the witness Exhibit -- I

10          think the photo arrays were --

11          MR. GODIALIS:  Thirty.

12          MR. LEWIS:  Exhibit 30?

13          THE COURT:  All right.

14          (Witness reviewing)

15          THE COURT:  I've shown her Exhibit 30.

16  DIRECT EXAMINATION BY MR. LEWIS (continuing):

17      Q   I think it's two sets of photo arrays there?  If I'm

18  not mistaken, two pages, Ms. Basilicato --

19      A   Yes.

20      Q   -- that I asked you to look at?

21      A   Yes.

22      Q   Do you recall ever being shown those photo arrays by

23  Mr. -- State's Attorney Michael Dearington?

24      A   Yes, they look familiar.

25      Q   Okay.

26          MR. GODIALIS:  Just so the record is clear, Your

27          Honor, Mr. Dearington is not the person who showed

her the photographs.  We will stipulate, however, that she was shown them by state officials.

THE COURT:  I see.

DIRECT EXAMINATION BY MR. LEWIS (continuing):

Q    Now at the time that you were asked to view those photos, did you select any of those photos as the person you encountered on that morning in question?

A    Yes.

Q    Which individual did you select, Mr. -- Ms. Basilicato?

A    I believe on page 1.  I believe it was number 2.

Q    Number 2?

MR. LEWIS:  Your Honor, would I -- I ask you to use that marker so she may sign the photo that she selected --

THE COURT:  Thank you, sir.

MR. LEWIS:  -- if you don't mind?

THE COURT:  No.  Go ahead.

THE WITNESS:  Oh, it's okay?

DIRECT EXAMINATION BY MR. LEWIS (continuing):

A    I'm sorry, circle or sign?

Q    Both.

A    Okay.

(Judge hands marker to witness)

THE WITNESS:  Thank you.

DIRECT EXAMINATION BY MR. LEWIS (continuing):

Q    So is it your testimony today that that's the

1  individual that you encountered prior to entering your

2  apartment that morning?

3  A   Yeah, he looked -- this is the one I identified, I

4  believe.  Yes.

5  Q   And at that time did you tell state officials that

6  you were sixty percent certain of that?

7  A   Yes.

8  Q   Okay.  And was that a result of the time limits?

9  A   Yeah, definitely.  And the fact that in this photo

10  the hair -- although the face looked familiar to me, the hair

11  is not like I had described it in my, um, statement -- my

12  testimony.

13  Q   Ms. Basilicato, do you believe that had you been

14  asked to identify this individual at the time of the crime,

15  that you would have been able to make a more certain

16  identification?

17  A   I believe I did give a description to the police at

18  the -- prior -- right after the incident.

19  Q   Right.

20  A   So --

21  Q   What I'm asking you is had the police shown you

22  photos of this individual --

23  A   Mm-hmm.

24  Q   -- do you believe that you would have been more

25  certain as to that picture you selected being the individual

26  you seen?

27  A   Possibly.

```
 1      Q    Possibility?  'Cuz right now you're saying you're
 2  sixty percent certain.
 3      A    Right.
 4      Q    Right?
 5      A    The same as I was when I saw it in '05.  Yes.
 6      Q    Right.  Now that's a good point.  And you saw the
 7  photo in '05.  You were sixty percent sure.  Is that correct?
 8      A    Mm-hmm.
 9      Q    Did you see the photo again in 2007 at Morant's
10  petition for trial?
11      A    I believe so, yes.
12      Q    And you identified that same photo, correct?
13      A    I believe so.
14      Q    And now that was two years after 2005.  Right?
15      A    Mm-hmm.
16      Q    So today you identified that same photo.
17      A    Correct.
18      Q    That's correct?  Are you more certain now or are you
19  less certain or pretty much the same?
20      A    Pretty much the same.
21      Q    Pretty much the same?
22      A    Yes.
23      Q    Well, let me ask you this, Ms. Basilicato.  If you
24  were able to see that individual in person, would you be able
25  to make a more certain identification?
26      A    Now?
27      Q    Yes.
```

1    A    I don't know.  A lot of time has gone by, so....

2    Q    Do you see anyone in court that resembles that

3    individual?

4    A    Sort of.

5    Q    Sort of?  Can you point to that individual?

6    A    In the back corner.

7    Q    In the back corner where?  The officer?

8    A    No.

9    Q    The lady?

10    A    No.

11    Q    Is it that gentleman in the corner over there --

12    A    Somewhat.  I mean --

13    Q    -- is the person you're speaking to?

14    A    -- a lot of time has gone by.  He could look like

15    anything now.  I mean --

16    Q    Right.  But that's the individual that looks similar

17    to the person you seen.

18    A    Mm-hmm.  A little bit.

19        MR. LEWIS:  May the court take note that Ms.

20        Basilicato said the individual in the corner is the

21        person that looks similar?

22        THE COURT:  It may.

23        MR. LEWIS:  Thank you.  I have no further

24        questions, Your Honor.

25        THE COURT:  Cross-examination when you're ready.

26    CROSS-EXAMINATION BY MR. GODIALIS:

27    Q    Ms. Basilicato, good morning.

1     A    Hi.

2     Q    When you were shown that photo array in 2005, do you

3  remember what the inspector asked you to do when you looked at

4  it?

5     A    What do you mean?  I'm not sure what you're asking.

6     Q    Did -- did he put the arrays in front of you and show

7  you the photos?

8     A    Mm-hmm.

9     Q    And what did he ask you to do?

10    A    Well, he --

11    Q    Once he showed you the photos.

12    A    -- circle and initial the one.  Is that what you're

13  talking about?

14    Q    What specifically did he ask you to pick out, if

15  anything?  Well, let me withdraw that question.  He put the

16  arrays in front of you.  Correct?

17    A    Correct.

18    Q    And then said something to you about what he wanted

19  you to do.  Right?

20    A    To pick whoever was familiar to me?

21    Q    Pick whoever was familiar to you.

22    A    Correct.

23    Q    Is that what he said to you?

24    A    Yes.

25    Q    And who did you pick as a result of that?

26    A    I believe I picked number 2.

27    Q    And do you remember the inspector asking you why you

1    thought he was familiar?

2        A   Yes.

3        Q   And do you remember what you told the inspector?

4        A   Because of his skin color?  Is that what I said?

5        Q   Did the inspector ask you where you had seen him

6    before?

7        A   I don't remember.

8        Q   And you don't remember that?  Okay.

9        A   No.

10       Q   And do you remember telling the inspector that you

11   were sixty percent sure that you had seen the person that you

12   picked out before?

13       A   Correct.  Sixty --

14       Q   Now, is it a true statement that you never saw who

15   committed the crimes in this case?

16       A   I never seen anything.

17       Q   And the person that you've just described to us

18   earlier this morning --

19       A   Mmm.

20       Q   -- the same person that you testified about at the

21   criminal trial -- is somebody that you saw outside the

22   building?

23       A   Correct.

24       Q   Did you ever see that person commit a crime?

25       A   No.

26       Q   Thank you.

27           MR. GODIALIS:  I have no further questions.

1      THE COURT:  Redirect?

2            MR. LEWIS:  Yes, Your Honor.

3    REDIRECT EXAMINATION BY MR. LEWIS:

4      Q   Ms. Basilicato, you said you witnessed this person

5    whistling prior to entering --

6      A   Yes.

7      Q   And you said he was whistling in the manner to do

8    what?

9      A   Uh, like to get somebody's attention in the building.

10     Q   To get someone's attention in the building?

11     A   Yeah.

12     Q   Now, during your 2005 interview with -- was it

13   Inspector --

14            MR. LEWIS:  Who was it, Mr. Godialis?

15            MR. GODIALIS:  It would be, um, Inspector

16      Reardon.

17   REDIRECT EXAMINATION BY MR. LEWIS (continuing:

18     Q   -- Inspector Reardon.  He asked you to view some

19   photos for the purpose of -- what was that?

20     A   To identify the man who was whistling.  Is that what

21   you're --

22     Q   When -- on what date?

23     A   On the date of the murder.

24     Q   Okay.

25     A   Is that what you're talking about?

26     Q   Yes.

27     A   Yes.

1    Q    Do you know why he was asking you that?

2    A    Not really.

3    Q    So you don't know if that individual was involved in

4    the murders or not, do you?

5    A    I have no idea.

6    Q    All you know is that's who you seen.  He was outside

7    whistling to get someone's attention.

8    A    Mm-hmm.

9    Q    And the individual you picked out in photo number 2

10   for the last three years, you say that individual in that

11   corner resembles him.  Is that correct?

12   A    I mean, I could walk down the street and see four

13   guys that resemble this.  I'm just saying --

14   Q    Right.  But we -- I'm just talking about as far as

15   the people in this courtroom.

16   A    Oh, I mean, he's the closest.  I mean, I don't want

17   to point him out.

18   Q    Thank you.  All right.

19   A    I apologize.

20   Q    I understand that.  I mean, I just -- there's no way

21   to be a hundred percent sure of anything.

22   A    There isn't.

23   Q    I just asked you --

24   A    No, I never -- yes.

25   Q    Okay.

26   A    I never claimed to be a hundred percent.  That's why

27   --

1      Q    Okay.  And you're not making any accusations toward

2    that individual.

3      A    No.

4      Q    You're just saying this is the individual that looks

5    similar to the person I seen that morning.

6      A    Yeah.

7      Q    Is that correct?

8      A    Correct.

9      Q    Thank you.

10           MR. LEWIS:  I have no questions.

11           THE COURT:  Any recross?

12           MR. GODIALIS:  Just one, Your Honor.

13    RECROSS-EXAMINATION BY MR. GODIALIS:

14      Q    Ms. Basilicato, when Inspector Reardon placed the

15    photos in front of you --

16      A    Yes.

17      Q    -- did he say to you, Ms. Basilicato, please pick out

18    the person who you saw whistling in front of your building on

19    the night of the murder?  Or was it something else?

20      A    (Whispering) I don't remember.  (Aloud) I'm trying to

21    think.  I guess my long-term is better than my short-term.

22    Um, I believe he said to iden- -- if I could possibly pick out

23    who looked familiar to me from outside the building that

24    evening.

25      Q    That's what he asked you to do.

26      A    I believe so.

27      Q    Thank you.

| | |
|---|---|
| 1 | THE COURT:  All right.  Thank you, Ms. |
| 2 | Basilicato.  You may step down.  You're excused. |
| 3 | THE WITNESS:  Okay.  Thank you. |
| 4 | THE COURT:  If I may have any exhibits. |
| 5 | THE WITNESS:  Sure. |
| 6 | (Witness leaves stand) |
| 7 | MR. LEWIS:  Your Honor, may I have a moment to |
| 8 | consult with Mr. Emanuel? |
| 9 | (No audible response) |
| 10 | MR. LEWIS:  At this time I would like to call |
| 11 | Michael Cardwell to the stand. |
| 12 | THE COURT:  All right. |
| 13 | THE CLERK:  Please raise your right hand.  Do you |
| 14 | solemnly swear or solemnly and sincerely affirm, as |
| 15 | the case may be, that the evidence you shall give |
| 16 | concerning this case shall be the truth, the whole |
| 17 | truth, and nothing but the truth, so help you God or |
| 18 | upon penalty of perjury? |
| 19 | THE WITNESS:  I do. |
| 20 | THE CLERK:  Can you please state your name and |
| 21 | spell your last name for the court? |
| 22 | THE WITNESS:  Michael Cardwell, C-a-r-d-w-e-l-l. |
| 23 | THE CLERK:  Thank you.  You may be seated. |
| 24 | THE COURT:  Good morning, Mr. Cardwell. |
| 25 | THE WITNESS:  Good morning. |
| 26 | THE COURT:  Mr. Lewis. |
| 27 | |

1    Q    Number 2.  Now you just -- did you reside at 378
2    Orchard Street on October 11, 1990?

3    A    I'm not sure.

4    Q    You're not sure?  Where did you reside?  You don't --
5    do you know where you resided?

6    A    I don't remember.

7    Q    You don't remember anything from October of 1990 or
8    you just don't remember where you lived?

9    A    No, I remember October.  I just don't remember my
10   address at the time.

11   Q    You don't remember your address?  Did you live with
12   your mother?

13   A    No.

14   Q    No?

15   A    At the time of the murder?

16   Q    In October of 1990, yes.

17   A    No. I was --

18   Q    You didn't.

19   A    -- I wasn't livin' in New Haven.

20   Q    Okay.  Where were you living?

21   A    Um, I think I was livin' in New Britain.

22   Q    You was living in New Britain, Connecticut.

23   A    Yeah.

24   Q    How many individuals know that?  That you were living
25   in --

26   A    I just had got home from parole.  That was my
27   address.  I don't know how many people knew I was livin' in

1    New Britain.

2        Q    Okay.  But you were living in New Britain.

3        A    Yes.

4        Q    And you were living with a ex-girlfriend of yours or

5    a girlfriend of your?

6        A    I was livin' with my son's mother.

7        Q    Your son's mother?

8        A    My daughter's mother.

9        Q    Your daughter's mother?

10       A    Yes.

11       Q    Okay.  And your daughter's mother's name is?

12       A    Deanne Coleman.

13       Q    And your father's name is?

14       A    Arnold Spears.

15       Q    Arnold Spears?  Do you and Vincent have the same

16   fathers?

17       A    No.

18       Q    No?  Now, Mr. Cardwell, you just heard testimony that

19   someone like -- that looked like you was identified moments

20   before the murders of Mr. Carl Turner outside of his

21   apartment.

22       A    Yeah.

23       Q    Was that you?

24       A    'Cuz I don't smoke cigarettes and I don't know how to

25   whistle, so....

26       Q    Okay.  You don't smoke cigarettes and you don't know

27   how to whistle.

1     A    Yeah.

2     Q    But that wasn't you, but you do acknowledge that the

3  photo she selected is you.

4     A    If she picked that one, yeah, that is me.

5     Q    And you do acknowledge that you are, in fact, Michael

6  Cardwell.

7     A    Yes.  And I do, in fact, that I been to Mr. Turner

8  house over a hundred times, so she coulda seen me comin' in

9  and out of Mr. Turner house.

10     Q    Right.  I understand that.  And why -- why was it

11  that you was at Mr. Turner's house?

12     A    Because him and Mr. Fields were friends of mine.

13     Q    They were friends of yours?  Okay.  And how long did

14  you know Mr. Turner?

15     A    Ever since I was a child.  I don't know how many

16  years.

17     Q    You don't know how many years?  When you say "since

18  you were a child," would that be maybe eleven years old,

19  twelve years old?

20     A    About fourteen years old, twelve -- between twelve

21  and fourteen years old.

22     Q    Okay.  And what was your dealings with Mr. Turner?

23     A    He was a friend of mine.

24     Q    When you say "friend of -- " -- I'm trying to -- well

25  let me ask you this.  How much older was Mr. Turner than you?

26     A    Um, I was never sure of Mr. Turner's age.  So I don't

27  know how hold Mr. Turner was.

1  Q    You didn't know of his age?  And your relationship

2  with Mr. Turner was strictly friends?

3      A    Friends and we had business together..

4      Q    What type of business did you have together?

5      A    I don't want to incriminate myself, so it was illegal

6  business we did.

7      Q    Was it the dealing of narcotics?

8          THE COURT:  Well, sir, you do have a right to

9          invoke the Fifth Amendment if an answer might

10         incriminate you.  It's probable that the statute of

11         limitations has expired.  In other words, it's --

12         it's too late to prosecute you for anything that you

13         did.  But I could understand if you wanted to be

14         cautious about the matter.  And if you want to invoke

15         the Fifth in part because you don't have a lawyer

16         here, I'll let you invoke the Fifth.

17  DIRECT EXAMINATION BY MR. LEWIS (continuing):

18     Q    Yes.  The Fifth.

19     A    You're pleading the Fifth?

20         MR. LEWIS:  Your Honor, I would take exception to

21         that ruling in the fact that I'm only asking him if

22         he dealt drugs with Mr. Turner.  The crime is

23         seventeen years old.  It's definitely a non-

24         prosecutable offense.  There's no way in the world

25         that I believe that he should be entitled to plead

26         the Fifth Amendment to that crime.  And if there is a

27         possibility that he could plead the Fifth Amendment

1        to the crime, I also understand that the court has

2        the power to grant him immunity in regards to that

3        charge.  So I would ask that, you know, he be allowed

4        to answer that question.

5            THE COURT:  I know where you're going here, Mr.

6        Lewis.  I think there is a possibility he might

7        incriminate himself if he answered, so I'm going to

8        allow him to take the Fifth, especially in the

9        absence of counsel.

10   DIRECT EXAMINATION BY MR. LEWIS (continuing):

11       Q   So, Mr. Cardwell, your dealing with Mr. Turner was

12   the dealing in -- in the illegal capacity which you choose not

13   to answer.  Is that correct?

14       A   Yes.

15       Q   And you've been dealing with him in that capacity for

16   how long?

17       A   Maybe two years.

18       Q   Two years.

19       A   Two or three years.  I'm not sure.

20       Q   Okay.  And you said that some time in October you had

21   just gotten off of parole?  Is that correct?

22       A   No, I just got on parole.  I just came home from

23   prison.

24       Q   You had just came home from prison.

25       A   Yes.

26       Q   Do you recall the date that you actually went to

27   prison?

1    A   No.

2    Q   No?  Do you recall the date that you came home from

3 prison?

4    A   No.

5    Q   But you did come home from prison prior to Mr. Turner

6 being executed?

7    A   Yes.

8    Q   Yes?  You don't know how long prior to him being

9 executed.

10    A   Um, nope, I don't remember.

11    Q   Did you and Mr. Turner ever have a falling out over

12 your business relationship?

13    A   No, it was never a falling out.  We just went

14 different ways.

15    Q   You went different ways?  What does that mean?

16    A   He went his way; I went my way.

17    Q   And was there a reason behind that?

18    A   Yes.  His way was different from my way.

19    Q   Okay.  And what way was your way?

20    A   I wanted to do things my way; he wanted to do things

21 his way.  And I couldn't keep up with his ways.

22    Q   And when you say you wanted to do things your way,

23 what things were that?

24    A   He wanted me to spend more money what I didn't have,

25 so I couldn't deal with Mr. Turner.  So I just be by myself.

26    Q   Okay.  He wanted you to spend more money.  Spend more

27 money with who?

1    MR. GODIALIS: Your Honor, the -- just for the

2    record, the witness is looking over at you before

3    answering these questions, and I think we're getting

4    into the privileged area again.

5    THE COURT: I think so, too. I think you're

6    trying to get him to admit the nature of the

7    business. You can take the Fifth as to that. It's

8    almost to the point where I think that I have to

9    consider whether to appoint counsel for Mr. Cardwell.

10    MR. LEWIS: I think that would be the appropriate

11    remedy, Your Honor. And I wouldn't mind having an

12    extension of time --

13    THE COURT: Well --

14    MR. LEWIS: -- for you to do that.

15    THE COURT: -- I didn't have that in mind, Mr.

16    Lewis.

17    MR. LEWIS: Okay.

18    MR. GODIALIS: Well, perhaps I can -- I can --

19    THE COURT: Yeah.

20    MR. GODIALIS: -- clear this up. If all Mr.

21    Lewis wants to know is that Mr. Cardwell was dealing

22    drugs, I will represent right now that the state is

23    not going to prosecute Mr. Cardwell for any drug

24    dealing that he may have done with Mr. Turner back in

25    1991. If that helps.

26    THE COURT: I still have a concern here.

27    MR. LEWIS: Your Honor, the state just offered

1   the man immunity.

2      THE COURT:  I understand that.  Mr. Lewis, would

3   you object if I conferred with Mr. Godialis *ex parte*?

4   I'll represent that the nature of the conference at

5   the -- would be at the sidebar -- would be to state

6   my concerns about possible incrimination.

7      MR. LEWIS:  Would the court mind if Mr. Emanuel

8   sat in on that?  I would have no objection in that

9   regard.

10      THE COURT:  Mr. Emanuel?  I know you've conferred

11   with him, but --

12      MR. LEWIS:  Well, I would just -- well, in

13   regards to -- I would just simply -- just want to

14   know my rights are being protected as well.

15      THE COURT:  Right.  I understand.  Well -- no,

16   Mr. Emanuel doesn't represent you

17   would be inappropriate.  I think we need to take a

18   recess and I'll -- I'll call the Public Defender's

19   Office.

20      MR. LEWIS:  Fine with me, Your Honor.

21      THE COURT:  Stand in recess.

22      (Court reconvenes)

23      THE MARSHAL:  Good morning, Your Honor.

24      THE COURT:  Good morning, marshal, ladies and

25   gentlemen.  During the recess, I appointed public

26   defender David Channing to represent Mr. Cardwell for

27   today's purposes while he testifies.  And, Mr.

1    Channing, I appreciate very much your availability

2    and willingness to serve.  So I believe we can

3    continue with the testimony of Mr. Cardwell.  So, Mr.

4    Cardwell, if you'd resume the stand and, Mr.

5    Channing, you can come forward if you like.  Please

6    have a seat, sir.  Continue direct examination, Mr.

7    Lewis.

8         MR. LEWIS:  Yes.

9    DIRECT EXAMINATION BY MR. LEWIS (continuing):

10        Q    Mr. Cardwell, we left off and I asked you a question.

11   What was your relationship with Mr. Turner?  Do you remember

12   that?

13        A    Yes.

14        Q    And you indicated you had some type of business

15   relationship with Mr. Turner.

16        A    Yes.

17        Q    Is that correct?  Was that business relationship the

18   dealing of narcotics?

19        A    Yes.

20        Q    Yes, it was.  And you said you knew Mr. Turner for

21   how long?

22        A    I don't know how many years I knew him.  I knew I

23   knew him for a long time.

24        Q    Since you were at a young age.

25        A    Yes.

26        Q    That's correct.  And you also stated prior to the

27   recess that after you got out of prison, sometime before

1    October 1990, you were residing in New Britain with your son's

2    mother.  Is that correct?

3                    MR. GODIALIS:  Objection, Your Honor.  Asked and

4            answered.

5                    THE COURT:  All right.  It was.  If you're

6            leading to some other point, I'll allow it.

7    DIRECT EXAMINATION BY MR. LEWIS (continuing):

8        A    Ask the question again?

9        Q    You testified earlier that you were residing with

10   your then-girlfriend, the daughter's mother, in New Britain.

11   Is that correct?

12       A    I got paroled to that house.  Um, I'm assuming -- I

13   can't really remember, but I was -- I was paroled to that

14   house so I guess I was living there.

15       Q    And that would be in New Britain, Connecticut.  Is

16   that correct?

17       A    Yes.

18       Q    Now, Mr. Cardwell, do you know an individual by the

19   name of Thomas Housley?

20       A    Yes, I do.

21       Q    And was he a friend of yours?

22       A    Yes.

23       Q    And did he also have a business relationship with Mr.

24   Turner?

25       A    I don't know what kind of relationship they had.

26       Q    You don't know.  But did you have a business

27   relationship with Mr. Housley?

1    A    Mr. Housley was a friend of mine.

2    Q    And there was no drug relationship between you and

3    Mr. Housley?

4    A    Yes, Mr. Housley -- yes, me and Mr. Housley had --

5    yes.

6    Q    Dealt drugs together.  Okay.  And do you recall the

7    last time that you seen Mr. Turner alive prior to his death?

8    A    No.

9         MR. LEWIS:  Your Honor, at this time I would like

10        to mark as an exhibit Mr. Turner's date book from

11        1990, which was also a full exhibit at the criminal

12        trial -- if I may.  Mr. Godialis?

13        MR. GODIALIS:  Well, it can be marked for

14        identification.  I don't know what the purpose of the

15        offer is.

16        THE COURT:  All right.

17        MR. LEWIS:  Just for the record, Your Honor, I

18        would offer it as a full exhibit.  Mr. Godialis, that

19        exhibit was introduced as a full exhibit in the

20        criminal trial.  And I believe that Your Honor would

21        have that be a part of the record in reviewing this

22        habeas petition.

23        THE COURT:  It might at least be relevant to the

24        issue of prejudice, perhaps, so --

25        MR. GODIALIS:  My only concern, Your Honor, is

26        that that is not the original exhibit and it is

27        marked up.

1    THE COURT:  I see.

2    MR. LEWIS:  It's a -- it's a copy of the original

3    exhibit.  It wasn't marked up --

4    MR. GODIALIS:  The original is --

5    MR. LEWIS:  -- with the exception of the

6    highlighters.  I highlighted certain things on the

7    calendar.  That is correct.

8    THE COURT:  Yeah.  Does anyone have a clean copy?

9    MR. GODIALIS:  I don't.

10    THE COURT:  Mm-hmm.  Is it relevant to this

11    witness' testimony?

12    MR. LEWIS:  Well, I just wanted to refer to a

13    specific date.  I asked him a question -- when's the

14    last time he seen Mr. Turner.

15    THE COURT:  Mm-hmm.

16    MR. LEWIS:  And I just wanted to ask him if that

17    specific date refreshed when was the last time he

18    seen Mr. Turner.

19    THE COURT:  Okay.  You can use it to refresh his

20    recollection.  Marshal, if you would show it -- but

21    it doesn't have to come in as a full exhibit.  If you

22    would show the witness the document.

23    DIRECT EXAMINATION BY MR. LEWIS (continuing):

24    Q    If you don't mine, Mr. Cardwell, can you turn to the

25    date -- the month of September of 1990?  The date, uh -- the

26    box dated September 7th?

27    A    Yep.

1    Q    Do you see the name Michael Cardwell there?

2    A    Yep.

3    Q    With the reference "GA6?"

4    A    Yep.

5    Q    Do you recall if that may have been the last day that

6    you seen Mr. Turner?

7    A    No, I can't remember the last day I saw Mr. Turner.

8    Q    Does September 7th have any significance to you?

9    A    Nope.

10    Q    Okay.  What about -- do you see the arrow that points

11    down to September 14th?

12    A    Yep.

13    Q    Does September 14th have any significance to you?

14    A    Nope.

15    Q    Is it possible that you went to prison on

16    September 14, 1990?

17    A    I don't know the day I went to prison, but I know Mr.

18    Turner was there with me.

19    Q    He was there with you?

20    A    Yes, he was.

21    Q    Okay.

22         MR. LEWIS:  Can I offer as an exhibit the

23         Department of Corrections file on Mr. Cardwell?

24         MR. GODIALIS:  Well, this is -- this is not the

25         Department of Corrections file on Mr. Cardwell

26         MR. LEWIS:  Mr. Ortiz in the, uh --

27         MR. GODIALIS:  It's a marked-up copy of something

1   that's not the Department of Correction file on Mr.

2   Cardwell.  And then I also have a question about the

3   relevance of it.

4       MR. LEWIS:  Your Honor, Mr. Cardwell has just

5   testified that Mr. Turner was in court with him on

6   the prior dates that were just mentioned -- September

7   7th and September 14th.  I just wanted to show Mr.

8   Cardwell here where this is that he did, in fact --

9   or was, in fact, incarcerated in the Department of

10  Correction, admitted on September the 14th, 1990.

11      THE COURT:  I would be inclined to admit what

12  would be a certified or official record of the

13  Department of Corrections, but apparently that is not

14  -- that is not that.

15      MR. GODIALIS:  It is not.

16      MR. LEWIS:  Well, it's a --

17      THE COURT:  Well, if you disagree, I would look

18  at it.

19      MR. LEWIS:  Well, I'd ask Your Honor to look at

20  it.

21      THE COURT:  Yes, sir.

22      MR. LEWIS:  Mark it full exhibit.

23      THE COURT:  Well, we certainly can mark it for

24  identification.  I'll look at it to determine whether

25  it appears to be an official record of the Department

26  of Corrections regarding Mr. Turner and Mr. Cardwell.

27      MR. LEWIS:  That specific record there concerns

1    Mr. Cardwell.

2        THE COURT: I see.

3        (The court reading)

4        THE COURT: Yes, it appears to be a record of Mr.

5    Cardwell rather than Mr. Turner. And it appears to

6    be Department-of-Correction-type printout. I'm not

7    troubled by the highlighting because those just

8    identify the dates in question. So if you're

9    offering it as evidence of when Mr. Cardwell was

10    readmitted to prison and when he was released, I'd be

11    inclined to admit that unless, Mr. Godialis, you have

12    something of concern to add.

13        MR. GODIALIS: Well, Your Honor, I'm -- I'm

14    concerned about everything that's happening here --

15        THE COURT: Right.

16        MR. GODIALIS: -- simply because we seem to be

17    way outside the scope of anything that was pled.

18    That is not an official record of the Department of

19    Corrections. Mr. Lewis paraphrased what he thought

20    Mr. Cardwell just testified to. Mr. Cardwell said

21    simply that Mr. Turner was with him on whatever day

22    that he was in court but he doesn't know what day

23    that was. And that record doesn't help us clear that

24    up.

25        THE COURT: No, not as to court. It does appear

26    to state when Mr. Cardwell was readmitted to prison

27    and when he was then released to community residence.

1         So for those purposes, I'll admit Exhibit 36 in full.

2              MR. LEWIS:  Thank you, Your Honor.

3              THE COURT:  I -- yes.

4              MR. LEWIS:  May you show that to Mr. Cardwell,

5         please?

6              THE COURT:  All right.

7    DIRECT EXAMINATION BY MR. LEWIS (continuing):

8         Q    Mr. Cardwell, looking at the highlighted area where

9    it says (as read) "Readmission with sentence, good time one

10   year, September 14, 1990," is that the day that you went to

11   prison?

12        A    I'm not sure of the day I went to prison.

13        Q    You're not sure.  But in any event, you testified

14   earlier that Mr. Ricardo Turner was in your presence at that

15   time.  Is that correct?

16        A    Yes, he was.

17        Q    Yes, he was.  Now my question to you is you testified

18   earlier that you severed your relationship with Mr. Turner.

19   Is that correct?

20        A    Yes.

21        Q    Did that occur after this court date or before that

22   court date?

23        A    It happened way before that court date.  Mr. Turner

24   helped me -- helped me get money to pay for a lawyer.  Me and

25   Mr. Turner had been parted ways before I went to jail.  Mr.

26   Turner was a good friend of mine.  Mr. Fields was a good

27   friend of mine.

1    Q    So your relationship with Mr. Turner severed on the

2    business relationship but you were still amicable with him.

3    Is that correct?

4    A    Yes.

5    Q    Okay.  And that was one of the reasons why he would

6    have been in court with you on that specific day?

7    A    Yes, 'cuz he knew I didn't have money for a lawyer

8    and Mr. Turner helped me out with a lawyer.

9    Q    Okay.  And does that also show that you were released

10   on September 29, 1990?

11   A    I'm not sure what day I was released.

12   Q    I'm asking you what does that indicate.

13   A    Yes, it says I was released September 29th.

14   Q    Nineteen ninety.  Now you testified that your purpose

15   of Mr. Turner being with you in court had to be -- it was

16   financial, so to speak.  He -- you needed his financial

17   assistance to obtain a lawyer.  Is that correct?

18   A    Mr. Turner was being a friend.  He helped me out.  He

19   didn't want me to go to court with a public defender, so he

20   helped me get a lawyer.

21   Q    Okay.  So he helped -- you got a lawyer.  And did he

22   actually pay for that lawyer?

23   A    We splitted the fee.

24   Q    You splitted the fee.  Okay.  And in any event he got

25   you a lawyer and you still went to jail.  Correct?

26   A    Yes.

27   Q    Okay.  And you were released on September 29, 1990.

1    Is that correct?

2        A    That's what the papers say.  I'm not sure what day I

3    was released on.

4        Q    Do you remember the actual day Mr. Turner was

5    murdered?

6        A    No, I don't.

7        Q    Is -- how many days, so to speak, is September 29th

8    from October 10, 1990?  Well, I'll withdraw that.  First, let

9    me ask you, how many days does that calendar show in the month

10   of September of 1990?

11       A    Thirty days.

12       Q    So it's thirty days.  Can you turn to the next page

13   -- the month of October?  If you were to count from the end of

14   September of 1990 to October 10, 1990, how many days would

15   that be?

16       A    From September 30th?

17       Q    Yes.

18       A    Ten days.

19       Q    Ten days.  So Mr. Turner was killed ten days after

20   you were released from prison.  Is that correct?

21       A    That's what the calendar say.  I'm not sure the day

22   Mr. Turner got killed.

23       Q    Right.  But according to the calendar he was killed

24   ten days after the day you was released.

25               MR. GODIALIS:  Well, Your Honor, I -- I object.

26               THE COURT:  Mr. Lewis --

27               MR. LEWIS:  I'm -- I'll get to the point.

1    THE COURT:  -- we know when it -- we can

2    stipulate to the number of days that occurred between

3    these two events, but this witness is not sure when

4    he was released from prison and is not sure when Mr.

5    Turner was killed.  So we're not using our time

6    efficiently.

7    DIRECT EXAMINATION BY MR. LEWIS (continuing):

8    Q    Okay.  Well, let me ask you this, then.  You said

9    prior to your court dates you were at odds with Mr. Turner

10   over the drug business, so to speak.

11   A    We was not odds.  We just had different -- Mr. Turner

12   wanted too much money for his drugs.  I couldn't afford it.

13   So I didn't deal with Mr. Turner no more.

14   Q    Okay.

15   A    We still was friends.  That had nuttin' to do with

16   our friendship.

17   Q    So Mr. Turner wanted too much drugs with -- too much

18   money for his drugs.  But at the same time he lent you money

19   to pay for a lawyer.  Is that what you're saying?

20   A    Yes, he did.  He was being my friend.  He knew I

21   didn't have the money, so he helped me out.

22   Q    Okay.  Do you know a individual by the name of Milton

23   Johnson?

24   A    Yes, I do.

25   Q    Does he go by any nicknames?

26   A    Yes, he do.

27   Q    What is one of his nicknames?

1    A    Maestro.

2    Q    Maestro.  Did he also have occasion to use the name

3    Eric?  If you know?

4    A    Not to my knowledge.

5    Q    Not to your knowledge?  Have you ever been arrested

6    with Mr. Johnson in the past?

7            MR. GODIALIS:  Objection, Your Honor.  Relevance.

8            THE COURT:  I don't see an relevance, Mr. Lewis.

9    DIRECT EXAMINATION BY MR. LEWIS (continuing):

10    Q    Do you also know an individual by the name of Jamie

11    Pringle?

12    A    Yes, I do.

13    Q    And how long have you been friends with Mr. Johnson

14    and Mr. Pringle?

15    A    Since childhood.

16    Q    And when you say childhood, that would be thirteen,

17    fourteen?

18    A    The same amount of time when me and Mr. Turner became

19    friends.  Maybe I was friends with Mr. Johnson, Mr. Pringle --

20    I was friendly with Mr. Johnson before I was friends with Mr.

21    Pringle.

22    Q    Okay.  And did you know any of Mr. Johnson's family

23    members?

24            MR. GODIALIS:  Objection, Your Honor.  Relevance.

25            THE COURT:  I still don't see any relevance to

26        this, Mr. Lewis.

27            MR. LEWIS:  Your Honor, the relevance is that

**January 11, 2008**

1     there's a police report -- if I'm not mistaken,

2     Exhibit 16 or Exhibit 6 -- which states that Mr.

3     Cardwell confessed to committin' the homicides in

4     question.  We realize that the informant turned out

5     to be deceased, but what I'm trying to establish here

6     is that there's evidence that suggests that the

7     informant was related to one of Mr. Cardwell's

8     associates.  And I will be puttin' that evidence on

9     through his next witness -- or at least attempting to

10    put that evidence on depending on the court's ruling

11    and Mr. Godialis' objection.

12         THE COURT:  And I'm trying to follow the chain

13    here.  What does it matter if an informant was

14    related to one of Mr. Cardwell's associates?

15         MR. LEWIS:  Well, according to the informant, Mr.

16    Cardwell confessed to committin' this crime.

17         THE COURT:  All right.  Well --

18         MR. LEWIS:  The informant had Mr. Cardwell as

19    actually being the triggerman to the crime as opposed

20    to the lookout.  It's my ascertation (phonetic) that,

21    you know, if this confession is actually true,

22    obviously, it would be made to somebody that's close

23    or closely associated to this group of individuals.

24    Thereby -- and actually I think that's a requirement

25    of law that to show a close connection between the

26    informant and the person who allegedly confessed to

27    the informant.

1          THE WITNESS:  May I please say something?

2          THE COURT:  Not yet.  But you could talk to your

3     lawyer if you like.

4          THE WITNESS:  Okay.

5          MR. LEWIS:  And if Your Honor would look at the

6     death certificate, which is Exhibit -- the death

7     certificate is Exhibit 6, and on -- the maiden name

8     on the death certificate in regards to the family

9     member of this person -- last name is Johnson.  And

10    again, I would be puttin' on evidence through

11    Detective Rodgers that there was a person actually

12    seized by the police at the murder scene with the

13    name Johnson.

14         THE COURT:  I'm having a hard time seeing what

15    relationship, if any, this has to your petition.

16         MR. LEWIS:  Well, it has a lot to do with the

17    petition in regards to prejudice, the investigation

18    procedures, and Mr. -- Mr. Williams.  Especially when

19    you have one -- now we know at least arguably that

20    Mr. Cardwell has been placed at the crime scene

21    although he denied being there.  Ms. Basilicato, in

22    my opinion, pointed out to the court that the person

23    she identified was the person who was similar to an

24    individual in photograph number 2 --

25         THE COURT:  Right.

26         MR. LEWIS:  -- of the photo array.

27         THE COURT:  Right.

1    MR. LEWIS:  She also pointed to the individual as

2    that person in open court.  And then the person comes

3    on the stand testify and admits that he is actually

4    that person.

5        THE COURT:  So you're saying it relates to the

6    prejudice prong of the ineffective assistance --

7        MR. LEWIS:  Ineffective assistance.

8        THE COURT:  -- of counsel claim --

9        MR. LEWIS:  Yes.

10       THE COURT:  -- against Mr. Williams?

11       MR. LEWIS:  Yes.  Yes, it does, Your Honor.

12       THE COURT:  Mr. Godialis?

13       MR. GODIALIS:  Well, no one asked -- no one asked

14   Mr. Williams about any of this.

15       THE COURT:  Right.

16       MR. GODIALIS:  That wasn't the basis of any of

17   the questioning of Mr. Williams.  And my

18   understanding, unless I'm wrong, is that Mr. Cardwell

19   is here on -- on the claim of newly-discovered

20   evidence of actual innocence.  And, of course, the

21   problem with that is going to be that none of this is

22   newly discovered because Mr. Cardwell has been known

23   about since he gave the police a statement in 1991.

24       THE COURT:  I'm not even seeing the newly-

25   discovered claim in the amended petition.

26       MR. LEWIS:  May I be heard on that?

27       THE COURT:  I'll hear you in a second, but let me

1    complete my thought here.  I suppose that if Mr.

2    Williams had committed ineffective assistance in the

3    ways claimed and sought to be proven by Mr. Lewis --

4    which don't involve this issue, I agree -- then he

5    would have to show prejudice that the -- in that the

6    outcome of the case would have been different.

7    Perhaps this goes to that.  Seems to me a stretch.

8    Mr. Lewis?

9         MR. LEWIS:  Yes, Your Honor.  In relation to --

10   and I think you're correct in regards to the

11   prejudice prong of ineffective assistance count --

12   but in addition to what Mr. Godialis pointed out --

13   and I want to apologize to the court and Mr. Godialis

14   -- I did file a second amended petition to include

15   the count of actual innocence.  However, that was

16   returned to me by the clerk's office because it

17   wasn't a order page.  So Mr. Godialis has the copy of

18   it but I don't think the court has a copy of it.  It

19   was my intention at the end of evidence -- you know,

20   once the evidence was developed -- to ask the court

21   for leave to amend the petition to conform to the --

22   the evidence that was being presented.

23        THE COURT:  I saw that reference in your brief.

24   What's your position on that, Mr. Godialis?

25        MR. GODIALIS:  I don't quite know what to say,

26   Your Honor.  Apparently the documents that I have are

27   not the same documents that Mr. Lewis is filing,

1    although I was of the impression that that was what

2    was happening.  I mean, to the extent that he's

3    claiming newly-discovered evidence of actual

4    innocence, the court is well-aware that newly

5    discovered doesn't mean he just found about it or

6    decided to bring it up.  It has to be something that

7    could not have been discovered in 1991.  Nothing with

8    respect to Mr. Cardwell is going to fit in that mold,

9    as far as I can tell.  If the questions of Mr.

10   Cardwell at this point are about the ineffective

11   assistance of John Williams, then I would have

12   expected there to be some questions of Mr. Williams

13   about what investigation he conducted vis-à-vis the

14   things that Mr. Lewis is asking about.  But none of

15   those questions were asked.  So I don't know where we

16   are.

17        THE COURT:  I continued this case so that we

18   could hear, I think, three witnesses -- Ms.

19   Basilicato, Mr. Cardwell, and, I -- and, yes,

20   Detective Rodgers.  So perhaps -- I haven't seen any

21   motions or amended petitions.  I did see the

22   reference in your brief.  I might allow amendment of

23   the petition to conform to the evidence that we had

24   contemplated presenting today.  I'm certainly not

25   going to allow any new claims that we hadn't

26   contemplated.  How long is this line of questioning

27   gonna go on, Mr. Lewis?

1          MR. LEWIS:  Um, it's not much longer, Your Honor.

2     I'm just giving you a rough idea, you know, based on

3     the answers and the truthfulness of Mr. Cardwell.  It

4     could be another ten, maybe fifteen minutes.  And I

5     don't -- I don't even know if that's asking an

6     abundance amount of questions, but I could probably

7     say I got maybe, like, ten or fifteen questions.  So

8     I'm basing it on a minute per question.

9          THE COURT:  Yeah.  Okay.  I think I'll overrule

10    the objection and allow the question without

11    prejudice to my ruling on whether this is relevant to

12    anything and any existing petition or amended

13    petition that I may or may not allow.  But just out

14    of an abundance of caution and in an effort to move

15    this along and complete Mr. Cardwell's testimony,

16    I'll allow.

17         MR. LEWIS:  Can I have the, uh, reporter repeat

18    the question, if that's okay?

19         THE COURT:  Well, it was a while ago.  You were

20    asking about the relationship of the informant to Mr.

21    Cardwell's relatives.

22    DIRECT EXAMINATION BY MR. LEWIS (continuing):

23      Q   You said you know an individual by the name of -- of

24    Milton Johnson.  Correct?

25      A   Yes.

26      Q   And you said you were friends with him since your

27    childhood.  Correct?

1    A    Yes.

2    Q    My question to you was, have you ever been arrested

3    with Mr. -- with Mr. Johnson in the past?

4    A    Yes, I have.

5    Q    Yes, you have.  And would you care to divulge what

6    basis those were?

7    A    It was a rent-a-car that was reported stolen but it

8    was not stolen.  It was a rent-a-car that was -- that had got

9    reported stolen.

10    Q    Were there any other arrests that you may remember?

11    A    With Mr. Johnson?

12    Q    Yes, sir.

13    A    No, not that I can remember.

14        MR. LEWIS:  Your Honor, I would like to offer

15    this exhibit for identification.  It's a police

16    report from February 14, 1986, indicating the arrest

17    of Michael Cardwell and Milton E. Johnson.

18        MR. GODIALIS:  Objection, Your Honor.

19        MR. LEWIS:  I'm asking for identification.

20        THE COURT:  All right.  For identification only.

21    What do you want to -- try to refresh his

22    recollection?

23        MR. LEWIS:  Yes, sir.

24        THE COURT:  All right.  You -- marshal, if you'd

25    be good enough to show it to the witness.

26        MR. GODIALIS:  I'm gonna interpose an objection

27    on relevance grounds, Your Honor.

THE COURT:  I don't see any relevance as to how -- as to any fact that Mr. Cardwell was arrested with Mr. Johnson.  I think we're just far afield from the petition here.

MR. LEWIS:  Your Honor, with all due respect, I do have Mr. Rodgers, which is the next witness.  And according to his police report -- and this may give the court a little leeway --

THE COURT:  What does the fact Mr. Cardwell may or may not have been arrested with Mr. Johnson have to do with anything in the petition?

MR. LEWIS:  Well, it's the state's theory, Your Honor, that three persons were responsible for this homicide.  They theorized that one person was outside while two people were inside of the -- the apartment.  The evidence that we developed -- even though Mr. Godialis argues that it's not new, which is something that we could take up later -- well, you just heard evidence from Ms. Basilicato for the first time who identified the person she seen whistling outside of the crime scene.  That would place two more people or two individuals still within the apartment.  Mr. Godialis acknowledged that even if Cardwell was this particular person or -- excuse me, I don't mean to mischaracterize -- but when he spoke to Ms. Basilicato, she testified that she didn't see anything in regards to who committed this murder.

1    She was just testifying as to who was outside of the

2    murder scene (indiscernible) within hearing the

3    gunshots.

4        THE COURT:  All right.

5        MR. LEWIS:  It's my effort to introduce, in

6    addition to Mr. Cardwell being at the crime scene,

7    that a friend of -- associate of his was also at the

8    crime scene in the name of Mr. Johnson.  And not only

9    that, that they had a criminal history of committing

10   crimes together in the past in the like manner that's

11   relative to this crime as well, where Mr. Cardwell

12   served as the lookout.

13       THE COURT:  All right.  Marshal, if you'd be good

14   enough to show him this to refresh his recollection.

15       THE WITNESS:  I remember the crime.

16       THE COURT:  Oh, okay.  All right, he remembers.

17   DIRECT EXAMINATION BY MR. LEWIS (continuing):

18   Q    You do remember the crime?

19   A    Yes, I do.  When you said 1986, this is a long time

20   ago.

21   Q    All right.  So you do acknowledge that you were

22   involved in criminal activity with Mr. Johnson in the past.

23   A    Yes, I do.

24   Q    Is that correct?  Do you also acknowledge that the

25   role you played in that crime was the lookout?

26   A    I don't -- I don't even -- I remember the crime, but

27   I don't remember the crime.  I remember what we did.  I don't

1  remember what my part was.

2      Q    You remember what you did, but you don't remember

3  what your part was.  Okay.  But you do acknowledge that you

4  committed crimes with him in the past.

5      A    One crime.  That crime right there.

6      Q    Are you sure it's only one?

7      A    I've been arrested with Mr. Johnson, but that crime

8  right there was the only crime we committed.

9              MR. LEWIS:  Your Honor, I would also like to mark

10             for identification another police report, which is a

11             separate crime in regards to Mr. Cardwell and Mr.

12             Johnson.  Just for identification --

13             THE COURT:  All right.

14             MR. LEWIS:  -- to try to refresh his memory.

15             THE COURT:  All right.  Why don't you just -- you

16             don't have to mark items shown for purposes of

17             refreshing recollection as exhibits.  So why don't

18             you just show it, see if it refreshes his

19             recollection.  Thank you, marshal.

20  DIRECT EXAMINATION BY MR. LEWIS (continuing):

21      Q    Would you be able to compare both of those to see if

22  there's actually more than one in which you just testified to?

23             MR. GODIALIS:  Your Honor, may I inquire what

24             we're refreshing his recollection as to?

25             THE COURT:  Apparently, as to any crimes he may

26             have committed with Mr. Johnson.

27             MR. GODIALIS:  Then I'm gonna object again on

1        relevance grounds.

2                MR. LEWIS:  It's the last one I have.

3                THE COURT:  All right.  Overruled.

4  DIRECT EXAMINATION BY MR. LEWIS (continuing):

5        A    I don't remember this crime right here.

6        Q    You don't remember that --

7        A    No, I --

8        Q    -- specific crime?  Do you have a brother named Andre

9  Cardwell?

10       A    Yes, I do.

11       Q    Although you don't remember that crime, does that

12  police report indicate that you, Milton, and your brother were

13  involved in that particular episode?

14       A    It has his name up here.

15       Q    But do you acknowledge that that report indicates

16  that?

17       A    I don't remember this crime, so I'm not acknowledging

18  nothin'.  I don't remember this crime.

19                MR. LEWIS:  Your Honor, I ask that -- mark those

20            exhibits for identification and I will claim for

21            admitted as full exhibits to show a system of

22            criminal activity between these -- between these

23            three individuals.

24                MR. GODIALIS:  Objection, Your Honor.

25                THE COURT:  Well, we can mark them for ID.  Basis

26            of the objection, Mr. Godialis?

27                MR. GODIALIS:  Well, he -- it would be a hearsay

1 objection.  He's offering a police report to try to

2 establish some fact, and it's not this witness'

3 report.

4   THE COURT:  Sustained.

5   MR. LEWIS:  Your Honor, may I take exception to

6 that ruling?

7   THE COURT:  Certainly.

8   MR. LEWIS:  I believe that in light of the

9 informant's account, the informant account was that

10 Mr. Cardwell and his brother were involved in this --

11 this crime.  Again, I'm gonna put on evidence to link

12 the informant to Mr. Milton Johnson.  Those police

13 reports show that these individuals have a system of

14 criminal activity of committin' crimes.

15   THE COURT:  Police report is not a court

16 statement, not subject to cross-examination or under

17 oath.  That makes it hearsay.  And I sustain the

18 objection on that ground.

19   MR. LEWIS:  Okay.  I take exception to that, Your

20 Honor.

21   THE COURT:  Yes, sir.

22   MR. LEWIS:  Thank you.

23 DIRECT EXAMINATION BY MR. LEWIS (continuing):

24  Q   Mr. Cardwell, you did acknowledge that you have

25 another brother by the name of Andre Cardwell.  Is that

26 correct?

27  A   Yes.

1    Q    And you have a brother by the name of Vincent

2    Cardwell.  Is that correct?

3    A    Yes.

4    Q    And you have a childhood friend by the name of Mr.

5    Johnson.  Is that correct?

6    A    Yes.

7    Q    Okay.  And you've known Mr. Johnson since you were

8    young at age.  Is that correct?

9    A    Yes.

10    Q    Do you admit that you committed crimes with Mr.

11    Johnson?

12    A    I admitted -- I committed a crime with Mr. Johnson,

13    yes.

14    Q    Okay.  Did you ever commit a crime with Mr. Johnson

15    and your brother?

16    A    Never.

17    Q    Never?

18    A    Not that I could recall.  Which brother are you

19    talking about, Vincent or Andre?

20    Q    Either one of them.

21    A    Not that I recall.

22    Q    Not that --

23         MR. LEWIS:  May I ask the witness to take a look

24         at Exhibit -- I think we introduced it this morning

25         -- Exhibits 33 and 34?

26         THE COURT:  Yes.

27    DIRECT EXAMINATION BY MR. LEWIS (continuing):

1    Q    Do you recognize those individuals?

2    A    No.

3    Q    You don't know who they are.

4    A    Well, I can't recognize 'em.  No, I can't recognize

5    'em.

6    Q    Is -- you can't recognize 'em because of what reason?

7    A    If it's Mr. Fields and Mr. Turner, it resembles 'em

8    but it doesn't -- I don't remember 'em lookin' like this.

9    Q    Okay.  And that would be because of --

10    A    The way they are -- the way they're laying.  Only

11    reason -- if you showed me two pictures of this on the street,

12    I couldn't tell you who they were.  Only reason why I know who

13    they are today is 'cuz where I'm at today.

14    Q    Okay.  So you wouldn't know a man that you've known

15    for your entire life based on that picture because he's shown

16    in that picture to be deceased?

17          MR. GODIALIS:  Objection, Your Honor.

18          Argumentative.

19          THE COURT:  Sustained on the ground of leading.

20    DIRECT EXAMINATION BY MR. LEWIS (continuing):

21    Q    Well, why wouldn't you know the individual you know?

22    A    It does -- it just doesn't look like 'em.  Only -- I

23    could just -- only reason why I could tell -- like I said, I

24    could tell, is because of where I'm at and I'm studying the

25    picture, and I could see who they are.  Now, that -- 'cuz I'm

26    here.

27    Q    Okay.  Mr. Cardwell, did you give a statement to

1  police concerning this matter?

2     A   Yes, I have.

3          MR. LEWIS:  Mr. Godialis, if I may borrow your

4     police re- -- the statement that Mr. Cardwell gave to

5     the police that we spoke about earlier?

6          MR. GODIALIS:  We spoke about it earlier?

7          MR. LEWIS:  Prior to the hearing I asked if you

8     had a copy of it?

9          MR. GODIALIS:  You want Mr. Cardwell's statement?

10         MR. LEWIS:  Yes.  Uh, Your Honor, I won't be able

11    to put this in as an exhibit according to Mr. -- can

12    I have him just review this -- the statement he gave

13    to the police?

14         THE COURT:  There's no showing that he needs his

15    recollection refreshed or any other basis for doing

16    so.

17 DIRECT EXAMINATION BY MR. LEWIS (continuing):

18    Q   Do you remember what it is that you told the police

19 in regards to this homicide?

20    A   No, I don't.

21    Q   Do you need your memory refreshed?

22    A   Um, you can give it to me and, uh, I could see --

23    Q   I'm just asking you if, you know, based on the fact

24 that you testified that you don't remember anything, I don't

25 want to ask you a question and you give an answer that's

26 different than what you gave the police.  So do you -- do you

27 need to refresh this -- your memory as to what you told the

1  police?

2      A   Well, when I was in the same predicament with Mr.

3  Morant, the -- they said that I was saying stuff that I don't

4  remember, so that's gonna be the same report.  I don't

5  recollect -- remember what I said in that, so....

6      Q   Do you remember what they say you were saying?

7      A   I don't remember none of that.  I just remember what

8  I told 'em.  They showed me some pictures of you and Mr.

9  Morant.  That's the only thing I remember.

10     Q   Okay.  You don't remember whether you told the police

11 that Mr. Turner and Mr. Fields were executed -- or the way

12 they were executed and that your brother told you that?

13     A   I think -- I think my brother did tell me that a

14 mutual friend told him that -- he called me and told me that

15 Mr. Turner and Mr. Fields were killed.

16     Q   And did you ever find out how he knew that five shots

17 were fired?

18     A   He never told me five shots were fired.

19     Q   He never told you five shots were fired?

20     A   Not that I recall.

21     Q   Do you recall telling that to police?

22     A   Not that I can recall.

23     Q   Okay.  But you're saying that somebody else told him

24 and then he told you.

25     A   If I remember, I think my brother did call me.  I'm

26 not saying I'm a hundred percent sure.  But I think my brother

27 was the first one that told me that Mr. Fields and Mr. Turner

1   was killed.

2       Q    Okay.  But he never told you how he learned that

3   information?

4       A    I'm assuming somebody told him.

5       Q    Okay.  But he never told you who told him?  Just

6   somebody told -- just somebody told him.

7       A    Uh, he coulda told me who told him, but I don't

8   remember.

9       Q    Okay.  Now, Mr. Cardwell, during the course of these

10  proceedings -- I think it was last year in the Morant hearing

11  -- am I correct?  You testified.  Correct?

12      A    Yep.

13      Q    And in that hearing, did you learn that somebody

14  actually made a allegation that stated that you confessed to

15  being responsible for the homicides of Mr. Turner and Mr.

16  Fields?

17      A    He had mentioned somebody's name.

18      Q    Did you ever have --

19      A    But the person that he -- the person -- the people

20  you comin' up with is people I don't even involve myself with.

21  So, like I told them before, it's you and Mr. Morant

22  slandering my name.  I'm saying y'all act like I did it and,

23  like I told 'em before, in my hood -- in my neighborhood, they

24  know I ain't do it.  Mr. Field's son and Mr. Turner's son,

25  they come to see me.  They know I ain't kill their father.

26      Q    Okay.

27      A    So I'm saying you could do you best --

**January 11, 2008**

1  Q   Let me ask you this.

2  A   -- you could do what you want to do, but I know that

3  I did not kill Mr. Turner and Mr. Fields.

4  Q   Well, let me ask you this.  I'm not saying that you

5  killed Mr. Turner and Mr. Fields.  So let's --

6  A   Then what I'm doin' here den?

7  Q   -- let's get straight.  I'm not saying that.  I'm

8  saying that someone said that you confessed to them that you

9  did that.  I'm saying that somebody identified you at the

10  crime scene.

11       MR. GODIALIS:  Your Honor, objection.  Could he

12       ask the witness a question?

13       THE COURT:  Yes.  Sustained.

14  DIRECT EXAMINATION BY MR. LEWIS (continuing):

15  Q   In addition -- let me just -- let me just ask --

16       THE COURT:  What's your question, Mr. Lewis?

17       MR. LEWIS:  Yes.

18  DIRECT EXAMINATION BY MR. LEWIS (continuing):

19  Q   Let me ask you this.  You just testified that me and

20  Mr. Morant -- me and Mr. Morant are the ones that are making

21  these accusations against you.  Is that correct?

22  A   Yes, sir.  Every time one of my friends come home

23  from jail, they tell me you or Mr. Morant is runnin' around

24  the prison saying I committed the crimes.

25  Q   And you testified that no one from your neighborhood

26  was saying that.  Is that correct?

27  A   You can't find nobody in my neighborhood that would

1   point a finger at me.

2       Q    Okay.  And you also said that you've known Mr. Milton

3   Johnson for most of your life.  Is that correct?

4       A    Yes, sir.

5       Q    Okay.  Now I asked you a question, did you know of

6   any of Mr. Johnson's relatives?

7       A    I knew his brother, his two sisters.

8       Q    Okay.  And what's his brother's name?

9       A    We call him Fatman.

10      Q    I asked you what his -- what's his first name?

11      A    I know him by Fatman.

12      Q    You know him by Fatman?  Does he go by the name of

13  Frank?

14      A    I know him by Fatman.

15      Q    Okay.  Do you know anybody that goes by the name of

16  Frank?

17      A    I know a couple of people named Frank.

18      Q    Okay.  Did you have a opportunity to review the

19  allegations of the person that said you committed these

20  crimes?

21      A    This the first time I ever heard that.  Nobody's

22  never told me that -- only people that tell me that is you and

23  Mr. Morant.  It's nobody else --

24      Q    Okay.

25      A    -- but you and Mr. Morant.

26          MR. LEWIS:  Your Honor, may I have the witness

27          review the police report as Exhibit 16?

```
 1              THE COURT:  For what purpose?

 2              MR. LEWIS:  Well, he's indicated that the only --

 3         everybody's telling him that me and Mr. Morant are --

 4         are making these allegations to him.  And what I

 5         wanted to show him -- that the individuals that are

 6         making these allegations against him are actually

 7         individuals from his community.  Obviously, he hasn't

 8         seen this.  And he's thinking it's just me trying to

 9         point the finger at him.

10              THE COURT:  Well, why don't you ask him about

11         some particular individual and ask him whether it's

12         from his community.
```

DIRECT EXAMINATION BY MR. LEWIS (continuing):

```
14    Q    Is Milton Johnson from your community?

15    A    Sure enough is.

16    Q    Okay.  And is Milton Johnson's family from your

17 community?

18    A    His family is not from the community.

19    Q    When I say his family, his mother, his uncles, his

20 aunts, they never lived in that area?

21    A    Yeah, they lived in the area.

22    Q    Okay.  So when I asked you if they from that

23 community, was that pretty vague or....

24    A    They -- they live -- Mr. Johnson is -- and his family

25 is the only one I communicate.  Everybody else is a hi-and-bye

26 situation.

27    Q    Okay.  But Mr. Johnson and his family are individuals
```

1    that you are close with, so to speak.

2        A    I know 'em.

3        Q    And is your testimony that there's no one in your

4    community that's ever said that Michael Cardwell, a.k. (as

5    spoken) Bullet, is the one that's responsible for these

6    homicides?

7        A    Nobody has ever in my community came up to me and

8    said, "Yeah, I heard you did it; yeah, you the one who did

9    it." Only person who -- people in my community come up to me

10   and says, "Mr. Lewis and Mr. Morant is in jail saying that you

11   did it."

12       Q    Okay. And do you go by a street name?

13       A    Street name of what?

14       Q    Do you go by a street name? That's what I'm asking

15   you.

16       A    Yes.

17       Q    And what is that street name?

18       A    Bullet.

19       Q    And why do they call you Bullet?

20       A    It was a nickname that I had ever since I was a baby.

21       Q    Since you was a kid? So there's no reason why they

22   call you Bullet. It's just they call you Bullet.

23       A    When I moved into the neighborhood, my name was

24   Bullet.

25       Q    So it was a name you had before you came into the

26   neighborhood.

27       A    Yes, sir.

1     Q   And who gave you that name?

2     A   It was a -- one of my parents' friends.

3     Q   One of your parents' friends gave you the name

4 Bullet?

5     A   Yes.

6     Q   Did you ever find out the reason why he gave you that

7 name?

8            MR. GODIALIS:  Objection, Your Honor.  Relevance.

9            THE COURT:  Sustained.  Mr. Lewis, I think I --

10           MR. LEWIS:  Okay.  I'm about to finish up, Your

11      Honor.  I got a few more questions.

12          THE COURT:  Yes, sir.

13          MR. LEWIS:  Okay.

14 DIRECT EXAMINATION BY MR. LEWIS (continuing):

15     Q   Mr. Cardwell, when you testified last year, you

16 stated that your brother Vincent was a drug user?  Is that

17 correct?

18     A   Yes, he was.

19     Q   Okay.  Do you have any idea where your brother is

20 now?

21     A   Yes.  He's -- he's in New Haven.

22     Q   Okay.  Do you -- can you give me the address where he

23 resides?

24            MR. GODIALIS:  Objection, Your Honor.  Relevance.

25           THE COURT:  I don't see any relevance to this,

26      Mr. Lewis.

27 DIRECT EXAMINATION BY MR. LEWIS (continuing):

1      Q    But he does reside in New Haven.

2      A    Yes, he does.

3      Q    In 1990 was he a drug user, so to speak?

4      A    I can't recall.  I don't -- I don't know when he

5    started -- began using drugs.

6      Q    Now you asked -- you testified last year that

7    basically you -- you described him as a fiend.

8      A    Yes, he was a fiend.  He was a dope fiend.

9      Q    And what does that mean?  I'm just asking.

10     A    He -- he was hooked --

11          MR. GODIALIS:  Objection, Your Honor.  Relevance.

12          THE COURT:  I'll allow an answer to this

13          question.

14   DIRECT EXAMINATION BY MR. LEWIS (continuing):

15     A    He -- he was a dope fiend.  He like to sniff heroin.

16     Q    He liked to sniff heroin?  Did he do any other type

17   of drugs that you know of?

18          MR. GODIALIS:  Objection, Your Honor.  Relevance.

19          THE COURT:  It's irrelevant and there's --

20          there's no foundation for this.

21          MR. LEWIS:  Your Honor, I -- I'm --

22          THE COURT:  Sustained.

23          MR. LEWIS:  -- asking for the simple fact that

24          this was a drug-related homicide.  There's testimony

25          that Mr. Turner stored drugs in his apartment and

26          that the reason for the so-called homicides had to do

27          with drug involvement.  Um, Mr. Cardwell's brother

1        was implicated, not by myself or Morant.  Just so you

2        know that.  It was an informant came forth to the

3        police and said that you and your brother were

4        responsible for the homicides of Mr. Turner and Mr.

5        Fields.  Not me and Mr. Morant.  Just so you're clear

6        on that.  The was a drug-related homicide.  We have a

7        individual that was placed at --

8              THE COURT:  Mr. Lewis, I'd sustained objection,

9        in part on relevance and in part on lack of

10       foundation.

11  DIRECT EXAMINATION BY MR. LEWIS (continuing):

12       Q    But you did say your brother was a drug user.  Is

13  that correct?

14       A    Yes, he was.

15       Q    And how much older is your brother that you?

16       A    He's about six years older than me.

17       Q    He's six years older than you?  And it's your

18  testimony that you were not at the crime scene that night in

19  question.  Is that correct?

20       A    I was not there.

21       Q    But it is your testimony that you are the individual

22  in photo array number 2.  Is that correct?

23       A    Yes.

24       Q    And you do acknowledge that you were pointed out as

25  the person who was similarly seen at -- at the crime scene

26  that morning.  Is that correct?

27       A    Yeah, 'cuz I'm the only light-skinned person in the

1    courthouse.  Course she's gonna say he looked like me.

2        Q    'Cuz -- because you're the only light-skinned --

3        A    Yes.  I'm the only one that looks like the person.

4        Q    So every light-skinned person looks like you?

5        A    If you were to put -- you were to -- if I was there

6    with ten other people, I'm pretty sure she wouldn't a pointed

7    at me.

8        Q    Okay.  You're positive of that.

9        A    I'm not saying I'm positive, but, uh, I'm pretty sure

10   that she wouldn't a pointed at me.

11       Q    Okay.  Do you know where you were on the night in

12   question?

13       A    Do I know where?

14       Q    Yeah.

15       A    Repeat your question.

16       Q    Do you know where you were on the night in question?

17       A    The night in question of what?  Of the murder?

18       Q    On October -- yes.

19       A    No, I can't recall.  I guess I -- I don't know if I

20   was home with my mother or I was with my -- my baby's mother.

21   I don't -- I don't recall.  I just know I got a phone call

22   stating that Mr. Turner and Mr. Fields was killed.

23       Q    Okay.  And you don't -- you know you received a phone

24   call but you don't know where you received that phone call.

25       A    No, I have no clue.

26       Q    And your mother or any other person that you was with

27   can validate that you was with them on that night in question?

1    A    My mother's deceased.   And I'm not sure that Mrs.
2    Coleman can remember if, um, I was with her or not 'cuz I'm
3    not sure where I was at.
4    Q    So you just --
5    A    But I knew I was not on Howard Avenue.
6    Q    Okay.  You know that for certain but you're not sure
7    where you was at otherwise.  Is that the question?
8    A    I'm positive I wasn't on Howard Avenue.
9    Q    Okay.  And you did live in New Britain with Mrs. --
10   you said your daughter's mother, Dean Coleman, if I'm not
11   mistaken?
12   A    Deanne Coleman.
13   Q    Deanne Coleman.  And she resided in New Britain.
14   A    Yes, she did.
15   Q    So the person that alleged that you confessed to, if
16   they were to say that you lived in New Britain with your
17   daughter's mother, that would have been true?
18   A    I did not confess to nobody 'cuz I did not commit no
19   murder.
20   Q    That's not what I'm asking you.  I'm asking you --
21   A    You're asking me -- you're asking me --
22        MR. GODIALIS:  Objection, Your Honor.  That is
23        what he's asking.
24        THE COURT:  I didn't understand the question.
25        MR. LEWIS:  Well, can I rephrase it?
26        THE COURT:  I do think, Mr. Lewis, that you're
27        abusing the privilege that I granted to you.  I would

**January 11, 2008**

1          concede that the last line of questioning was

2          relevant and important, but we spent ten, fifteen

3          minutes on things that I don't see having any

4          connection to this case.

5               MR. LEWIS:  Okay.

6               THE COURT:  So you're not using your time --

7               MR. LEWIS:  Last question is, uh --

8               THE COURT:  -- excuse me, you're not using your

9          time properly or efficiently.

10              MR. LEWIS:  Okay.  Last question.

11              THE COURT:  All right.

12     DIRECT EXAMINATION BY MR. LEWIS (continuing):

13         Q    You do acknowledge in October of 1990 you did live

14     with your daughter's mother in New Britain, Connecticut.

15         A    I'm not one hundred percent positive.  I know that's

16     where I was paroled to.  And I was -- my mother lived in New

17     Haven, so I could have been anywhere between New Haven and New

18     Britain at the time.

19         Q    Okay.  Thank you.

20              MR. LEWIS:  I have no further questions.

21              THE COURT:  Thank you, Mr. Lewis.  Cross-

22          examination.

23              MR. GODIALIS:  Very briefly, Your Honor.

24     CROSS-EXAMINATION BY MR. GODIALIS:

25         Q    Mr. Cardwell, good morning.

26         A    Good morning.

27         Q    Good afternoon.  Do you recall giving a statement to

1  the New Haven police on March 18th of 1991?

2      A    I remember giving a statement, but I don't remember

3  what day it was.

4      Q    No, I'm just asking whether you gave -- recall giving

5  one.

6      A    Yes, I gave a statement.

7      Q    And do you recall whether the police asked you at

8  that time if you were involved in the Turner-Field murders?

9      A    Uh, they coulda asked me.  I just -- I don't

10  remember.  Only thing, like I say -- only thing I remember was

11  the pictures they showed me.  They showed me pictures.  They

12  asked me a couple of questions I don't really remember.  But I

13  do remember the pictures.

14      Q    Let me show you a document and ask you to take a look

15  at it.  Just read it to yourself.

16          MR. LEWIS:  I object, Your Honor.  He didn't say

17          that he needed his memory refreshed.

18          THE COURT:  He stated he didn't remember.

19          MR. GODIALIS:  He stated he did not remember.

20          (Witness reading)

21  CROSS-EXAMINATION BY MR. GODIALIS (continuing):

22      Q    Mr. Cardwell, does that refresh your recollection

23  about whether the police asked you if you were involved in the

24  Turner and Fields murders?

25      A    Hmm, I'm not sure.  They coulda asked me, uh -- this

26  -- they coulda asked me.

27      Q    That doesn't help to refresh your recollection?

1    A    No, not really.

2    Q    Okay.  Then let me ask you this.  Were you involved

3  in the Turner and Fields murders in any way?

4    A    Absolutely not.

5    Q    Thank you.

6         MR. GODIALIS:  I have no further questions.

7         THE COURT:  Any redirect?

8  REDIRECT EXAMINATION BY MR. LEWIS:

9    Q    Mr. Cardwell, you do acknowledge you are the person

10  in photo number 2.  Is that correct?

11    A    Yes.

12        MR. LEWIS:  I have no further questions.

13        THE COURT:  Any recross?

14        MR. GODIALIS:  No, Your Honor.

15        THE COURT:  Thank you very much, Mr. Cardwell.

16  You may step down.

17        Mr. Channing, the court expresses its

18  appreciation to you for stepping in on short notice.

19  Thank you, sir.

20        How long do you think you'd be with the next

21  witness, Mr. Lewis?

22        MR. LEWIS:  Um, I don't want to put myself in --

23        THE COURT:  I know, but I just wanted to get an

24  idea of whether it would be long or short.  I'd like

25  to accommodate the officer if I can, but --

26        MR. LEWIS:  It won't be too long.  It's just

27  based -- questions based on his police report --

| TSR-CV06-4001783-S | : | SUPERIOR COURT |
| LEWIS, SCOTT | : | TOLLAND JUDICIAL DISTRICT |
| VS. | : | AT ROCKVILLE, CONNECTICUT |
| WARDEN, STATE PRISON | : | JANUARY 11, 2008 |

### Certification

    I hereby certify that the foregoing is a true and accurate transcription of the hearing in the above-entitled matter, heard in Superior Court at Rockville, Connecticut on January 11, 2008, before the Honorable Carl J. Schuman, Superior Court Judge.

    Dated at Storrs, Connecticut this 21st day of July, 2008.

*Donna L. Hite*

Donna L. Hite, Transcriptionist

DOCKET NO.: CV-02-0465200-S

XXXXXXXXXXXXXXXXXXXXXXXXXXXXX

STEFON MORANT            :  SUPERIOR COURT
                               :
                               :
       VS.               :  JUDICIAL DISTRICT OF
                               :  NEW HAVEN AT NEW HAVEN
                               :
                               :
COMMISSIONER OF CORRECTION  :  JANUARY 30, 2007

XXXXXXXXXXXXXXXXXXXXXXXXXXXXX

BEFORE:  THE HONORABLE ANTHONY V. DeMAYO.

A P P E A R A N C E S:

FOR THE PETITIONER:
MICHAEL FITZPATRICK, ESQUIRE
PARK CITY PLAZA
10 MIDDLE STREET, 11TH FLOOR
BRIDGEPORT, CONNECTICUT 06604

FOR THE RESPONDENT:
CHRISTOPHER GODIALIS, ESQUIRE
300 CORPORATE PLACE
ROCKY HILL, CONNECTICUT 06067

SOTONYE OTUNBA-PAYNE
COURT MONITOR



| 1 | **A U G U S T I N E   C A S T R O** |
| 2 | After having been duly sworn was examined and |
| 3 | testified as follows: |
| 4 | THE CLERK:  Okay.  State your name |
| 5 | and address for the record. |
| 6 | THE WITNESS:  Augustine Castro. |
| 7 | THE COURT:  And your present address, |
| 8 | sir? |
| 9 | THE WITNESS:  34 Park Street. |
| 10 | THE COURT:  New Haven? |
| 11 | THE WITNESS:  Yes. |
| 12 | THE COURT:  Thank you.  You may be |
| 13 | seated.  Counselor. |
| 14 | ATTORNEY FITZPATRICK:  Thank you, |
| 15 | Your Honor. |
| 16 | **DIRECT EXAMINATION** |
| 17 | **BY ATTORNEY FITZPATRICK:** |
| 18 | Q    Good -- good morning, Mr. Castro. |
| 19 | A    Good morning. |
| 20 | Q    Mr. Castro were you previously incarcerated |
| 21 | in the State of Connecticut under Inmate No. 201973? |
| 22 | A    Yes. |
| 23 | Q    And is your date of birth 3/9/74? |
| 24 | A    Yes. |
| 25 | Q    And your real name is Augustine Castro, |
| 26 | correct? |
| 27 | A    Yes. |

1      Q      And at times in your life you have also

2  used the name Ovil Ruiz?

3      A      Yes.

4      Q      And is it true that Ovil Ruiz is the name

5  of your younger brother?

6      A      Yes.

7      Q      Okay.  Do you also go or have you also gone

8  by, at times, the nicknames Blockhead and Pitbull?

9      A      Yeah.

10     Q      And did you testify as a prosecution

11  witness in the trial of State v. Stefon Morant?

12     A      Yes.

13     Q      And when you testified at that trial, did

14  you use the name Ovil Ruiz?

15     A      I don't recall.

16     Q      Okay.  Mr. Castro, is it true that Stefon

17  Morant and Scott Lewis -- withdrawn.  Mr. Castro,

18  when you testified in Mr. Morant's trial in 1994, did

19  you tell the truth?

20     A      I plead the Fifth.

21     Q      Mr. Castro, is it true that Stefon Morant

22  and Scott Lewis did not participate in the killings

23  of Ricardo Turner and Lamont Fields?

24     A      I plead the Fifth.

25     Q      Okay.  Is it true, Mr. Castro, that Stefon

26  Morant and Scott Lewis never rode with you in a car

27  over to Howard Avenue, and never entered the

1    apartment of Tuner and Fields on October 11th, 1990?

2         A       I plead the Fifth.

3         Q       Do you have any personal or independent

4    knowledge about the killings of Turner and Fields on

5    October 11th, 1990?

6         A       I plead the Fifth.

7         Q       After October 11th, 1990 did you ever meet

8    with Detective Vincent Raucci and discuss the

9    killings that allegedly occurred on Howard Avenue on

10   October 11th, 1990?

11        A       I plead the Fifth.

12        Q       Between October 11th, 1990 and your

13   testimony at the Morant trial in 1994 did you meet

14   with Detective Vincent Raucci and concoct -- and

15   concoct a story to falsely implicate Morant and

16   Lewis?

17        A       I plead the Fifth.

18        Q       In 19 -- in January of 1991 were you

19   arrested by Detective Raucci on an assault charge?

20        A       I plead the Fifth.

21        Q       Did that assault charge stem from a

22   shooting incident on December 19th, 1990?

23        A       I plead the Fifth.

24        Q       Did Detective Raucci and you ever discuss

25   how your arrest on the assault charge would be used

26   as a reason to provide information with regard to the

27   Howard Avenue killings?

1        A       I plead the Fifth.

2        Q       Did you participate in the killing of

3   Turner and Fields?

4        A       I plead the Fifth.

5        Q       Do you know who killed Turner and Fields?

6        A       I plead the Fifth.

7        Q       Do you have information in your possession

8   that would exonerate Morant and Lewis in the killing

9   of Turner and Fields?

10       A       I plead the Fifth.

11       Q       I'm showing you, sir, what's been marked

12  for identification as Plaintiff's Exhibit 26.  A two-

13  page document -- rather a three-page document.  Would

14  you take a look.  Just take a look at that document

15  for a moment.  Did you recognize that document, sir?

16       A       Huh-uh, I plead the Fifth.

17       Q       Is your signature at the end of that

18  document, namely, the second page where the letter

19  concludes?

20       A       I plead the Fifth.

21       Q       Sir, did you write that document?

22       A       I plead the Fifth.

23       Q       Did you send that document to Scott Lewis?

24       A       I plead the Fifth.

25       Q       Do you recall being interviewed by the FBI

26  in 1996 after the Lewis trial ended?

27       A       Excuse me?

1      Q      Do you recall being interviewed in 1996

2   after the Lewis trial ended -- pardon me.  Withdrawn.

3   Sir, do you recall being interviewed by the FBI in

4   1996 after the Lewis trial ended?

5      A      I plead the Fifth.

6      Q      Mr. Castro, did you meet with the FBI on

7   February 26th, 1996; March 21st and 25th, 1996; October

8   22nd, 1996; and February 14th, 1997?

9      A      I plead the Fifth.

10     Q      And on at least the first three times that

11  you met with the FBI did you tell the FBI, Mr.

12  Castro, that Morant and Lewis were innocent of the

13  killings?

14     A      I plead the Fifth.

15     Q      Do you -- sir, do you recall any of the

16  testimony you gave at Mr. Morant's trial?

17     A      Excuse me?

18     Q      Do you remember any of the testimony you

19  gave at Mr. Morant's trial?

20     A      I plead the Fifth.

21     Q      Okay.  Do you remember telling the ju --

22  the jury, sir, at Mr. Morant's trial that you had,

23  ah, retrieved the guns for Lewis and Morant, that you

24  had ridden in the car with them over to Howard

25  Avenue, that they had asked to keep it running while

26  they went inside, and that a short time later they

27  came down -- back down, entered the car carrying one

1    bag full of drugs and another bag full of money?  Do

2    you recall telling the jury that at Morant's trial?

3        A    I plead the Fifth.

4        Q    Sir, if I asked you today if you were to

5    testify in this proceeding, would your -- would your

6    role in the crime be any different today than it was

7    in 1994 when you testified at Mr. Morant's trial?

8        A    I plead the Fifth.

9        Q    Mr. Castro, if you were granted immunity

10   in -- in this proceeding, would you divulge the

11   information that you have and answer all of the

12   questions that I just asked you?

13       A    Yes.

14       Q    And would you like the Court to grant you

15   immunity?

16       A    Yes.

17       Q    Would you like the respondent, the State

18   Attorney's Office, to grant you immunity?

19       A    Yes.

20       Q    What -- immunity for what, sir?  Would it

21   be for the homicide or would it be for something

22   else?

23       A    It would be for everything.

24       Q    And when you say everything, can you

25   explain to me what you mean?

26       A    For the homicides, and, um, and stuff like

27   this.

1    Q    Are you worried that the State of

2  Connecticut might prosecute you for this homicide?

3    A    No, because they told me that -- that if I

4  cooperate, then nothing was going to happen to me.

5    Q    Who told you that?

6    A    Huh?  Dave Gold.

7    Q    Did he tell you that before you testified

8  at the trials of Morant and Lewis?

9    A    I mean it was all good and -- all good and

10 dandy when, um -- when I testified against them.  And

11 then when I want to the Feds, now all of a sudden

12 indeed they want to prosecute me on somethin' else.

13 That's why I got the -- I prob -- I plead the Fifth.

14   Q    So once it became clear to the State's

15 Attorney's Office that you were going to go from a

16 prosecution witness to a defense witness, they

17 started to threaten you with prosecution?

18   A    Yeah.

19            THE COURT:  What -- what was that

20            answer?

21            THE WITNESS:  Yes.

22   Q    And -- and would it be fair to say that

23 it's the threat of prosecution that's forcing you to

24 invoke the Fifth Amendment today?

25   A    Yes.

26   Q    If -- if you weren't -- if you didn't have

27 the fear that you were going to be prosecuted, would

1    you take the Fifth today?

2        A    No.

3        Q    And would you agree with me that over the

4    last 17 years -- the crime having occurred in 1990.

5    Would you agree with me that over the last 17 years

6    the State has never charged you with any crimes

7    related to the killing on Howard Avenue?

8        A    No.

9        Q    But now because you are going from --

10              ATTORNEY GODIALIS:  Well, objection,

11          leading.

12              THE COURT:  Sustained.

13       Q    Does your fear of prosecution stem from the

14   fact that there have been communications --

15              ATTORNEY GODIALIS:  Objection,

16          leading.

17       Q    What -- what types of communications or

18   threats have you received about not testifying in

19   this case?

20       A    I mean I got -- I got threats.  I'm always

21   getting threats.  I mean look where I live at.  I

22   live in the ghetto.  And everybody knows about me,

23   you know.

24       Q    When you were in prison, did you ever get a

25   call from somebody saying that you should not

26   testify on behalf of Morant in these proceedings?

27       A    I plead the Fifth.

1    Q    Do you know where that call came from?

2    A    No, I plead the Fifth.

3    Q    Did that call from -- call, ah, arguably

4 come from somebody from the State's Attorney's

5 Office?

6    A    I plead the Fifth.

7    Q    Did you ever make remarks to Corrections'

8 officers while you were incarcerated that you were

9 being threatened to withhold your testimony in these

10 post-conviction hearings?

11    A    I plead the Fifth.

12    Q    And you say that you had a -- a promise or

13 a representation from David Gold, the prosecutor,

14 before the Morant --

15             ATTORNEY GODIALIS:  Objection,

16             leading.

17    Q    What was the promise, if anything, that you

18 had from David Gold before you testified for the

19 State in the trials of Morant and Lewis?

20    A    That if I testified, I will receive

21 leniency against, um, myself first, and -- and -- and

22 the actual crime.

23    Q    And when you say the "actual crime," do you

24 mean the killings on Howard Avenue?

25    A    Yes.

26    Q    And did you understand that to mean that

27 the State of Connecticut wouldn't prosecute you for

1    any involvement you may have had in that?

2        A        Because I was the only State witness.

3        Q        Did Mr. Gold tell you that he would not

4    prosecute you for the homicide?

5        A        Yes.

6        Q        And is it the case that you are now being

7    told that if you changed your testimony, you are

8    going to be exposed to prosecution?

9        A        I'm not changing my testimony.  I'm just

10   pleading the Fifth.

11       Q        But if you were to testify in a way

12   favorable to Mr. Morant and Mr. Lewis, based on the

13   things that you have been told, what do you believe

14   would happen?

15                    ATTORNEY GODIALIS:  Objection,

16               speculation.

17                    ATTORNEY FITZPATRICK:  It goes to

18               his --

19                    THE COURT:  Sustained.  Sustained.

20                    ATTORNEY FITZPATRICK:  If your Honor

21               please, no further questions.  Thank you.

22                    THE COURT:  Counselor.

23                    ATTORNEY GODIALIS:  Just briefly.

24   CROSS-EXAMINATION

25   BY ATTORNEY GODIALIS:

26       Q        Mr. Ruiz, do I understand your testimony

27   that someone from the prosecutor's office has

1    threatened you at some point in time?

2    A    I plead the Fifth.

3         ATTORNEY GODIALIS:  Your Honor, now

4         we are into this sticky situation where

5         he's testified to certain things and he

6         doesn't want to be cross-examined about it.

7         And I'm going to have to move to strike his

8         entire testimony as a result.  That's --

9         that's -- if I just may, that's the problem

10        with a -- with a piecemeal invocation of

11        the Fifth Amendment privilege.  It's not

12        supposed to be allowed because we run into

13        the situation where the witness answers

14        some questions for some counsel and -- and

15        then doesn't want to be cross-examined

16        about it by others.

17        ATTORNEY FITZPATRICK:  If your

18        Honor please, my recollection is that he

19        took the Fifth when those questions were

20        posed to him by --

21        THE COURT:  Yeah, I don't think

22        he --

23        ATTORNEY FITZPATRICK:  -- by the --

24        THE COURT:  I don't think he --

25        ATTORNEY FITZPATRICK:  -- plaintiff.

26        THE COURT:  -- identified the caller

27   and I don't think he -- that was my

1    recollection.

2            ATTORNEY FITZPATRICK:  Yeah.  I think

3    the other thing, Your Honor, is that, ah,

4    not only is there a lack of basis for a

5    Motion to Strike, but to ask that all his

6    answers this morning stricken is a bit

7    extreme.

8            THE COURT:  Yeah.  And I see us

9    starting this all over again another time.

10   I will deny that motion.  Do you want to

11   inquire further, Counselor?

12           ATTORNEY GODIALIS:  I have nothing

13   further, Your Honor.

14           THE COURT:  Do you care to react --

15   indicate whether the request for immunity

16   is  anything that you want to an

17   opportunity to consider.

18           ATTORNEY GODIALIS:  The State will

19   not grant immunity in this case.

20           THE COURT:  All right, well ...

21           ATTORNEY FITZPATRICK:  If your Honor

22   please, ah, before I move the Court to --

23   to afford Mr. Ruiz immunity, I -- I want to

24   just stop for a moment on this question of

25   whether or not the -- the State should

26   provide immunity.

27           THE COURT:  Well, well, why are

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

**FILED**

------------------------------------------------x
:
Scott Lewis                           :        2008 AUG 22 P 1: 11
:                   PRISONER
vs.                                   :Civil No. 3:03CV196 RNC  DISTRICT COURT
:                                      BRIDGEPORT, CONN
Commissioner of Correction    :
:
------------------------------------------------x

## ORDER RETURNING SUBMISSION

The Clerk has received your <u>Request to Supplement Appendix</u> however, it is deficient in the area(s) checked below:

(NOTE:  L.R. refers to the Local Rules, District of Connecticut)

1. _ L.R.5(c)        _ No certificate of service attached to pleading
_ Certificate of service fails to list names and addresses of all parties served
_ Certificate of service is not signed

2. _ L.R.5(e)        Failure to submit document under seal

3. ✔ L.R.10          ✔ Failure to sign pleading (original signature)
_ Failure to double space
_ Margin is not free of printed matter
_ Left hand margin is not one inch;
_ Judge's initials do not appear after the case number
_ Docket number is missing
_ Failure to supply federal bar number
_ Holes not punched in document

4. _ L.R.83.1(d)     Motion to admit pro hac vice must be made by local counsel or member of the bar of this Court

5. _ Other           ____

The Clerk is hereby Ordered to return the above pleading and to notify counsel of such action.

Date:  August 22, 2008          _____
United States Magistrate Judge

(MIC)                                                                    ev. 6/26/07

**G** ⟳

CERTIFICATION

I, SCOTT LEWIS, CERTIFY THAT A COPY OF THE FOREGOING WAS MAILED AUGUST 28, 2008[7] TO JO ANNE SULIK, ASSISTANT STATES ATTORNEY AT 300 CORPORATE PLACE, ROCKY HILL, CT. 06067.

Scott Lewis

FOOTNOTE

7 - THE PETITIONER INCLUDED THE REVISION OF THE MOTION WITH THE ADDED PORTION OF THE JANUARY 30TH, 2007 TRANSCRIPT TO THE PREVIOUSLY SUPPLIED APPENDIX TO THE STATE.