# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

SCOTT T. LEWIS,

      Petitioner,

v.

COMMISSIONER OF CORRECTION,

      Respondent.

No. 3:03 - CV - 196 (CSH)

DECEMBER 16, 2013

## RULING ON PETITION FOR HABEAS CORPUS

**HAIGHT, Senior District Judge:**

In this habeas corpus action pursuant to 28 U.S.C. § 2254, Petitioner contends that he is being held in the custody of Respondent Connecticut Commissioner of Corrections in violation of the United States Constitution. Following an evidentiary hearing conducted by this Court, and written and oral submissions by counsel for the parties, the Court enters this Ruling.[1]

## I.  PRELIMINARY STATEMENT

In the early morning hours of October 11, 1990, Ricardo Turner and Lamont Fields were shot and killed while inside their apartment on the second floor of a building at 634 Howard Avenue, New Haven, Connecticut. Petitioner Scott Talmadje Lewis and another individual, Stefon Morant,

---

[1]   The hearing before this Court was conducted on consecutive business days from June 3 to June 12, 2013. The transcripts of the hearings appear on the case docket at Doc. 262 to 269.

were charged by the State of Connecticut with murder and felony murder in connection with the deaths of Turner and Fields.

Morant and Lewis were tried separately on these charges.  Morant was tried first, and on June 8, 1994, following a trial in the Connecticut Superior Court for the Judicial District of New Haven before Judge Hadden and a jury, he was convicted of two felony murder counts in violation of Conn. Gen. Stat. § 53a-54c.[2]  Lewis was convicted in that court on May 10, 1995, following a trial before Judge Ripley and a jury.  Lewis was sentenced to 120 years of imprisonment in a Connecticut penal institution, which he is now serving.  On direct appeal, the Supreme Court of Connecticut affirmed Lewis's convictions for the murders of Turner and Fields, while vacating his felony murder convictions on double jeopardy grounds.  *See State v. Lewis*, 245 Conn. 779 (1998). Lewis twice sought habeas corpus relief from the Connecticut courts, without success.  *See Lewis v. Comm'r of Correction*, 73 Conn.App. 597 (2002), *cert. denied*, 262 Conn. 938 (2003); *Lewis v. Warden*, No. CV064001783S, 2008 WL 544579 (Conn. Super. Ct. Feb. 5, 2008), *appeal dismissed*, 116 Conn. App. 400 (2009), *cert. denied*, 294 Conn. 908 (2009).

Lewis is now before this United States District Court,  as a petitioner for habeas corpus relief pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254.  Lewis contends that the State denied his constitutional right to a fair trial when, during the trial in New Haven resulting in his conviction, the State violated Lewis's right to due process of law when it suppressed exculpatory and impeachment information that was material to his conviction; sponsored perjurious testimony of a key prosecution witness; and denied Lewis the right to present a defense

---

[2]   On August 27, 1997, Morant's convictions were affirmed by the Connecticut Supreme Court in *State v. Morant*, 242 Conn. 666 (1997).

of third-party culpability.  After extensive motion practice and prior Rulings by the Court, familiarity with which is assumed, the Court held an evidentiary hearing which began on June 3 and ended June 12, 2013.  Able and energetic counsel for the parties filed compendious post-hearing briefs on August 7, 2013 [Doc. 276 & 277], and presented oral arguments on August 27, 2013.  Counsel's oral submissions were neither limited in time by the Court nor restrained in content by counsel.  The resulting arguments and colloquies cover 156 pages of the Hearing Transcript.

This Ruling decides the merits of Lewis's federal habeas corpus petition.  While this was not a bench trial, which would be governed by Rule 52(a)(1), Fed. R. Civ. P., I will from time to time adopt that Rule's practice and state Findings of Fact separately from Conclusions of Law.

## II.  LEGAL STANDARDS

### A.   <u>Substantive Law</u>

Petitioner Lewis invokes the provisions of the AEDPA.  Under AEDPA, federal habeas relief is available when a "person in custody pursuant to the judgment of a State court . . . is in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a).  A federal habeas court may grant habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" only if the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

This substantive limitation § 2254(d) places upon a federal court's power to give habeas relief to a state prisoner is frequently referred to as "AEDPA deference."  *See, e.g., Cullen v. Pinholster*,

— U.S. — , 131 S.Ct. 1388, 1410-11 (2011); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003). In addition, a federal habeas court must presume all state court factual determinations to be correct, unless the petitioner rebuts the findings by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). AEDPA's deferential review applies whenever a state court disposes of a state prisoner's federal claims on the merits, regardless of whether it gives reasons for its determination or refers to federal law in its decision. *Harrington v. Richter*, — U.S. — , 131 S.Ct. 770, 785 (2011); *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

The Supreme Court has interpreted the phrase "clearly established [f]ederal law" to mean "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. 362, 412 (2000); *see also Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id*. Elaborating on the "unreasonable application" standard, the Supreme Court has held that a habeas court may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington*, 131 S.Ct. at 786.

4

**B.**    **Procedural Law**

Because Petitioner Lewis is in custody pursuant to the judgment of the State of Connecticut, 28 U.S.C. § 2254(d) governs the procedure to be followed in this federal habeas case.

To reiterate: § 2254(d) precludes federal habeas relief with respect to any claim that was adjudicated on the merits in State court proceedings unless Lewis satisfies one of two predicates: a State court decision was contrary to, or involved an unreasonable application of, established federal law, § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, § 2254(d)(2).  Only if Lewis establishes one of these predicates is this Court authorized to consider the ultimate question posed by § 2254(a): whether Lewis is in custody in violation of the United States Constitution or laws.    Under either § 2254(d) predicate, a determination of a factual issue by a State court is presumed to be correct, and a petitioner has the burden of rebutting the presumption by clear and convincing evidence.  *Id.*, § 2254(e)(1).

This Court conducted an evidentiary hearing in this case.  Rule 8 of the "Rules Governing Section 2254 Cases" provides that "[i]f the petition is not dismissed," the district judge must review the record "to determine whether an evidentiary hearing is warranted."  I held that a hearing was warranted in this case, for reasons stated in a prior Ruling and not here repeated.

In consequence, the present record in the case consists of two bodies of evidentiary material: (1) evidence generated during those State court proceedings which gives rise to the habeas claims asserted in the petition; and (2) evidence generated during the federal habeas proceeding.  The question therefore arises as to when and how the district court should consider those two bodies of evidence in undertaking the two-stage analysis required by § 2254: first, determining whether a

5

petitioner has established one of the prerequisites under § 2254(d); and second, deciding whether petitioner has shown an entitlement to habeas relief under § 2254(a).  Whatever doubt may have surrounded that question was resolved by the Supreme Court's decision in *Pinholster*, 131 S.Ct. at 1398, which clarified that the Court's "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."

While *Pinholster* makes it clear that additional or new evidence adduced at a federal habeas hearing cannot be considered by the federal court in a § 2254(d)(2) analysis, the Court elected not to decide "whether § 2254(e)(2) prohibited the District Court from holding the evidentiary hearing or whether a district court may ever choose to hold an evidentiary hearing before it determines that § 2254(d) has been satisfied."  131 S.Ct. 1411 n. 20.  Subsequent to *Pinholster*, in *Lopez v. Miller*, 906 F.Supp. 2d 42 (E.D.N.Y. 2012), Judge Garaufis observed in a thoughtful and comprehensive opinion that "no authority prevents this court from holding an evidentiary hearing before making a § 2254(d) ruling – AEDPA does not speak to the issue, and *Pinholster* deliberately left it open."  906 F.Supp. 2d at 58.  Concluding that he had discretion "to decide the timing of the hearing," Judge Garaufis exercised that discretion in this fashion:

> With respect to [petitioner's] ineffective assistance claim, the court shall not rely upon evidence produced at the [federal] hearing to decide whether the state court's adjudication of his claim was unreasonable under 28 U.S.C. § 2254(d).  But if the court later concludes – based solely on the state court record – that Lopez has satisfied § 2254(d), it will consider the evidence generated at the hearing to determine whether Lopez is being held in custody in violation of the United States Constitution, thus entitling him to habeas relief under 28 U.S.C. § 2254(a).  The court will hold the hearing on Lopez's claims before it rules on the substance of those claims.

*Id*. at 59.  He reasoned that delaying the federal habeas evidentiary hearing until after the court

6

decided the § 2254(d)-satisfaction issue "would only have the effect of significantly delaying the hearing, a result that would be unfortunate in a proceeding that has been pending for ten years." *Id.* at 58. The same consideration applies in the case at bar. At least one district court has followed Judge Garaufis's procedure in the timing of the federal hearing: *Pope v. Crews*, 936 F.Supp.2d 1331, 1348 (S.D. Fla. Mar. 26, 2013). In the exercise of my discretion, I will do the same.

It follows that I must next determine whether, with respect to Lewis's federal habeas petition, he has satisfied and overcome the limitations and restrictions that §§ 2254(d)(2) and 2254(e)(1) place upon the petition. This Court will make that determination based solely upon the Connecticut State court record in Lewis's case.

### III.   §§ 2254(d) and 2254(e) ANALYSIS

I am required by AEDPA to analyze the federal habeas claims Lewis asserts in this action within the context of any adjudication on the merits of those claims that may previously have been made by the state courts which considered Lewis's case.

In 1991 Lewis was convicted of murdering Turner and Fields. His post-conviction record includes the following seven reported Connecticut state court opinions and orders: direct appeal: 245 Conn. 779 (1998) (Supreme Court); first habeas corpus petition: 2001 WL 1203354 (Conn. Super.Ct. Sept. 19, 2001) (Trial Court), 73 Conn.App. 597 (2002) (Appellate Court); and second habeas corpus petition: 2008 WL 544579 (Conn.Super.Ct. Feb. 5, 2008) (Trial Court), 116 Conn.App. 400 (2009) (Appellate Court), 294 Conn. 908 (2009) (Supreme Court, denying certification for appeal). These opinions and orders constitute part of the state court record which, for AEDPA purposes, sets the boundary for the Court's inquiry on this point. Exhibits submitted in

connection with the cited proceedings also form a part of that record.

Lewis's federal habeas claims have generated voluminous papers.  For the purpose of the analysis in this Part, those claims may be summarized as follows.

**A.**   **Suppression by the State of Exculpatory and Impeachment Evidence**

This heading of claim focuses upon one Ovil Ruiz, an individual who, the State concedes and the state courts acknowledge, was the State's key witness in Lewis's trial.  Lewis contends in his federal habeas petition that the State failed to disclose to defense counsel at trial that: (1) Ruiz made a prior inconsistent statement to a New Haven police detective, specifically, that Ruiz had no knowledge of the events resulting in the Turner and Fields murders; (2) a New Haven police detective coaxed Ruiz to give perjurious testimony at the trial; (3) Ruiz had previously lied to the police with respect to a different shooting incident; and (4) Ruiz received favorable treatment in sentencing on other cases in exchange for his trial testimony against Lewis.

On these aspects of his federal petition, Lewis relies principally upon *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959).

**B.**   **State-Procured Violation of Lewis's Right to Present a Third-Party Culpability Defense**

This heading of claim focuses upon the State's successful efforts during the Lewis trial to exclude from evidence a police report quoting an informant's identification of an individual other than Lewis as the murderer of Turner and Fields.

On this aspect of his federal petition, Lewis relies principally upon *Chambers v. Mississippi*, 410 U.S. 284 (1973).

Lewis asserted these federal constitutional claims at one time or another during the state court proceedings giving rise to the opinions and orders cited *supra*. Those state opinions, and the evidentiary record before each state court at the time of its opinion, must be analyzed with particular reference to the issues posed by 28 U.S.C. § 2254(d). In framing that discussion, I follow the foregoing headings of Lewis's claims.

## C.    *Brady* Considerations

Following the Connecticut Supreme Court's rejection of Lewis's direct appeal from his conviction, Lewis filed two habeas corpus petitions in the state Superior Court.

### 1.    Lewis's First State Court Habeas Petition

Lewis appeared *pro se* in the first of his two state habeas petitions. Judge Howard F. Zoarski heard the case and denied Lewis's petition in an opinion reported at 2001 WL 1203354 (Conn.Super.Ct. Sept. 19, 2001). The Connecticut Appellate Court dismissed Lewis's appeal from that denial because Lewis failed to provide a trial transcript. 73 Conn.App. 597 (2002). The Supreme Court denied Lewis's petition for a certification of further appeal without opinion. 262 Conn. 938 (2003). In these circumstances, the Superior Court is the only State court where any claim by Lewis on his first state court habeas petition "was adjudicated on the merits," as that phrase is used in 28 U.S.C. § 2254(d).

The habeas hearing before Judge Zoarski consumed five trial days. Lewis, appearing *pro se*, relied principally upon documents, including transcripts and exhibits generated by prior court proceedings, which were submitted to and received by the state habeas court. Counsel for Petitioner and Respondent in the case at bar entered into a Joint Stipulation [Doc. 75] which enumerated and

furnished copies of all the exhibits received during that first state habeas proceeding.  Counsel's cooperation and mutual good will in fashioning that stipulation saved a great deal of time and I appreciate it.

The exhibits presented to the first State habeas judge included two transcripts of testimony given by a former New Haven police lieutenant named Michael J. Sweeney.  Sweeney testified on October 25 and 26, 1999, at a hearing before Judge Jon C. Blue of the Connecticut Superior Court on a motion for a new trial by Stefon Morant.  The State charged Lewis and Morant with the murders of Turner and Fields; they were tried separately; both were convicted; each filed direct appeals from and collateral attacks against their convictions; the Connecticut courts rejected all those efforts. Judge Blue denied Morant's 1999 motion for a new trial in an opinion reported at 2000 WL 804695 (Conn.Super.Ct. June 5, 2000).  In his opinion in *Morant*, Judge Blue  described at length the testimony Sweeney gave before him in that case.  *See* 2000 WL 804695, at *9-11.  Lewis submitted the transcripts of that testimony by Sweeney to Judge Zoarski in support of Lewis's first habeas petition.

The relevance of Sweeney's testimony in *Morant* to Lewis's habeas petition arises from the fact that Sweeney described events occurring during the night of January 13-14, 1991, when Ovil Ruiz gave his first statements to the New Haven police about the Turner and Fields murders.  Ruiz, it will be recalled, was the State's key witness in the murder trial of Lewis; he played the same role in the separate trial of Morant.  During the early morning hours of January 14, 1991, at the police station, Ruiz gave to a New Haven detective named Vincent Raucci a statement that directly implicated Lewis and Morant in the Turner-Fields murders.  Turner and Fields were killed on October 11, 1990.  Ruiz's January 14, 1991 statement to Detective Raucci said that Ruiz overheard

10

a conversation between Lewis and Morant in which Lewis said he shot the two men, and Morant replied, "Well, you had to do what you had to do, so you did it."  2000 WL 804695, at *10 (quoting Trial Ex. 9, p. 8). At a later time, according to Ruiz, he saw Lewis throw the murder weapon into the water near the Chapel Street Bridge, New Haven, in Morant's presence.  *Id.* (quoting Trial Ex. 9, p. 14). Ruiz further said that he had been driving a car with Lewis and Morant that night, they drove to a Clay Street apartment and obtained two guns, drove to the Howard Street building where Turner lived, Lewis and Morant went up to that apartment, Ruiz heard shots, Lewis and Morant came back to the car, and they drove off.  *Id.*  These details were included in Ruiz's January 14, 2001 statement to Raucci and in a further statement Ruiz gave Raucci on May 28, 1991.  At the trials of Lewis and Morant, Ruiz gave testimony consistent with these earlier statements to Raucci.  Small wonder, then, that the Connecticut courts considering the cases regarded Ruiz as a key witness for the State, particularly in the absence of direct eyewitness testimony or forensic evidence identifying Lewis or Morant as the shooter.

As noted, the transcript of Sweeney's testimony before Judge Blue was made part of the record in Lewis's first habeas hearing before Judge Zoarski.  For purposes of the present analysis, it is useful to quote portions of Judge Blue's paraphrases of Sweeney's testimony (omitting the citations to the *Morant* record):

> Ruiz was arrested by warrant on January 13, 1991. Before bringing Ruiz to the police station, Raucci drove him around New Haven for a period of time. During this drive they viewed one or more of the locations involved in the Turner-Fields homicides. Ruiz was then brought to the Detective Division for questioning.
>
> Sweeney interviewed Ruiz alone for more than half an hour. The questioning concerned the Turner-Fields homicides. Ruiz indicated that he knew nothing about the murders. At that point, Raucci arrived

at the Detective Division. Sweeney and Raucci then jointly interviewed Ruiz. Ruiz once again stated that he knew nothing about the homicides. Raucci then began giving Ruiz facts about the case. Sweeney thought that this was inappropriate and asked Raucci to step out of the room. Sweeney told Raucci not to tell Ruiz anything about the case, and Raucci agreed. The two of them again confronted Ruiz. Raucci told Ruiz that he would let him go, although he was arrested on an arrest warrant, that he wanted Ruiz to tell him about the case, that he was driving the car that night, and that it was in Ruiz's best interest to give a detailed statement.

At this point, Ruiz started changing his statement. At the same time, however, Raucci began to give Ruiz additional details. Raucci told Ruiz about the Clay Street house (there was evidence at the trial that Morant and Lewis sold drugs from a house on Clay Street) and described the building. Raucci also described a scenario about guns in a gym bag. Sweeney took Raucci out in the hall a second time and told him to knock it off.

Sweeney became preoccupied with other matters. Raucci went back to confront Ruiz alone. After a period of time, Raucci emerged and reported that Ruiz wanted to give the whole case up. Sweeney then went in with Raucci to listen to Ruiz. Ruiz said that he had been driving the car that night. He further said that he had driven to Clay Street where they obtained two guns in a gym bag and then drove to Howard Avenue where Morant and his partner took the bag and went up in the apartment. He heard shots. Morant and his partner came back to the car, and they drove off.

Sweeney told Raucci to step out of the room. Sweeney then confronted Ruiz and asked him if he was telling the truth. Ruiz responded that he was not telling the truth and that the information he had given had come from Raucci. After Sweeney reported this to Raucci, Raucci requested another interview with Ruiz. Raucci came out a short period of time later reporting that Ruiz was now saying that he wasn't present and had "overheard these two people talking about the case."

Sweeney's shift had now ended, and he was replaced by Detective Joseph Pettola. Sweeney did not see Ruiz again. Other evidence in the case establishes that Ruiz's tape recorded statement was taken between 12:50 A.M. and 1:20 A.M. on January 14, 1991. Sweeney did not witness that statement.

12

2000 WL 804695, at *9-10.

It is readily apparent why John Williams, Lewis's defense counsel at the trial, would have prized Detective Sweeney's account of the events at the Detective Division during the crucial hours of January 13-14, 1991.  Williams could have cross-examined Ruiz on Ruiz's prior statements inconsistent with his trial testimony (Ruiz's repeated protestations to Sweeney that he knew nothing about the Turner-Fields homicides),  and also on Raucci's coaching of Ruiz, as observed and testified to by Sweeney in the hearing before Judge Blue.  These factors bear directly upon the credibility of the State's key witness at trial.

Superior Court Judge Zoarski denied Lewis's first state habeas petition.  His opinion is reported at 2001 WL 1203354.  Lewis contends on this federal habeas petition that this State court's adjudications of the merits of his claims are rife with decisions contrary to "clearly established Federal law" or based on "an unreasonable determination of the facts," the vices identified in 28 U.S.C. § 2254(d) that open the gate to this Court's non-deferential evaluation of Lewis's constitutional claims under § 2254(a).  It becomes necessary to quote this State court opinion at some length.

Judge Zoarski had before him the testimony Detective Sweeney had given earlier before Judge Blue in the Morant case; it appears that Sweeney was not available to testify at Lewis's petition hearing.  Judge Zoarski's opinion discusses the Sweeney testimony at two points.  First, the opinion says:

> The petitioner has filed a post trial brief which discussed the statement taken from Ovil Ruiz on January 14, 1991. He argues that Detective Sergeant Sweeney was critical of Detective Raucci. He contends Detective Raucci therefore, conveyed false or misleading

information to Ruiz. Detective Sweeney's testimony at the trial of
Morant disclosed that the information provided by Detective Raucci
was insignificant and did not disclose the names of the petitioner or
Morant. It also did not reveal numerous other significant facts which
were disclosed by Ovil Ruiz in his statements as well as his testimony
at the trial of the petitioner. The statements obtained from Ruiz on
January 14, 1991, and May 28, 1991, were available to the petitioner
at the time of his trial. The evidence relating to those statements was
known or available at the time of trial and it is not now newly
discovered evidence. Newly discovered evidence must consist of facts
which were unknown at the time of trial, and it must appear that the
defendant or defense counsel could not have known those facts by the
use of due diligence. Due diligence means doing everything
reasonable.

The argument of the petitioner in his brief that Detective Sweeney
had evidence of Ruiz's untruthfulness in his statements in 1991, has
not been proven by the petitioner. This court is not persuaded that
Detective Sweeney's knowledge constituted new evidence that would
probably result in a different verdict at a new trial, or that an injustice
has been done.

2001 WL 1203354, at *2 (citations, internal quotation marks, and punctuation omitted).  The opinion

discusses other aspects of the case, and then returns to Sweeney's testimony, where it is said:

The final claim alleged by the petitioner in this count is that the
State failed to disclose exculpatory information to the defense relating
to the statement taken from Ovil Ruiz on January 14, 1991. He
alleges Detective Raucci gave false information to Ruiz and Detective
Sweeney failed to disclose to the defense that Ruiz was
untrustworthy. Petitioner also claims Ruiz committed perjury at the
probable cause hearing.

The testimony of Detective Michael Sweeney, who was
unavailable to testify in this matter, was admitted by filing of a
transcript of his testimony on October 25, 1999. That transcript
discloses the only information Detective Raucci allegedly disclosed
to Ruiz prior to his statement on January 14, 1991, related to an
apartment on Howard Avenue; the color of the buildings and the
petitioner's car was a BMW. Other insignificant facts were mentioned
as part of the questioning technique. The petitioner has failed to prove
that any critical information was disclosed by Detective Raucci, or

14

that he provided any false information to Ruiz.

The claim of the petitioner that exculpatory information was not provided to the defense prior to the trial in 1995, has not been proven. *This court finds not only was all exculpatory evidence furnished to the defense, but also the alleged evidence was available by due diligence to the defense,* and the petitioner was obliged to raise his claims before the trial court or the Appellate Court. The petitioner has failed to sustain the heavy burden to establish that the prosecution suppressed evidence.

2001 WL 1203354, at *3 (emphasis added; citations and internal quotation marks omitted).  On his present federal petition, Lewis contends that the emphasized language in the State court decision just quoted contains, in a single sentence, a material and unreasonable error of fact,  and a departure by the State habeas court from federal law clearly established by decisions of the United States Supreme Court.

Specifically, Lewis first asserts that the State court's finding that "all exculpatory evidence [was] furnished to the defense" is erroneous, because neither Lewis nor his  defense attorney were told before the trial about Sweeney's interactions with Ruiz and Raucci in the Detective Division offices on January 13-14, 1991.  During the course of these interactions – as described by Sweeney in his testimony – Sweeney heard Ruiz deny three times, in the manner of St. Peter in a different context, any knowledge of the Turner-Fields murders, only to emerge, after  being  closeted with Raucci, as the State's key fact witness against Lewis and Morant.

Second, Lewis asserts that the State court ruled in a manner contrary to established Federal law, as established by Supreme Court decisions, when it held that the evidence in question "was available by due diligence to the defense."  That ruling is factually incorrect, Lewis contends, since there was no written record of Sweeney's interactions with Ruiz and Raucci, and Lewis, who was

not present, could not have known of them.  In addition, Lewis argues that the State court departed

from Supreme Court case law when it implicitly held that a defendant must exercise due diligence

to discover exculpatory or impeachment evidence which is imputable to the prosecutors and which

the State is obligated to produce to the defense under *Brady*, *Giglio,* and the progeny of those

seminal United States Supreme Court decisions.

Lewis is correct in these contentions.  The State court record on Lewis's first habeas petition

clearly establishes *Brady* and *Giglio* violations by the State unless one entirely disregards Sweeney's

testimony as inherently incredible.  There is no basis in the State court record for doing so.

That observation makes it important that I clarify my judicial function at this stage of the

analysis.  Michael Sweeney testified before me during the federal habeas hearing in June.  He gave

the same factual account that he gave during the State court proceeding involving Morant.  Counsel

for the State vigorously attacked Sweeney's credibility during his cross-examination before me, and

continued to do so in Respondent's post-hearing brief and oral argument.  For purposes of this 28

U.S.C. § 2254(d) analysis, I disregard entirely Sweeney's federal habeas hearing testimony and his

credibility as a witness at that hearing: a quality that Petitioner praises and Respondent condemns.

At this stage of the case, I can consider only the State court record; that is the teaching of *Pinholster*.

What the State record shows is that Superior Court Judge Blue heard Sweeney's testimony, observed

him giving it, described Sweeney as "a credible witness," and expressed the view that Sweeney's

testimony, which "specifically concerned Ruiz's statement to Raucci on January 14, 1991,"

"establishe[d] that the statement in question was obtained under suspicious circumstances."  2000

WL 804695, at *9.  While Sweeney gave his testimony in the Morant case, the transcript was

admitted as part of the record in Lewis's first habeas case before Superior Court Judge Zoarski, and

16

there is no indication that Judge Zoarski regarded Sweeney's testimony as anything other than credible: rather, he accepted the truth of Sweeney's account of events and concluded they did not entitle Lewis to relief, an entirely different proposition.

In these circumstances, for the purpose of this § 2254(d) analysis, Lewis is entitled to a conclusion by this federal Court that the State court record establishes the reliability and truth of Michael Sweeney's account of his own conduct and that of Ruiz and Raucci during the night of January 13-14, 1991.  That being so, the conclusion necessarily follows that the substance of Sweeney's account should have been disclosed to Lewis's defense attorney prior to his trial.  It requires no further discussion to demonstrate that Sweeney's account of those events was, from Lewis's point of view, exculpatory under *Brady*, impeachment material under *Giglio*, or both.   Nor is it of any moment for present purposes if I assume, without deciding, that the State prosecutor at Lewis's trial knew nothing about Sweeney's description of those events.  In *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 161 (2d Cir. 2008), the Second Circuit held:

> "A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused." *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006). Evidence that is not disclosed is suppressed for *Brady* purposes even when it is "known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). Evidence is favorable if it is either exculpatory or impeaching. *See, e.g., Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

544 F.3d at 161 (parallel citations omitted).

Since the Second Circuit cited a United States Supreme Court decision for each of the three propositions recited in *Triumph Capital Group*, those propositions constitute "clearly established Federal law" as that phrase is used in § 2254(d)(1).  If one accepts the truth of Sweeney's State court

17

testimony, as I am obliged to do based on the State court record, then the three just-quoted principles of Federal law make it clear that Judge Zoarski's challenged factual determination, that all exculpatory evidence was furnished to the defense, was erroneous and unreasonable. Sweeney's account of events was imputed to the prosecutor, that evidence was favorable to Lewis because it was both exculpatory and impeaching, and it was not furnished to the defense. Lewis has satisfied § 2254(d)(2)'s prerequisite to this Court's consideration of Lewis's claim to habeas relief under § 2254(a). If one regards the judge's statement about exculpatory evidence as "a determination of a factual issue" as that phrase is used in § 2254(e)(1), Lewis has rebutted its presumption of correctness by clear and convincing evidence, *viz*., the State's suppression of the substance of Sweeney's account of the events involving Ruiz and Raucci.

Moreover, Lewis has shown that Judge Zoarski's decision denying the first State habeas petition was contrary to established Federal law. Specifically, the judge included the defense's exercise of due diligence as an alternative basis for his ruling that Sweeney's account did not have to be furnished to the defense as exculpatory information. Judge Zoarski discussed Sweeney's testimony at two places during his decision. I quoted both passages at pages 13-15, *supra*. The first of these passages states that to sustain Lewis's contentions, "it must appear that the defendant or defense counsel could not have known those facts by the exercise of due diligence." The State court made that observation in the context of a supposed motion for a new trial on the basis of newly discovered evidence, where a defendant's diligence in discovering the evidence in question is indeed a factor.[3]

---

[3] The factual predicate for Judge Zoarski's reference to the defense's due diligence is suspect. He reasoned: "The statements obtained from Ruiz on January 14, 1991 were available to the petitioner at the time of his trial and is not now newly discovered evidence." This can refer only

In the second quoted passage, Judge Zoarski turned from a new trial context to Lewis's claim that "exculpatory information was not provided to the defense prior to the trial in 1995," a claim the judge rejected by saying: "The court finds that not only was all exculpatory evidence furnished to the defense, but also the alleged evidence was available by due diligence to the defense," page 15, *supra*.  As previously noted in this Ruling, that assertion is factually incorrect; but in addition, a defendant has no obligation to exercise diligence, due or otherwise, to discover exculpatory or impeaching evidence which the Supreme Court has held the State is under an absolute and unconditional obligation to disclose.  The Court  has given repeated expression to that proposition: *see, e.g., United States v. Bagley*, 473 U.S. 667 (1985) (the State is constitutionally obligated to disclose material evidence "favorable to the accused" even where the defense makes "no request" for such information); *Banks v. Dretke*, 540 U.S. 668, 695-696 (2004) ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed," since "[a]  rule declaring 'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to accord defendants due process.") (internal quotations in original).  In this regard, Lewis has also satisfied § 2254(d)(1)'s prerequisite to a § 2254(a) evaluation of his federal habeas claim.

For the foregoing reasons, this Court will consider whether the claims Lewis asserted without success in his first State court habeas petition entitle him to federal habeas relief under 28 U.S.C.

---

to Ruiz's written and taped statement given in the early morning hours of January 14, after (according to Sweeney's testimony) Ruiz had repeatedly denied to Sweeney any knowledge of the Turner-Fields homicides, and Raucci had coached Ruiz.  Lewis could not have known of those unrecorded events until Sweeney first described them in his testimony at the Morant proceeding, well after Lewis's trial.

§ 2254(a).[4]

## 2.    Lewis's Second State Habeas Petition

A time came when Lewis filed a second *pro se* petition for habeas corpus relief in the Connecticut Superior Court. The case was heard by Judge Carl J. Schuman, who held an evidentiary hearing and denied the petition in an opinion reported at 2008 WL 544579 (Conn.Super.Ct. Feb. 5, 2008). The Appellate Court dismissed Lewis's appeal from that denial. 116 Conn.App. 400 (2009). For 28 U.S.C. § 2254(d) purposes, the Appellate Court decision is the significant State court adjudication.

Lewis's principal contention on his second state habeas proceeding was based upon testimony given by the ubiquitous Ovil Ruiz at a state court hearing on the habeas petition of Stefon Morant, charged by the State as Lewis's co-perpetrator in the Turner-Fields homicides, and convicted on those charges in a trial separate from that of Lewis. Ruiz, the State's key witness in the Lewis trial, testified at that trial that he did not receive anything from the State in exchange for his testimony against Lewis. Subsequently, on January 30, 2007, Ruiz gave testimony at the Morant hearing during which, Lewis contends in his brief on the present federal petition, "Ruiz testified that he did in fact have a deal with the State in [a designated] exchange." Lewis's brief then quotes a portion of Ruiz's testimony at the Morant state habeas proceeding. Doc. 277, at 53.[5] These circumstances,

---

[4]    I will include in that consideration an additional *Brady-Giglio* claim Lewis asserted in his first habeas petition: that the State failed to disclose to the defense that Ovil Ruiz had lied to the police about his involvement in the unrelated shooting of one Xavier Torres.

[5]    Key quoted questions and responses in that exchange included, *inter alia*:

Q.    Are you worried that the State of Connecticut might prosecute you for this homicide?

Lewis argues in this Court, bring the case at bar within the rule the Supreme Court laid down in *Napue v. Illinois*, 360 U.S. 264 (1959).

The *Napue* case was an Illinois state court prosecution arising out of a murder that occurred during the early morning hours in a Chicago cocktail lounge.  Four men – Napue, Hamer, Poe and Townsend – announced their intention of robbing those present.  An off-duty policeman, present in the lounge, drew his service revolver and began firing.  Townsend was killed.  The policeman was fatally wounded.  Hamer was wounded.  Napue and Poe carried Hamer to a waiting car and made off.  Hamer was subsequently apprehended, tried for the murder of the policeman, convicted on his plea of guilty, and sentenced to 199 years.  Poe was apprehended, tried, convicted, sentenced to death, and executed.  Hamer was not used as a witness at Poe's trial.  Thereafter, Napue was apprehended and put on trial "with Hamer being the principal witness for the State."  360 U.S. at 265.  The Court continued: "On the basis of the evidence presented, which consisted largely of Hamer's testimony, the jury returned a guilty verdict and petitioner [Napue] was sentenced to 199

---

A.  No, because they told me that – that if I cooperate, then nothing was going to happen to me.

Q.  Who told you that?

A.  Huh?  Dave Gold.

Q.  Did he tell you that before you testified at the trials of Morant and Lewis?

A.  I mean it was all good – all good and dandy when, um – when I testified against them. . . .

Doc. 277, at 63.

21

years." *Id*. at 266.

What then transpired in the case revealed a startling impropriety on the part of the former assistant state's attorney who had prosecuted the Hamer, Poe and Napue cases. When the last trial was over, and Hamer was serving a 199-year sentence, that prosecutor filed a petition in the nature of a writ of error *coram nobis* on behalf of Hamer, in which he alleged that "as prosecuting attorney he had promised Hamer that if he would testify against Napue, 'a recommendation for a reduction of his [Hamer's] sentence would be made and, if possible effectuated.'" This prosecutor prayed that the state court would effect  "consummation of the compact entered into between the duly authorized representatives of the State of Illinois and George Hamer."  *Id.* at 266-267 (footnote omitted).

That *coram nobis* proceeding concerning Hamer came to the attention of the convicted Napue, who filed his own post-conviction petition alleging that "Hamer had falsely testified that he had been promised no consideration for his testimony, and that the Assistant State's Attorney handling the case had known this to be false." *Id.* at 267.  The truth of Napue's allegations was established by this exchange during the prosecutor's re-direct examination of Hamer at Napue's trial: "Q. [by the same prosecutor] Have I promised you that I would recommend any reduction of sentence to anybody?  A. You did not." *Id.* at 267 n.2, 271.  Chief Justice Warren's opinion for the Supreme Court, having quoted that exchange, adds this comment: "[That answer was false and known to be so by the prosecutor .]" *Id.* at 271. Responding to Napue's petition, the Illinois Supreme Court found that the state's attorney had promised Hamer consideration if he testified at Napue's trial, and knew that Hamer lied in denying that.  Nonetheless, the state supreme court denied Napue relief; but its reasons for doing so failed to persuade the United States Supreme Court, which held that "the false testimony used by the State in securing the conviction of petitioner [Napue] may have had an

22

effect on the outcome of the trial.  Accordingly, the judgment below must be reversed."  *Id.* at 272.

In the case at bar, Lewis is cast in the role of Napue and Ruiz in that of Hamer.  But the plot lines are at Lewis's trial quite different.  The prosecutor in *Napue* was condemned by his own words: written, when the prosecutor in his *coram nobis* petition on Hamer's behalf acknowledged –  nay, proclaimed – that he promised favorable treatment to Hamer if Hamer testified against Napue; and oral, when during the Napue trial, the prosecutor elicited from Hamer on redirect examination testimony that no such consideration had been given to Hamer – a denial the prosecutor knew to be false.  In the present case, the State has denied from the outset that prosecutors made any promise to Ruiz in order to obtain his trial testimony against Lewis, and presses that denial today.[6]  The question of whether a State prosecutor made such a promise to Ruiz for that purpose is "a determination of the facts" as that phrase is used in 28 U.S.C. § 2254(d)(2), and "a determination of a factual issue" as that phrase is used in § 2254(e)(1).

Judge Schuman, the State trial court judge, held against Lewis on that factual issue.  The Appellate Court affirmed him.  Judge Douglas S. Lavine's opinion for that court reasoned as follows:

> The question of whether there existed an agreement between a witness and the state is a question of fact.  When reviewing the decision of a habeas court, the facts found by the habeas court may not be disturbed unless the findings are clearly erroneous. . . .  A petitioner bears the burden of proving the existence of an agreement between the state or police and a state's witness.  Any such understanding or agreement between any state's witness and the state police or state's attorney clearly falls within the ambit of the *Brady* principles.  An unexpressed intention by the state not to prosecute a

---

[6]  At the evidentiary hearing before this Court on Lewis's federal habeas petition, the State presented evidence from a number of witnesses in support of its contention that the prosecutors at Lewis's trial made no promises to Ruiz to procure his testimony.  I do not consider that evidence in conducting this § 2254(d) analysis, because for the reasons stated in text that evaluation must be made solely on the basis of the state court record.

23

witness does not.

In support of his claim that the habeas court improperly found that there was no evidence of an agreement between the state and Ruiz, the petitioner refers to Ruiz'[s] January 30, 2007 testimony, Sweeney's October 25, 1999 testimony and the FBI reports. The petitioner also notes that Ruiz was never prosecuted by the state for a different double murder.

We conclude that the habeas court's finding was not clearly erroneous. The petitioner did not present testimony at the hearing on his habeas petition from either Ruiz or anyone from the office of the state's attorney involved in the alleged deal. The fact that Ruiz has not been charged with the murders of Turner and Fields, or any other murders, is not evidence of an agreement between him and the state. Additionally, although Sweeney's testimony suggests that Raucci disclosed information to Ruiz during the questioning, it does not provide any evidence of a deal between Ruiz and the state.

The only evidence, therefore, offered by the petitioner to establish the existence of an agreement between Ruiz and the state was Ruiz' January 30, 2007 testimony and the statement Ruiz gave to FBI agents in 1996. The habeas court concluded that Ruiz' credibility was undermined greatly by his numerous inconsistent statements. We defer to the court's credibility determination and conclude, on the basis of our review of the evidence presented, that its finding that the petitioner failed to prove the existence of an agreement between Ruiz and the state was not clearly erroneous.

116 Conn.App. at 407-408 (citations and internal quotation marks omitted).

On this federal habeas petition, Lewis's brief asserts that the Appellate Court opinion I have quoted "unreasonably determined facts about Ruiz's agreement with the State and therefore AEDPA, under § 2254(d)(2), does not limit federal judicial review." Doc. 277 (Brief), at 62. Lewis's argument on this point is conclusory and wholly unpersuasive. His brief alternates between characterizing Ruiz's alleged agreement with the state as suppressed evidence under *Brady* and evidence that Ruiz perjured himself at Lewis's trial. Both theories depend upon the state habeas

court finding that Ruiz's quoted testimony from the Morant hearing both established the existence

of such an agreement, and was credible.  Judge Schuman read Ruiz's testimony and found it lacking

in credibility.  The Appellate Court affirmed that conclusion by the state habeas trial court.

Lewis's argument under § 2254(d)(2) must be that these state courts' "determination of the

fact" of the existence *vel non* of an agreement between Ruiz and the state was "unreasonable," which

is to say, a judicial refusal to accept Ruiz's testimony as credible was irrational.  Lewis does not

make that showing.  The difficulty of his task in doing so is compounded by § 2254(e)(1), which

provides that "a determination of a factual issue made by a State court shall be presumed to be

correct," Lewis thereby assuming "the burden of rebutting the presumption of correctness by clear

and convincing evidence."  I have considered all of Lewis's contentions on this point, and conclude

without difficulty that he has not made the required showing or carried the applicable burden.[7]  Judge

Schuman was entitled to regard Ruiz's testimony on the issue as lacking in credibility, and the

Appellate Court was entitled to affirm the habeas judge for having done so.  Ruiz gave the testimony

Lewis quotes and relies upon in response to a series of leading questions put to him by counsel for

Morant at the Morant hearing.  When counsel for the state sought to cross-examine him, Ruiz took

the Fifth Amendment and refused to answer.  As Judge Schuman and the Appellate Court noted,

Ruiz has throughout the lengthy history of the case given a series of contradictory, recanted, and

---

[7]  There is one peculiarity in Lewis's brief [Doc. 277], which at page 54 says that "the appellate court concluded that the 'habeas court improperly found that there was no evidence of an agreement between the state and Ruiz,'" citing to 116 Conn.App. at 407.  What the appellate court actually said at page 407 of its opinion is this: "*In support of his claim that the* habeas court improperly found that there was no evidence of an agreement between the state and Ruiz, the petitioner refers to . . ."  Lewis's brief excised the italicized words from its quotation of the Appellate Court opinion, thereby transforming a failed argument by Lewis into a favorable-sounding statement by the court.  No doubt this distortion was inadvertent, but it should not have occurred.

reasserted statements of fact.   Lewis and his own counsel are selective in their assessment of Ruiz's credibility: they say Ruiz should be believed when to do so reinforces a habeas petition (as here, on the issue of whether there was an agreement between Ruiz and the state), and disbelieved when Ruiz's testimony is adverse to Lewis's interests (as during Lewis's trial and in some of the written statements he gave to law enforcement officials).   I decline to hold that Judge Schuman acted unreasonably in doubting Ruiz's credibility on this particular issue, or that the Appellate Court's affirming that appraisal was irrational.

In summary, on this point: After considering the state court record and the state court opinions with respect to Lewis's claim that Ruiz and the State of Connecticut entered into an agreement to procure Ruiz's trial testimony against Lewis in exchange for the state's granting Ruiz leniency on charges against him, I conclude that this claim by Lewis does not pass muster under the AEDPA prerequisites enacted in 28 U.S.C. §§ 2254 (d)(2) and 2254(e)(1).   Accordingly, this Court will give no consideration to that claim in its analysis of whether Lewis is entitled under *Brady* and its progeny to federal habeas corpus relief under § 2254(a).

I limit this conclusion to claims cognizable under *Brady* because, as Lewis's brief correctly observes, the Appellate Court held that for state procedural reasons, the habeas court was "unable to determine whether an allegedly false testimony was material and whether, but for that testimony, the petitioner would most likely not have  been convicted."   116 Conn.App. at 412 n. 9.   In consequence, neither Connecticut court adjudicated the merits of Lewis's claim that his conviction resulted from Ruiz's perjured trial testimony procured by an agreement with the state.   Lewis based that claim upon *Napue* and a later Second Circuit case, *Ortega v. Duncan*, 333 F.3d 102 (2d Cir. 2003), which Lewis cited to the Appellate Court.   It follows, as Lewis now contends, that there was

26

no state court adjudication sufficient to trigger the gate-keeping functions of § 2254(d), and this Court is at liberty to consider that particular claim *de novo* under § 2254(a).

Comparable considerations arise with respect to the Appellate Court's reference to an additional claim Lewis made during his second state habeas proceeding.  Lewis had unsuccessfully contended before the habeas court that newly discovered evidence showed his actual innocence of the Turner-Fields homicides.[8]  On his appeal, also unsuccessful, the Appellate Court said:

> He [Lewis] emphasizes the following evidence on appeal.  At his criminal trial, the petitioner attempted to introduce a police report prepared by Detective Vaughn Maher on November 24, 1990, which shows that Lieutenant Francisco Ortiz told Maher that an informant told Ortiz that an individual named Michael Cardwell confessed to murdering the victims. According to the report, Michael Cardwell told the informant that he murdered the victims while his brother, Vincent Cardwell, stayed outside to whistle when no apparent activity was on the street. Ortiz testified at the petitioner's trial, but the trial court sustained the state's objection to the introduction of the report into evidence because it concluded that the petitioner had not established that Michael Cardwell was an unavailable witness.

116 Conn.App. at 413.  In point of fact, the name of Lieutenant Ortiz's "informant" was Frank Graham, who to the knowledge of the prosecutor had died before the trial of Morant for the Turner-Fields murders, which preceded the trial of Lewis.  These circumstances give rise to Lewis's federal habeas claim, based upon the Supreme Court decision in *Chambers,* that he was deprived of his right to present a third-party culpability defense.  That claim turns upon the decision of the Connecticut Supreme Court rejecting Lewis's direct appeal, which I consider in Part IV.B., *infra.*  The present point is that to the extent the Maher report and the participants therein gave rise to a *Brady* claim on Lewis's behalf, the Connecticut courts did not adjudicate the merits of such a claim, and I may

_____

[8]   A claim of actual innocence is not an element in Lewis's federal petition for habeas relief.

consider the question *de novo*.

D.   ***Chambers* Considerations**

This aspect of Lewis's federal habeas petition requires a careful reading of the Connecticut Supreme Court's decision, 245 Conn. 779 (1998), which rejected Lewis's direct appeal from his conviction for the Turner-Fields murders.   The immediate question is whether that opinion implicates any of the gate-keeping prerequisites of 28 U.S.C. § 2254(d), and if it does, whether Lewis has satisfied those prerequisites, so that this Court may evaluate whether Lewis has a claim cognizable under *Chambers* which entitles him to federal habeas relief under § 2254(a).

I referred in Part III.B.1.b., *supra*,  to New Haven Detective Vaughn Maher's report dated November 24, 1990.  To recap:  During the early stages of the NHPD investigation into the Turner-Fields homicides, Detective Maher was the lead investigator.   Maher wrote a police report dated November 24, 1990 (Petitioner's Ex. 9 at the federal hearing) which stated, in words or substance, as follows:

During the week of November 11, 1990, Maher was contacted by Sergeant F. Ortiz of the NHPD. Ortiz told Maher that Ortiz had "a known and reliable informant who had information relative [*sic*] to the deaths of Ricardo Turner and Lamont Fields."  During that same week, "Sgt. Ortiz and his informant" met with Detective Maher and Sergeant W. McCoy at the NHPD Investigative Unit.  "During this meeting, said known and reliable informant" told Maher and McCoy that during the week of October 21 or 28, 1990, the informant was in discussion with a man well known to him as Michael Cardwell, in the course of which Cardwell told the informant that he [Cardwell] "did kill both Ricardo Turner and Lamont Fields."  The informant went on to recount to Maher and McCoy Cardwell's description to the informant of how Cardwell came to the Turner-

28

Fields apartment with his brother, Victor Cardwell; Michael Cardwell posted Victor Cardwell on the street as a lookout; Michael Cardwell then gained access to the victims' apartment.  "According to the informant" [Maher's report states], "Cardwell said that he walked in and found Turner awake in the bedroom with Lamont Fields asleep in the bed.  Cardwell told the informant that he shot five times, killing Turner first and then Lamont Fields while he layed [*sic*] in bed.  Cardwell then immediately fled meeting his brother Vincent outside."  Detective Maher's November 24, 1990 report further recites that during the week of November 18, 1990, he and McCoy "did again meet with the known and reliable informant," who said that "while again in conversation with Cardwell (Michael) this week, Cardwell told the informant that he killed Turner because he did him wrong."  In addition, "the informant also said that Michael Cardwell told the informant that the gun used to kill both Turner and Fields was at his girlfriend's house in New Britain, Connecticut."  Throughout his report, Detective Maher did not identify the "informant" by name.  The state record shows that the informant was an individual named Frank Graham.

During the trial of Lewis for the murders of Turner and Fields, defense counsel attempted with predictable vigor to get Detective Maher's November 24, 1990 report admitted into evidence and before the jury.  The prosecutor attempted with equally predictable vigor to have the Maher report excluded.  The prosecutor won.  The trial judge excluded the report because, in the judge's view, Michael Cardwell's self-incriminating statements, made to "the informant" (Frank Graham) and thereafter recited by Graham (hereinafter "Informant Graham") o Maher and recounted by Maher in his NHPD report, did not fall within any recognized exception to the hearsay rule.

The trial judge's exclusion of the Maher report became a prominent issue before the Connecticut Supreme Court on Lewis's direct appeal from his conviction.  Justice Borden's opinion

for the Court devotes 17 pages of the official report to that subject.  245 Conn. at 793-809.  The

Court affirmed the trial judge's evidentiary ruling and rejected Lewis's appeal.  I need not recount

the Supreme Court's reasoning with respect to the Maher report in full.  Several quotations from

Justice Borden's opinion will suffice for present purposes.  The Court concluded that "as a matter

of law, the defendant failed to establish that the statements overcame the hurdle of three levels of

hearsay."  *Id*. at 793.  In reaching that conclusion, the Court placed significant emphasis upon the

failure of defense counsel to show at Lewis's trial that Informant Graham was unavailable to testify

at the trial.  That emphasis appears from these passages in the Supreme Court's opinion:

> Even if we were to assume without deciding that Cardwell's
> statements were admissible as declarations against penal interest and
> that the police report was admissible under the business record
> exception to the hearsay rule, we conclude that the defendant has
> *failed to establish the unavailability of the informant* and the
> trustworthiness of the informant's statements to Detective Maher
> under the residual hearsay exception, which is the only hearsay
> exception arguably applicable to the informant's statements.
>
> *             *             *             *
>
> The informant's statements do not satisfy the requirements of
> admission under the residual exception to the hearsay rule. Contrary
> to the defendant's assertion in the trial court; see footnote 16; he did
> not show that the informant was unavailable. . . . . The record is bereft
> of any evidence regarding what efforts, if any, Morant made at that
> time, *and regarding any efforts by this defendant to locate the
> informant for this trial.*
>
> In addition, the evidence before the trial court could not support
> a finding of the trustworthiness of the statements.

*Id.* at 801, 806 (emphasis added).

What is puzzling about all this is that at the relevant times Informant Graham was dead, and

the State knew it.  Graham had died before the trial of Morant for the Turner-Fields homicides.

30

Morant's trial preceded that of Lewis.  A copy of Graham's death certificate was received in evidence at the Morant trial, in the course of a colloquy in the absence of the jury on an evidentiary point.  The prosecutor at the Lewis trial, who was also the prosecutor at the Morant trial, argued to the Lewis trial judge that defense counsel had not shown Graham's unavailability to testify.  I will indulge the charitable explanation that the prosecutor, at the time of the Lewis trial, had forgotten that the record of the Morant trial included the late Mr. Graham's Certificate of Ultimate Unavailability.  No matter: at the very least, during the Lewis trial the State had constructive knowledge of Informant Graham's death, and nonetheless taxed defense counsel for failing to show that Graham was unavailable as a trial witness.  Lewis's defense counsel, who had not participated in the Morant trial, had no knowledge that Graham was dead, and the State is in no position to argue that he should have learned of it.

The mystery deepens when it appears that the Justices of the Connecticut Supreme Court knew about Informant Graham's death when they heard oral argument on Lewis's direct appeal.  Lauren Weisfeld, Lewis's appellate attorney, included in her brief to the Supreme Court references to  Graham's death.  Lewis's brief on the present federal petition at page 99 quotes comments by Supreme Court Justice Borden during the oral argument before that Court:

> What do we do with the fact – I'm looking at page 18 of Ms. Weisfeld's brief.  We now know in hindsight that the informant was dead from the Morant file, from the Morant case.  So now we know at this stage of the game that, in fact, no matter what they could have done, the best they could have done with all the efforts would be to show that he was dead, which means he was unavailable.

Transcript of Oral Argument on January 14, 1998 at 39-40.

Meaning no disrespect whatsoever, I am bound to say that how Justice Borden could

31

acknowledge  during oral argument that Informant Graham died before the Lewis trial, and then write an opinion affirming the trial judge's exclusion of the Maher report because defense counsel failed to show Graham was unavailable, passeth all understanding.  However that may be, it is clear that at the very least, the Connecticut Supreme Court's opinion was based in significant part upon an unreasonable determination of the facts relevant to an important point of evidence, which resulted in a ruling precluding Lewis from using at trial a document of obvious value to his defense.  That is sufficient to satisfy the prerequisite of § 2254(d)(2).  This Court is accordingly able under AEDPA to  consider  whether these particular  circumstances  entitle Lewis to federal habeas  relief  under § 2254(a).  That is a different question.  I address it in Part IV.

## IV.  § 2254(a) ANALYSIS

A.    *Brady* **Considerations**

1. **Police Interviews of Ovil Ruiz on January 13-14, 1991**

A principal federal habeas claim Lewis asserts under *Brady v. Maryland* and its progeny arises  out of the account that former NHPD Detective Michael Sweeney gave with respect to events at the Detective Division during the night of January 13-14, 1991: an account Sweeney first gave in testimony before Judge Blue in a state court proceeding involving Stefon Morant.  I described that testimony in Part III.A.1., *supra*., when my consideration of the case was limited to the state court record.  For the reasons there stated, this habeas claim survives scrutiny under 28 U.S.C. § 2254(d), and I may therefore consider the evidence elicited in this Court during the federal habeas proceeding. That evidence includes testimony by Sweeney, who was called as a witness by Lewis, appeared before me, was examined extensively by counsel for Lewis, and cross-examined with equal

thoroughness by counsel for the Respondent.  After counsel had completed their examinations, I put

to Sweeney several questions of my own.  Sweeney appeared as a witness in this proceeding on June

5, 2013.  His testimony is found in Volume 3 of the transcript, for the morning session that day, at

pages 18-118.   In what follows, the page references are to that transcript.

Sweeney is presently employed as a registered nurse at the Connecticut Hospice in Branford.

Tr. 17.  He is a thirty-year veteran of the New Haven Police Department ("NHPD"), having joined

the Department in 1968 and retiring in 1998.  Tr. 18-19.  After retiring from the NHPD, Sweeney

responded to a United Nations inquiry to American police departments for officers who would "be

interested to go to Bosnia for a year and assist in the post-war situation."  Tr. 18.  During the year

1998, Sweeney served as a station commander for the United Nations in Bosnia, supervising

approximately 35 international officers and 350 Bosnian police officers.  Tr. 17.

On the night of January 13-14, 1991, Sweeney was serving in the NHPD, with the rank of

Detective Sergeant.  Tr. 19.  He supervised the evening shift of detectives, from 4:00 p.m. to 12:00

midnight.  Tr. 20.   At that time Sweeney was aware of the Turner-Fields homicides that had

occurred on October 11, 1991; "[i]t was a homicide," Sweeney testified, "that was being investigated

by one of the other sergeants that was in the same position as I."  Tr. 20.  Sweeney kept up with that

investigation because "[t]he file was kept in our office and I would review it.  If the investigators

were off on that case and information had come in, it was expected I was supposed to be familiar

with the case and continue with any information that would be forthcoming."  Tr. 21.

Ovil Ruiz was arrested and brought to the NHPD Detective Division during the night of

January 13, 1991.  The arrest was made by NHPD Detective Vincent Raucci, on a charge unrelated

to the Turner-Fields case.  Tr. 34.  Raucci brought Ruiz to the Detective Division offices.  Sweeney,

who was on duty at the Division that night, spoke to Ruiz alone, and formed the belief that Ruiz

"really didn't possess any information relevant to this homicide that night." Tr. 22 ("this homicide,"

the record makes clear, was the Turner-Fields murders).  The reason why Sweeney formed that

impression was explained in his responses to the Court's questions at Tr. 115-118, which I will quote

in part:

> THE COURT:  Mr. Sweeney, let me put one question to you.  I want to take you back to the evening of January 13, 1991, okay?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: Did a time come during that evening when you interviewed Mr. Ruiz yourself before Detective Raucci appeared on the scene; is that correct?
>
> THE WITNESS: Yes, it is correct, your Honor.
>
> THE COURT: All right. And during the course of that interview, did you ask Mr. Ruiz certain questions?
>
> THE WITNESS: Yes, sir; I did.
>
> THE COURT: Did he make certain answers to you?
>
> THE WITNESS: Yes, sir; he did.
>
> THE COURT: Give me your best recollection of the substance  – words or substance of what Mr. Ruiz said to you during the course of your interview with him before Detective Raucci arrived.  Do you understand what I'm asking?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: Give me your best recollection of that.
>
> THE WITNESS: I sat down with him and I advised him of his constitutional rights.  He stated that he understood them.  So, basically, I was extremely good at interviewing people.  So, I basically took him away from the crime initially, just talked to him,

asked him about his life, his family life, you know, what was happening.

   And I asked him if he knew he was arrested that night.  He said he did understood [sic] it.  And then I started talking about the crime, the homicide, that occurred .  And then I asked him ceratin – whether he was involved.  He stated that he absolutely was not.

   He – I asked him about any information he possessed about it, you know, what he did for a living.  And I just questioned him extensively about it and he just denied any involvement whatsoever.

   THE COURT: And you were then – when you say "it," you were asking questions that related to the Fields-Turner homicide, is that so?

   THE WITNESS: Correct.

   THE COURT: And as you pursued those questions using the skills of an experienced interviewer, tell me again the substance of what Mr. Ruiz said to you.

   THE WITNESS: He stated that he didn't know what I was talking about, that he was not involved in it.  I asked him and that time frame, does he remember what he was doing, you know.  And he just denied any involvement whatsoever.  He  said we have the wrong person; that he just wasn't involved and he knew nothing about it.

These exchanges occurred in an interview room at the police building.  There was a knock on the door.  Detective Raucci appeared.  Sweeney testified:

   I stepped outside and I spoke to Detective Raucci for a few moments.  And I questioned him about the case.  And I told him that I had been interviewing Mr. Ruiz.  And I asked him, you know, what was the information he had.  And he said that he had information that he was involved in it.

Tr. 23.  Sweeney and Raucci went into the interview room together.  Raucci began to question Ruiz in Sweeney's presence.  Sweeney testified:

   Q. [by counsel for Lewis] And what did Mr. Ruiz say in response

35

to questioning?

   A.  He initially denied any responsibility or involvement with the homicide.

   Q.  And what was Detective Raucci's response?

   A.  He told me he was lying; that he knew he was involved and there was other people involved and he was with them and that he should start talking or they will start telling on him and then he would take the full weight of it.

   Q. And at this point, did Detective Raucci provide any details to Mr. Ruiz concerning the Turner-Fields homicide?

   A. Yes, he did.

   Q.  And did you object to this manner of questioning?

   A. After awhile, I did, yes.

   Q.  And what did you do?

   A.  I took Vinny out of the room, Detective Raucci out of the room, and I told him to, what was going on.  He was telling this person, giving him bits and pieces.  And then this person was just parroting it back to him.

   And it just continued on.  Then he basically asked him, Detective Raucci.  Detective Raucci would ask a question and he would ask Raucci what the answer was.  So, I took him out of the room and I told him to knock it off.

Tr. 24-25 (intervening objection by counsel and Court's ruling thereon omitted) .  After Sweeney reprimanded Raucci for this manner of questioning, the two detectives returned to the interview room and Raucci resumed questioning Ruiz.  Sweeney testified that the following events transpired:

   Q.  And how did this interview proceed?

   A.  It started off, again, at one point he said he wasn't involved. And then Detective Raucci got questioning him, started doing the

same thing.  And this went on for a period of time and I took him back out of the room again.

 Q.  So, this would have been the second time you removed Mr. Raucci from the interview room?

 A. Yes.

 Q.  And what happened after that?

 A.  We went back into the room and – second time.  The questioning continued.  And then I had Detective Raucci at one point leave the room and I talked to this person alone; Mr. Ruiz.  And I asked him if he was involved and he stated he wasn't.

 And I said, Why are you saying you are?

 He said, Because Detective Raucci said I'd go home if I tell him what happened.  So, I just wanted to get out of here.

 Q.  Okay.  And when you spoke to Mr. Ruiz alone for that second time, did you ask him if he was telling the truth about Mr. Lewis'[s] alleged involvement in the Turner-Fields homicide?

 A.  Yes, I did.

 Q.  And what was his response?

 A.  Again, he said he wasn't involved.  But he would say anything to get out of there.

Tr. 25-26.

Sweeney testified that at one point during these events, Raucci indicated to Sweeney that Ruiz was ready to give the police a statement about the Turner-Fields homicides.  Sweeney quoted himself as saying to Raucci: "I told Vinny, You're not taking the statement of this man.  You're telling him more about the case, you're telling him the whole case and he's not telling you anything." Tr. 27.  At a later point, Sweeney testified, Raucci said to Sweeney: "Okay.  He wasn't involved, but

37

he overheard two people talking about the homicide.  I said, Well.  And he wanted to take his statement relative to that. And I saw no problem with that." Tr. 27-28.  Sweeney's shift was up.  He testified:

> Detective Joseph Pettola had come on duty somewhere around 12:00 o'clock.  And I told Detective Pettola to go in with Vinny and take a statement from this man, but don't let Vinny put words in his mouth. Don't let him play his games.
>
> And Detective Pettola told me that he would.  And then I went home shortly after that.

Tr. 28.

This account of events contained in the testimony Michael Sweeney gave before me is in all material respects the same as the account to which he testified before State court Judge Blue in the *Morant* hearing in October of 1999.  I quoted Judge Blue's paraphrase of that earlier testimony in Part III.A.1., *supra*.  During his testimony before me, Sweeney described how he came to give that testimony before Judge Blue:

> Q. [by counsel for Lewis] Okay.  How did you come to testify regarding the night of January 13, '91?
>
> A. There was quite a bit of controversy regarding Detective Raucci and this particular case generated in the newspaper and I had read it. And I felt that I had information that might be of assistance to the prosecutor and also the judge in the case.
>
> So, I called the New Haven Police Department after I had come back from Bosnia.  And I tried to talk to the lieutenant in charge of the bureau.  I wanted to make him aware of what had occurred with my participation and what I observed and I never got called back.
>
> So, I called the defense attorney, one of them, and I asked him if this would have any bearing on the case, if it would help the case or not.  He told me it would.  So, I spoke to this attorney, Fitzpatrick I believe his name.  And then he subpoenaed me to court and then I

testified.

   Q.  And Mr. Sweeney, why did you contact Mr. Fitzpatrick?

   A.  Because I felt that this man was basically fed the information on the case.  And I felt if this – either one of these two individuals had been arrested as a result of his statement, that I thought it was unfair, because I – this man was absolutely untruthful that night.

   Q.  And does this case stand out to you?

   A.  Pardon me?

   Q.  Do the events of January 13, 1991 stand out to you?

   A.  Yes, it does.

   Q.  And why is that?

   A.  I felt that the – I found that the case was built a lot on this Mr. Ruiz.  And I said that's not fair because he had been told a lot about the case.  And if he had subsequently told, given another statement about this, he already had information from one of the investigating officers.

Tr. 32-33.

Petitioner Lewis's theory of his federal habeas case is simple and straightforward: If the Court believes Sweeney's testimony at the federal hearing, the Court must grant Lewis habeas relief, whether or not the additional habeas claims he asserts have merit.  That proposition necessarily follows, Lewis's counsel argue, because the substance of Sweeney's testimony is classic, text book impeachment evidence.  Ruiz's testimony at trial, implicating Lewis as the killer of Turner  and Fields, was purportedly based upon Ruiz's personal knowledge and observations resulting from his presence on Howard Street and his participation in the events of that fatal night.  However, according to Sweeney's testimony, during the interview process at the Detective Division, before Detective

Raucci came knocking at the interview room door, Ruiz told Sweeney that he knew nothing whatsoever about the Turner-fields case, a disclaimer Ruiz repeated to Sweeney as Raucci gradually took over the interview and, according to Sweeney, coached Ruiz by supplying him with an inappropriate amount of detailed information.  Sweeney's knowledge of the events he described are imputed to the prosecutor, whether the prosecutor actually knew of them or not; this evidence should have been disclosed to Lewis's defense counsel before the trial began; it was not disclosed; the evidence went directly to the credibility of the State's key witness; habeas relief is required: Q.E.D.

Counsel for the Respondent State Commissioner respond to that proposition with a full-court-press attack upon Sweeney's credibility as a witness.  Counsel stated at oral argument that "the petitioner has simply failed in this case to show that there has been a violation of any constitutional rights.  The testimony of Detective Sweeney is not credible."  Tr. 121.  The post-hearing brief for Respondent [Doc. 276] asserts at page 11: "On cross-examination, Sweeney's testimony unraveled," and after describing certain perceived examples of the unraveling process, concludes with the cautionary note: "This Court should therefore entertain serious doubts about the accuracy of Sweeney's version of the events."  *Id*. at page 16.  The credibility-destroying factors Respondent cites are these:

*  Sweeney acknowledged he did not advise Ruiz of his Miranda rights before questioning him the first time.

* Although Sweeney recalled Raucci being summoned to the Detective Division to interview Ruiz, the records show Raucci was the officer who arrested Ruiz.

* Although Sweeney claimed to have been concerned about Raucci's interview tactics in furnishing information to Ruiz, he allowed Raucci to re-enter the interview room alone twice, even

40

after warning Raucci to stop coaching Ruiz.

* Sweeney accepted Ruiz's oath to a statement Ruiz signed and swore to on January 14, 1991.

* Sweeney did not institute any disciplinary action against Raucci, despite Raucci's twice disobeying Sweeney's direct order; nor did Sweeney make any written report or record of the incident.

* The only report of any kind Sweeney made about the incident was an oral remark to Detective Sergeant Lawlor.  Lawlor was called by the State as a witness at the hearing.  He testified that Sweeney made no such statement to him.

* Despite his professed concerns, in particular that Ruiz was not a reliable witness upon which to base an arrest for homicide, Sweeney made no effort to bring his concerns to the attention of the State's Attorney's Office.  Other witnesses at the hearing testified that Sweeney could have done so.

* Sweeney did not come forward with his concerns until four to five years after Lewis was convicted of the Turner and Fields murders.

On the basis of these factors, Respondent's brief reminds the Court that "a *Brady* disclosure obligation cannot attach to material that does not exist or to statements that were not made," and proceeds to argue:

> Based on the evidence presented to the Court and the reasonable inferences that can be drawn therefrom, the respondent submits the petitioner has not established by a preponderance of the evidence that Ovil Ruiz made any statements to Detective Sweeney in which he denied any knowledge or involvement in the Turner and Fields murders. Michael Sweeney's direct testimony about Ruiz' January 14, 1991 statement did not withstand the test of cross-examination; it was at best inconclusive, and at worst, not credible.

Doc. 276 at 15.

The Court is thus confronted with the ages-old task the rule of law imposes upon fact finders, be they trial judges or jurors.  A fact finder, who was not present at the particular time and place, must decide whether what a particular witness says occurred is *credible*, which is to say, *believable*, or in words of one syllable, *true*, insofar as it is given to the witness to know the truth.  That decision may be made with certainty only by angels, not by  men and women.  We must do our best by applying such considerations as: Is the witness's testimony plausible, or is it far fetched? Does the testimony appeal to our common sense, or does it offend that sense?  Does the witness's account of events accord with our own experiences in life, or does it run counter to them?  Is the witness's account corroborated or contradicted by evidence from other sources?  Was the witness's account of events on direct examination changed or called into question on cross-examination?  Does the witness have any motive or incentive to testify falsely, in whole or in part?  And what of the witness's appearance while giving the testimony – expressions, shifting, fidgeting, mannerisms, all the elements contained in the vernacular phrase "body language"?  The significance of that last factor leads trial judges to routinely instruct jurors at the start of a trial that they should not only listen to the witnesses carefully as they testify, both on direct and cross-examination, but also watch them carefully.  "Demeanor evidence" is the legal phrase for this factor, which appellate judges use to explain their deference to trial judges on issues of credibility: the trial judge had the benefit of demeanor evidence, the appellate judges did not.

For centuries, trial judges have given jurors this sort of guidance for judging the credibility of a witness.  Having applied those factors to the testimony Michael Sweeney gave before me, I conclude that his testimony is credible.  While state court Judge Blue made the same assessment

when in 1999, during the Morant proceeding, Sweeney gave essentially the same account of the events of January 13-14, 1991 involving Ruiz, Raucci and himself (in his opinion Judge Blue referred to Sweeney as "a credible witness") that evaluation, even by so respected a trial judge, plays no part in my own.[9] Some 14 years later Sweeney testified about these events before me.  I listened to him and watched him.  I accept Sweeney's testimony as credible for the following reasons.

Sweeney's account of how Ruiz repeatedly told him, when the two men were alone in the police interview room, that Ruiz knew nothing about the Turner-Fields homicides, only to give a purportedly factual account of the crimes after Raucci arrived on the scene and began furnishing details, is plausible – or, to state the proposition differently, there is nothing inherently implausible about that account.  On the scale of plausibility, the events Sweeney described in his testimony may be contrasted with the position the Respondent State is required to take.  While counsel for the State phrase it politely, the State's position necessarily comes down to this: Sweeney's account is a fabrication – he made it all up.  That must be the State's position because Sweeney's description of events, in response to questions by the attorneys and by the Court, is positive in its core details and unshaken on cross-examination.  That is to say: Ruiz either disclaimed any knowledge of the murders to Sweeney, or Ruiz did not.  Raucci either suggested facts to Ruiz to a degree Sweeney considered inappropriate, or Raucci did not.  Sweeney either reprimanded Raucci for doing so, or Sweeney did not.  It seems to me implausible to suppose that Sweeney would make all that up and then swear falsely twice that these events occurred: first to Judge Blue in his state trial court, then to me in my federal one.  I can discern no motive on Sweeney's part to lie about these events, and

---

[9]   I may of course consider the consistency of Sweeney's testimony during the two proceedings, and do so during the discussion in text.

counsel for the State suggest none.

Counsel for the State make the fair point that Sweeney did not report Raucci's improprieties in a forceful or prompt manner.  Sweeney contented himself, according to his testimony, with mentioning the incident orally to an NHPD serving officer and colleague, Robert Lawlor.  Responding to questions put on cross-examination by State counsel, Sweeney testified that "at some point an arrest warrant was prepared for Scott Lewis." Tr. 72.  These exchanges then took place:

> Q.  And you were aware of that?
>
> A.  Yes.
>
> Q.  All right.  Did you have concerns about the fact that an arrest warrant had been obtained?
>
> A.  Yes.
>
> Q.  And what did you do?
>
> A.  I come into the detective division one day, it was very busy and people were very happy there was an arrest; one or two arrests made. And they were all talking about it.  And so, I inquired.  And they said that he was  – they had made an arrest in the case.
>
> So, I asked him how was it – I hope it wasn't based on this kid, Ruiz, and they said it was.  I made a comment and I said, That's crazy. He should notify Mr. Dearington that this kid is a liar.[10]
>
> THE COURT: What you're speaking of is an arrest warrant that was eventually issued for Mr. Lewis; is that so?
>
> THE WITNESS:  That's correct, your Honor.
>
> Q. [by State's counsel] And to whom did you make that statement?

---

[10]   "Mr. Dearington" is a reference to a State's attorney active in the presentation of criminal charges.

44

A.  He's either Sergeant or Lieutenant Lawlor.

Q. Okay.

A.  He was a supervisor.  I just made an off-the-cuff remark that if it's based on him, you ought to notify Mr. Dearington that this kid is a liar.

Q. Okay.  And you definitely – and you told that to Robert Lawlor?

A. I did, yes.

    . . .

Q.  You couldn't call the State's Attorney's office and say, Hey, I personally have a problem with this statement?

A.  No, no.  I had notified my supervisor and it – his – he had more – and this case may have been built out of other things, I didn't know. I asked if it was based directly on Mr. Ruiz, and I was told yes and I couldn't believe it.  There might have been other facts in the case that the arrest warrant was based on and then I'd be happy with that.

THE COURT: And you had the conversation you've just described with a lieutenant; is that so?

THE WITNESS: That's correct.

THE COURT: Spell his name for me.

THE WITNESS:  L-a-w-l-o-r.  First name Robert.

Tr. 73-75.

The State called Robert Lawlor as a witness.  He is no longer employed by the NHPD; Lawlor is now a Criminal Inspector for the Division of Criminal Justice of the State of Connecticut. Lawlor's testimony introduced a note of uncertainty about his and Sweeney's relative ranks at the pertinent time of January 1991.  Sweeney described Lawlor as his "supervisor" at that time, perhaps with the rank of lieutenant.  Lawlor testified that Sweeney "was my counterpart in the detective

45

division.  He was also a detective sergeant . . . senior to me."  Vol. 8 June 12, 2013 a.m. Tr. 13, 38-

39.  On the question of Sweeney's credibility as a trial witness, the State focuses upon this answer

Lawlor made to a question put by the Court:

>    THE COURT: Now, you have testified that that conversation
> between Mr. Sweeney and you did not take place. . . . Are you saying
> that Sweeney never said anything like that to you, you're sure he
> didn't, or are you sure today you don't recall him saying something
> like that.  Can you help me out on that?
>
>    THE WITNESS: Yes, your Honor.  I'm absolutely sure he didn't say
> that to me.  That's not something I could leave alone, regardless of
> who said it to me.

Tr. 44-45.

Lewis's brief at 64 focuses upon Lawlor's testimony that "Sweeney never reported Raucci's

misconduct to him."  Returning the compliment, the brief argues that Lawlor's testimony on this

point is not credible, but even if deemed credible "this testimony is irrelevant.  Exculpatory evidence

known to police investigators – as Ruiz's repeated denials of knowledge about the murders were

known to at least Raucci and Sweeney – is imputed to the prosecutor even if it is never

communicated."  Brief at 64-65 (citing the Supreme court's decision in *Kyles*, 514 U.S. at 438-39).

That argument misses the point.  The State offers Lawlor's evidence for the quite different purpose

of challenging the credibility of Sweeney's testimony about what Sweeney observed and what he did

about it, specifically, telling Lawlor.

Both Sweeney and Lawlor exhibited the external manifestations of forthright and honest

witnesses.  To the extent their testimony conflicts, the conflict cannot be reconciled.  Either Sweeney

told Lawlor about the Raucci-Ruiz incident (Sweeney says he did so) or Sweeney did not tell Lawlor

about it (Lawlor says he did not).  Each man was recounting past events, and had perforce to rely

46

upon his recollection, unrefreshed by any contemporaneous document.  I accept Sweeney's testimony on this point rather than Lawlor's.  If one credits Sweeney's description of the late-night interactions of Sweeney, Ruiz and Raucci, the incident shocked and distressed Sweeney.  Sweeney remembers the incident, and is able to recount it in vivid detail, precisely because for him it was memorable.  Sweeney's subsequent concern, upon learning of Lewis's arrest, that the arrest may have been based upon some statement attributable to Ruiz, who Sweeney regarded as a "liar," is a logical progression of Sweeney's thought in the matter, as is his mentioning that concern to his colleague Lawlor.

Lawlor states unreservedly that Sweeney never told him about Raucci's misconduct on the night in question; but Lawlor was not involved in that distressing earlier incident, had no knowledge of it, and Sweeney described his communication to Lawlor as an "off-the-cuff remark" made amidst the busy comings and goings of the officers of the NHPD Detective Division.  To the extent that a witness's interest in the outcome of the case should be considered, Lawlor as a presently serving law enforcement officer with the State of Connecticut could be expected to prefer that Lewis's attack upon his conviction fail.  Sweeney has no comparable interest in the outcome, apart from his manifest concern about the rectitude of a conviction tainted by the events he has described.  But I do not place a great emphasis upon this question of a possible motive to shade or shape one's testimony, because I accept the sincerity of the testimony Lawlor gave during the hearing.  I simply conclude on this particular point that Sweeney mentioned the incident to Lawlor, as he said he did, and Lawlor understandably does not remember it, years later.

The Respondent State makes an additional argument which is based upon an interview of Ruiz conducted on May 6, 1991 by Ellen Knight, an investigator for the Public Defender's Office, which was representing Lewis, who by that time had been arrested and charged with the Turner-

Fields murders.  Knight testified at this hearing.  Her notes of that interview became Court Exhibit 2.  The notes reflect a long and discursive interview of Ruiz, during which, the State's brief at 14 accurately says, "Ruiz provided an account of the Turner-Fields homicides that corresponds with the testimony he would later give at the trial of petitioner [Lewis] and his co-defendant [Morant]."  At oral argument, counsel for the State focused particularly upon a notation in the Knight notes that during her interview of Ruiz, Ruiz said of his January 1991 interview with Raucci: "I denied three times knowing what happened."  Oral Argument Tr. 109.  Counsel expanded upon that notation in his submission toward the end of the argument that even if I accepted as credible Sweeney's testimony about the events of that January 1991 session at the Detective Division, Lewis was not entitled to habeas relief.  "Well, first of all, " counsel said, "they had that information."  He continued: "To the extent that Mr. Ruiz told Ellen Knight that he denied three times knowing about that, they had that information, so there's no *Brady* violation if they have the information."  Oral Argument Tr. 129.

There is no substance to this contention.  What is at issue is exculpatory or impeachment evidence that should have been disclosed to Lewis and his defense attorneys prior to the trial for their use in cross-examining Ruiz, the State's key witness.  The defense knew about Knight's interview with Ruiz and what Ruiz, a troubled and self-contradicting young man,  said during its rambling course.  The defense did not know that a seasoned NHPD detective had elicited Ruiz's repeated denials of any knowledge about the case, and observed the arresting detective's coaching Ruiz about the facts of the case.  There is no comparison in value to the defense between, first, cross-examining Ruiz on the basis of his scattered remarks during a rambling interview with Ellen Knight, and second, challenging Ruiz's credibility on the basis of the account Sweeney was prepared to give.  The

48

State 's argument –  that there is no *Brady* violation because knowledge of the first is the practical equivalent of knowledge of the second – is entirely unreasonable, and I cannot agree with it.

So I must turn to the credibility of the testimony Michael Sweeney gave at this hearing. Sweeney testified that it was not until he had retired from the NHPD and returned from his U.N. service in Bosnia that newspaper accounts of Raucci's discrediting for unrelated reasons caused Sweeney to recall and relive his concerns about Raucci's interaction with Ruiz in connection with the Turner-Fields case.  By then, both Morant and Lewis had been convicted of those murders, and had embarked upon collateral attacks on their convictions.  I accept Sweeney's testimony that, acting upon an aroused conscience, he tried to contact a responsible supervisor at the NHPD to express his concerns, his call was not returned, and he then reached out to Morant's attorney, a contact which led directly to Sweeney's appearance as a witness before Judge Blue.

As I watched Sweeney recount these events on the witness stand close at hand to my position on the bench, his demeanor gave me the impression that he took no pleasure in the testimony he was giving.  My sense is that this former NHPD detective was troubled by the sworn account he recited: troubled by the circumstance of describing dishonorable conduct by a former fellow officer of a police department Sweeney had served with honor for thirty years; and troubled by his own failure to act more forcefully at the time of Raucci's transgressions.  But Sweeney's answers to my questions toward the end of his testimony were firm and unhesitating.   There was nothing in Sweeney's answers or his demeanor in making them to suggest that he was doing anything other than give an honest and straightforward account of events that for Sweeney were distasteful, on professional and personal levels.  His testimony had about it the ring of truth.

I have considered all of the State's sensible and well-expressed caveats about Sweeney's

49

credibility.   However, those factors, alone or viewed in concert, do not support a conclusion by the Court that Sweeney's testimony was the result of mistaken recollection or deliberate fabrication.  The strongest point the State makes is the amount of time it took for Sweeney to come forward.  If the events of the night of January 13-14 were that troublesome, and Sweeney was that concerned about them, why did he wait until Lewis and Morant had been arrested, tried, convicted, and were collaterally attacking those convictions, before reaching out to an NHPD supervisor and then Morant's attorney, with the account to which he then testified?

The State's argument has to be that Sweeney's delay in recounting those events proves that the events themselves never occurred.  I cannot accept that proposition, which disregards the joint occupation of the human spirit by the better and lesser angels of our nature.  Sometimes, we do not do what we know we should, and sentence ourselves to a lifetime of regret.  Other times, we have an opportunity to do belatedly what we should have done earlier, and act on it.  I think it is the latter situation in which Sweeney finds himself.  He did not have to content himself at the time with an off-the-cuff remark to Robert Lawlor about his concerns; Sweeney believed the cause of justice was being tainted, and the State is right in saying that nothing prevented him from immediately shouting his concerns from the functional roof top, which is to say, calling up the State's Attorney's office.  I infer that the lesser angels of his nature held Sweeney back – a reluctance, it is reasonable to suppose, to be publicly critical of even so flawed a police colleague as Vincent Raucci.  Years later, retired from the NHPD, returned from U.N. service in Bosnia, Sweeney's awareness of the Turner-Fields case is  reawakened, his discomfort rekindled, and the better angels of his nature eventually bring him before two judges, one state, the other federal, to give his account.  Perhaps, in what I have just said, I steer perilously close to the reef of practicing psychotherapy without a license, but the fact

finder cannot refrain from, indeed he or she is encouraged to, form an impression of the witness whose credibility must be evaluated, and that is my sense of Sweeney.  In any event, I decline to draw the inference requested by the State that because Sweeney delayed in reporting these troublesome events, the events never took place.

In summary: I accept as accurate and truthful Sweeney's account of the interactions on the night in question, January 13-14, 1991, between Ruiz, Raucci and Sweeney.  Since knowledge of those facts was not disclosed to Lewis's defense counsel at trial, as they should have been under *Brady* and *Giglio*, and were central to the credibility of the State's key witness, I am bound to conclude that, for the reasons previously stated, Lewis's constitutional right to a fair trial was violated, and he is entitled to habeas relief from this Court.

## 2.  The Shooting of Javier Torres

Lewis asserts an additional claim of suppression by the State of impeachment evidence with relation to Ovil Ruiz.  The pertinent facts are set forth in ¶¶ 80-86 of the Amended Petition [Doc. 128].  It is there alleged that at about 9:00 p.m. on December 19, 1900, one Javier Torres was shot on a New Haven street when four Latin males exited a vehicle and fired at him.  Vincent Raucci was the NHPD detective assigned to investigate this incident.  Raucci prepared a police report dated December 20, 1990 which stated that Torres, the victim, said he did not know any of the vehicle's occupants or why he was shot.   Joseph Fret, a witness who had been walking with Torres when the shooting occurred, identified one Jose Aponte as a passenger in the vehicle, using a police photograph initialed by Raucci.

On December 20, Raucci and another detective traveled to Fair Haven in an effort to find

Aponte.  Instead, they located an individual later identified as Ovil Ruiz.  Raucci knew Ruiz from a previous unrelated shooting incident, in which Ruiz led Raucci to another individual Ruiz said was the perpetrator.  According to the December 20 police report on the Torres shooting, Ruiz told Raucci that he had been with Jose Aponte at about 7:00 p.m. that night, and that later Aponte had been with three other Latin males in his car.  Ruiz named two of those men, one being Fernando Rivera.  Ruiz took the police to the location of the vehicle believed to have been used in the Torres shooting, and told Raucci that Rivera, one of the two men Ruiz implicated, lived at the address where the vehicle was found.  After Rivera admitted being in the vehicle with Aponte earlier in the evening of the Torres shooting, the NHPD arrested Rivera and charged him in that case.

On January 9, 1991, Raucci signed an arrest warrant for Ruiz in connection with the Torres shooting.  As the December 20, 1990 report prepared by Raucci stated, Ruiz had implicated Aponte, Rivera, and one Victor Rosario in that shooting.  Ruiz had not at that time stated or suggested that he was personally involved in the Torres shooting.  The warrant Raucci prepared for Ruiz's arrest asserted that Jose Aponte had made a formal statement admitting being in the subject vehicle on the night of the Torres shooting, but that Ruiz was the individual who fired the weapon.  The warrant chaired Ruiz with that crime.  Ruiz later pleaded guilty to first degree assault upon Torres.  The parties to this petition agree that Ruiz offered an *Alford* plea, without admitting guilt.

On this petition, Lewis contends that when the NHPD police report dated December 20, 1990, reciting Ruiz's statement implicating others in the Torres shooting, is read together with the January 9, 1991 warrant for Ruiz's arrest for that shooting, the conclusion is inescapable that responsible NHPD officers concluded Ruiz had lied to them in giving his December 20 account.  That contention appeals to common sense, and given the close proximity in time of the Torres

shooting to the Turner-Fields homicides and the similarity of the crimes themselves, a police perception of Ruiz as a source prone to lying has obvious impeachment value within the context of the Lewis trial.  In his opinion rejecting Lewis's first state habeas petition, Judge Zoarski referred to Lewis's charge that the State failed to disclose Ruiz's "untrustworthy and false information" regarding the Torres shooting, 2001 WL 1203354 at *3, but the court gave no reasoned discussion of that factor, and this Court is not inhibited by 28 U.S.C. § 2254(d) from considering it, so I take Ruiz's involvement in the Torres shooting into account in deciding this petition.  I doubt that the evidence generated by the Torres shooting would be sufficient, standing alone, to justify habeas relief for Lewis, but the cumulative effect of a trial court's errors or omissions, even if harmless when considered singly, may amount to a due process violation requiring reversal of a conviction. *See, e.g., United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008).  That "cumulative effect" doctrine does not dictate the result in the case at bar, since suppression of the evidence revealed by Detective Sweeney's testimony would require habeas relief in any event.

## B.  *Chambers* Considerations

I revert to Lewis's petition for federal habeas relief from the Connecticut Supreme Court's rejection of the direct appeal from Lewis's  conviction for the Turner-Fields homicides.  *State v. Lewis*, 245 Conn. 779 (1998).

The relevant facts are stated in Part III.D., *supra*. To recapitulate: The trial court excluded from evidence Detective Maher's report, proffered as a defense exhibit, which recited the manner in which an informant told Maher that one Michael Caldwell had said he killed Turner and Fields.  The Connecticut Supreme Court affirmed that exclusion.  Lewis claims that the State Supreme Court's

decision was wrong and entitles him to federal habeas relief.

For the reasons stated in Part III.D., I concluded that this claim survived vetting under 28 U.S.C. § 2254(d). The question now is whether it establishes Lewis's right to federal habeas relief under § 2254(a). Specifically, Lewis contends that the exclusion of the Maher report violated his constitutional right to present a third-party culpability defense. He asserts that the admission of the Maher report into evidence at his trial was mandated by the United States Supreme Court's opinion in *Chambers v. Mississippi*, 410 U.S. 284 (1973).

In *Chambers,* a melee outside a small town bar resulted in the shooting death of a police officer. Leon Chambers, who had been in the crowd, was charged with the murder. Chambers proclaimed his innocence throughout. Several months after the incident Gable McDonald, another town resident who had also been in the crowd, went voluntarily to the office of Chambers' attorneys and gave a sworn written confession that he had killed the officer. McDonald had apparently been moved to do this by a discussion with an individual who owned a local gas station and was known as "Reverend Stokes." McDonald's confession was transcribed, signed and witnessed, and he was turned over to the local police and jailed. A month later, McDonald repudiated his sworn confession, stating that Stokes had persuaded him to make it in anticipation of sharing in the proceeds of a lawsuit that Chambers would bring against the town. 416 U.S. at 287-288. The prosecutors proceeded with the case against Chambers.

Chambers's attorneys planned, not surprisingly, to offer at trial a defense of third-party culpability, with McDonald as the culprit. In aid of that defense, counsel hoped to prove "that McDonald had repeatedly confessed to the crime. Chambers attempted to prove that McDonald had admitted responsibility for the murder on four separate occasions, once when he gave the sworn

54

statement to Chambers' counsel and three other times prior to that occasion in private conversations with friends." *Id.* at 289.   The trial judge effectively throttled those hopes.   At trial, the State did not call McDonald as a witness.   Defense counsel called McDonald, laid a predicate for the confession McDonald had given to counsel, and read it to the jury.   On cross-examination, the State elicited McDonald's recantation of that confession, and McDonald's testimony that he had not shot the officer.   Defense counsel then sought to examine McDonald as an adverse witness, for the purposes of "exploring the circumstances of McDonald's three prior oral confessions" and "challenging the renunciation of the written confession." *Id.* at 297.   The trial judge denied defense counsel's request to cross-examine McDonald along these lines "on the basis of a Mississippi common-law rule that a party may not impeach his own witness," *id.* 295, a concept also known as the "voucher" rule.[11]   In addition, the trial judge also refused to let the jury hear the testimony of the three individuals to whom McDonald had made oral confessions, apparently on the basis of the hearsay rule. *Id.* at 293 n. 6.

Chambers was convicted.   The State Supreme Court affirmed the conviction.   The United States Supreme Court reversed that judgment and remanded the case to the state courts.   Justice Powell's opinion for a unanimous Court observed that "the 'voucher' rule, as applied in this case, plainly interfered with Chambers' right to defend against the State's charges," and went on to say:

> We need not decide, however, whether this error alone would occasion reversal since Chambers' claimed denial of due process rests on the ultimate impact of that error when viewed in conjunction with the trial court's refusal to permit him to call other witnesses.   The trial court refused to allow him to introduce the testimony of Hardin,

---

[11]   As the *Chambers* court explained, the voucher "rule rests on the presumption – without regard to the circumstances of the particular case – that a party who calls a witness 'vouches for his credibility.'" 410 U.S. at 295-96 (citing *Clark v. Lansford*, 191 So.2d 123, 125 (Miss.1966)).

> Turner, and Carter. Each would have testified to the statements purportedly made by McDonald, on three separate occasions shortly after the crime, naming himself as the murderer. The State Supreme Court approved the exclusion of this evidence on the ground that it was hearsay.

*Id.* at 298. The United States Supreme Court held that the evidence's exclusion was erroneous because McDonald's declarations to the proposed witnesses avoided the bar of the hearsay rule as the result of the combination of two factors: the declarations were against McDonald's penal interest, and they were trustworthy. The Court went on at some length about the second factor; it began by saying: "The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Id.* at 300. The first of those circumstances was that "each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred." *Id.* I need not recount the other designated indicia of reliability. The Court summed up its holding on the point as follows:

> Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest.

*Id.* at 302.

*Chambers* is the United States Supreme Court decision that Lewis says establishes the error of the Connecticut Supreme Court in the case at bar. The question in this case thus becomes: Did the Connecticut Supreme Court in this case commit the same error that the United States Supreme Court held the Mississippi Supreme Court committed in *Chambers*?

*Chambers* held that the Mississippi court violated the defendant's constitutional right to a

56

fair trial in two ways: application of the "voucher" rule to curtail the ability Chambers's defense counsel to cross-examine McDonald, the self-confessed third-party culprit; and exclusion under the hearsay rule of testimony by McDonald's three close friends that he had confessed the crime to them. The voucher rule plays no part in the case at bar. The hearsay rule does. Defendant Lewis corresponds to defendant Chambers; Michael Caldwell, the suggested third-party culprit, corresponds to McDonald; and Frank Graham, the deceased informant, to whom Cardwell is said to have confessed, corresponds to the three acquaintances to whom McDonald was said to have confessed. *Chambers* held that the Mississippi court committed an error of constitutional import by barring as inadmissible hearsay the testimony of McDonald's acquaintances about confessions McDonald made to them shortly after the police officer's murder. The question presented by the case at bar is whether the Court's reasoning in *Chambers* condemns the Connecticut Supreme Court's decision barring as inadmissible hearsay Graham's descriptions of two confessions Cardwell made to Graham shortly after the Turner-Fields murders – descriptions which, according to the contemporaneous police report of NHPD Detective Maher, was recounted by Graham (the "Informant") to Maher. It is that report that Lewis tried unsuccessfully to get into evidence at his trial, and whose exclusion he now asserts as a ground for federal habeas relief.

The Connecticut Supreme Court's lengthy discussion on this point of evidence is summarized in a passage I quoted in Part III.D., *supra*, and now quote again, with different emphases:

> Even if we were to assume without deciding that Cardwell's statements were admissible as declarations against penal interest and that the police report was admissible under the business record exception to the hearsay rule, we conclude that the defendant has failed to establish the unavailability of the informant *and the trustworthiness of the informant's statements to Detective Maher* under the residual hearsay exception, which is the only hearsay

exception arguably applicable to the informant's statements.

245 Conn. at 801 (emphasis added).  In the detailed discussion that follows, the court said:

> The informant's statements do not satisfy the requirements of admission under the residual exception to the hearsay rule.  Contrary to the defendant's assertion in the trial court, . . . he did not show that the informant was unavailable.

*Id*. at 806.  As demonstrated in Part III.D., that is an incomprehensible comment, since at the time of Lewis's trial the informant had been rendered unavailable by death, and the author of the Connecticut Supreme Court's opinion indicated by his comments during oral argument that he knew it.  If *unavailability of the informant* was the only basis for the State Court's decision *then*, the State would be at distinct disadvantage in resisting Lewis's claim for federal habeas relief *now*.  But the State Court went on to say:

> *In addition*, the evidence before the trial court could not support a finding of the trustworthiness of the statements.  Contrary to the defendant's assertion, there was insufficient evidence of any close relationship between the informant and Cardwell so as to suggest that Cardwell would have confided in the informant that Cardwell had killed the victims.

*Id*. (emphasis added).  The Court went on to specify additional factual reasons for doubting the trustworthiness of these

statements.  *Id.* at 806-808.  Its conclusion on this point of evidence was stated thus:

> Therefore, because the record does not support the admissibility of each of three levels of hearsay necessary to admit Maher's report into evidence, the trial court did not abuse its discretion in excluding Maher's report.  The multiple levels of hearsay, the lack of independent bases for the admissibility of hearsay statements within hearsay statements, *and the lack of any other sufficient indicia of trustworthiness*, rendered the report insufficient to serve as an adequate surrogate for cross-examination so as to permit the report to be part of the determination of the guilt or innocence of the defendant.

*Id*. at 809 (emphasis added).

These quotations from the Connecticut Supreme Court's decision in the *Lewis* case make it apparent that the Court regarded the trustworthiness of Informant Graham's statements as a separate and independent prerequisite to their admissibility.   This approach is entirely consistent with *Chambers*, where the Court made a point of emphasizing that the statements the trial court excluded were originally made and subsequently offered "under circumstances that provided considerable assurances of reliability," 410 U.S. at 300, a quality the Court clearly regarded as necessary to admissibility: "The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and *thus* was well within the basic rationale of the exception for declarations against interest."  *Id.* at 302 (emphasis added).

The Connecticut Supreme Court manifested the separate and independent nature of the trustworthiness element by first discussing the availability-of-informant question (where error abounds) and then beginning its discussion of trustworthiness with the phrase: "In addition," whose natural reading depicts the introduction of a new and different topic.  That is the reading the Supreme Court gives to such language.  In *Wetzel v. Lambert*, 132 S.Ct. 1195 (2012), a federal habeas petition following a state court murder conviction, the Court said at 1198 note *:

> The only state court ruling the Third Circuit addressed – the conclusion that any impeachment evidence would have been cumulative – was one the state court introduced with "[m]oreover," confirming that it was an alternative basis for its decision.

In the case at bar, I read the Connecticut Supreme Court's phrase "in addition" the same way the United States Supreme Court read the word "moreover" in *Wetzel*.

 The Supreme Court's decision in *Wetzel* is also instructive because it sounds a cautionary

note for federal habeas courts' analyses of state court decisions.  The *Wetzel* petitioner, Lambert, who proclaimed his innocence, was convicted in the Pennsylvania courts of murdering two patrons during a robbery of a lounge in Philadelphia.  The State's principal witness, Jackson, a participant in the crime, testified that the Lambert also participated.  Lambert based his claim for habeas relief, first addressed to the state courts, upon the State's failure to disclose in violation of *Brady* a "police activity sheet" which noted that Jackson had named a different individual as "co-defendant," without specifying whether the crime in question was the lounge crime in question or an unrelated one (the individuals concerned had extensive criminal records).  The Pennsylvania Supreme Court held that this document was not material for *Brady* purposes for two reasons: It was only speculative that Jackson's reference to a "co-defendant" related in any way to the lounge crime.  "*Moreover*," the State Court continued, the document would not have materially furthered Lambert's impeachment of Jackson at the trial because Jackson was already extensively impeached by other means.  132 S.Ct.  at 1197.[12]

The federal district court denied habeas relief.  The Third Circuit reversed and remanded with instructions to the district court to conditionally grant the writ.  The Supreme Court vacated the Third Circuit's judgment.  This is the language in the Court's *per curiam* opinion that I find instructive:

> In this case, however, the Third Circuit overlooked the determination of the state courts that the notations were, as the District Court put it, "not exculpatory or impeaching" but instead "entirely ambiguous." Instead, the Third Circuit focused solely on the alternative ground that any impeachment value that might have been obtained from the notations would have been cumulative.  If the conclusion in the state courts about the content of the document was reasonable – *not necessarily correct, but reasonable* – whatever those

---

[12]  That is the use of "moreover" that  the Court quoted again in its footnote in  *Wetzel*, which I have quoted in text.

> courts had to say about cumulative impeachment evidence would be
> beside the point.

132 S.Ct. at 1198 (emphasis added)(citation omitted).[13]  The Court regarded the Third Circuit's

failure to consider both alternative bases for its decision cited by the Pennsylvania Supreme Court

as grounds for reversal.

By the time his case reached the Supreme Court, the petitioner in *Wetzel* had been in state

prison for 30 years for a crime he insisted he did not commit.  In the case at bar, petitioner Lewis has

been in prison for many years for a crime he insists he did not commit.  Counsel for Lewis stress that

length of time in urging his unconditional release as the form of habeas relief.  It is a powerful

argument, but *Wetzel* suggests it may cut both ways.  The Court concluded its opinion by saying this:

> Any retrial here would take place *three decades* after the crime,
> posing the most daunting difficulties for the prosecution.  That burden
> should not be imposed unless *each* ground supporting the state court
> decision has been examined and found to be unreasonable under
> AEDPA.

132 S.Ct. at 1199 (emphasis in original).

This Court's adjudication of the petition of Scott Lewis for federal habeas relief is governed

by AEDPA and by decisions of the United States Supreme Court.  AEDPA is that statute by which

Congress creates the jurisdiction of Federal district courts to receive and decide habeas corpus

petitions in behalf of persons in custody pursuant to the judgment of a State court, while at the same

time imposing limitations upon the district courts in respect of their exercise of that jurisdiction.

---

[13]   It is clear enough where the Court's formulation "not necessarily correct, but
reasonable" came from.  The AEDPA provisions in 28 U.S.C. § 2254(d)(1) and (2) refer respectively
to "an unreasonable application" of clearly established Federal law and "an unreasonable
determination of the facts."  The *Wetzel* Court prefaced the language quoted in text with a citation
to those AEDPA provisions.

Decisions of the Supreme Court govern the implementation of the statute and are the sole sources of jurisprudential authority.   Applying these principles to the case at bar, I conclude that notwithstanding the Connecticut Supreme Court's seeming confusion about the possible availability of the deceased Frank Graham, that Court's decision rejecting Lewis's direct appeal does not give rise to a cognizable federal habeas claim.

When one considers the Connecticut Supreme Court's decision in *Lewis* within the context of United States Supreme Court jurisprudence, the first observation to make is that the Connecticut Court's emphasis upon the trustworthiness of Informant Graham's statements as a prerequisite to admissibility is entirely consistent with *Chambers*.  *Chambers* holds that in principle, due process under the Fourteenth Amendment gives a state court criminal defendant the right to put in exculpatory evidence of third-party culpability.  *Chambers* also holds that in practice, such evidence must be admissible at the trial.  If the latter proposition were not so, the Supreme Court in *Chambers* would have had no occasion to consider whether the purported third-part culprit's oral confessions to his friends were sufficiently trustworthy to qualify as exceptions to the hearsay rule.  However, as previously noted, the Court set itself that task, and held Chambers had suffered a constitutional deprivation precisely because the "testimony rejected by the trial court," which "was critical to Chambers' defense," bore "persuasive assurances of trustworthiness and thus was well within" a recognized exception to the hearsay rule.  410 U.S. at 302.

Thus in *Lewis*, the Connecticut Supreme Court read *Chambers* correctly when it said:

> The constitutional right to present a defense, which includes, under appropriate limitations, the right to present evidence of third party culpability, *Chambers v. Mississippi*, 410 U.S. 284, 298-303 (1973); does not require that any evidentiary limitation on the admissibility of evidence, no matter how sound as a matter of policy, must yield.

*Id.*, at 302.

245 Conn. at 800 (parallel citations omitted).  In *Chambers* the United States Supreme Court held that McDonald's oral confessions to his friends were sufficiently trustworthy to be admitted into evidence before the jury.  In *Lewis* the Connecticut Supreme Court held that Michael Caldwell's oral confessions to Frank Graham were not shown to be trustworthy and could not be admitted. In their brief on this petition, counsel for Lewis argue that the Court's conclusion on that point was wrong. Counsel urge a number of factors that in their view make Caldwell's confessions to Graham, and relayed by Graham to Detective Maher, trustworthy and consequently admissible at Lewis's trial. The Connecticut Supreme Court articulated a number of factors that in its view made these statements untrustworthy and inadmissible. 245 Conn. at 806-807.  Both perceptions are defensible. It is not this Court's function to choose between them.  Under AEDPA's limitations, I am bound by the Connecticut Court's resolution of this issue unless it was *unreasonable,* the statutory touchstone for habeas relief, whether the Court's conclusion on trustworthiness be regarded as a finding of fact or a conclusion of law.  The parties differ on that classification to some degree, but it makes no difference: "unreasonable" is the core word in both § 2254(d)(1) and (2).  Or, to state the proposition as the Supreme Court did in *Wetzel*, I am bound by the Connecticut Court's conclusion on the admissibility of the statements at issue if that conclusion "was reasonable – not necessarily correct, but reasonable."  132 S.Ct. at 1198.

Lewis does not show that the Connecticut Court arrived at an unreasonable result.  If the question was one of law, I am not cited to a United States Supreme Court decision requiring a different conclusion.  If the question was one of fact, the propriety of the Court's finding is presumed and has not been rebutted.  The Court gave its reasons and they seem sensible enough.  Consider,

for example, the relationship between Caldwell and Graham: Maher's report said only that according to Graham, he "has been an associate of Cardwell for several years." 245 Conn. at 806. As the Court observed at 806 n. 25, "we do not know what kind of association – business, social, criminal, or some combination of the three – the informant and Cardwell enjoyed, nor how close that association was." Given the sometimes problematic cultures and conditions in the diverse and populous City of New Haven during the 1990s, that is a significant uncertainty. It may be contrasted with the relationship in *Chambers* between McDonald (in the role of Cardwell) and the three individuals to whom he was said to have confessed (in the roles of Graham). The murder "occurred in the small town of Woodville in southern Mississippi." 410 U.S. at 285. The three individuals who were prepared to testify that McDonald told them he shot the victim were Hardin, a friend who was "driving McDonald home later that night" of the shooting, *id.* at 292; Turner, "the friend with whom McDonald said he was drinking beer when the shooting occurred," *id.*; and Carter, who "was McDonald's neighbor," *id.* at 293. It is not unreasonable to assess differing degrees of trustworthiness to statements made in such different circumstances. And it cannot be said that the holding in *Chambers* mandates a holding in Lewis's favor in the case at bar.

Lastly on this issue, the Connecticut Court's seeming error on the question of Informant Graham's availability cannot lead to federal habeas relief for Lewis because the Court's holding on trustworthiness constituted an alternative basis for its decision to affirm the conviction. *Wetzel* holds that habeas cannot be granted "unless *each* ground supporting the state court decision is examined and found to be unreasonable under AEDPA." 132 S.Ct. at 1199 (emphasis in original). In the case at bar, the unavailability ground was unreasonable because mistaken in fact, but the trustworthiness ground was not unreasonable.

64

It follows that the Connecticut Supreme Court's rejection of Lewis's direct appeal does not support his petition for federal habeas relief.

## V.   REMEDY AND CONCLUSION

For the foregoing reasons, Lewis is entitled to federal habeas relief because the State suppressed exculpatory and impeachment evidence which should have been disclosed under Supreme Court's decisions *Brady* and *Giglio.*

The brief for Petitioner Lewis says at 3 that Lewis "should be released from state custody immediately," which the brief's conclusion repeats at 124: Lewis "should be released from custody immediately."  The brief does not contend explicitly that this Court should also preclude the State from trying Lewis again on these charges; perhaps that view is implicit in the proposed remedy as phrased.  The brief for the Respondent State takes the position that Petitioner is not entitled to any relief, and accordingly says nothing about what form a remedy should take.

It is not entirely unprecedented for a Federal habeas court to issue a writ  releasing a petitioner from State custody and at the same time barring the State from trying the petitioner again on the charges in question.  However, this extreme remedy is limited to the most unusual and extraordinary  cases, and is not favored.  In *DiSimone v. Phillips*, 518 F.3d 124 (2d Cir. 2008), arising out of a New York State murder conviction, the federal district court granted the habeas writ, vacated the state conviction, and "as part of its judgment ordered that New York be precluded from re-arresting and re-prosecuting the petitioner." 518 F.3d at 125.  On appeal by the State, the Second Circuit affirmed the vacating of petitioner's conviction and release from custody, but reversed the district court's preclusion of re-prosecution.  Judge Leval's opinion noted that "because of the

prosecution's withholding of evidence during his trial, his conviction was obtained in violation of

due process" under *Brady,* so that the district court "properly ordered that DiSimone's

unconstitutional conviction be vacated and that he be released from service of the sentence imposed

on that conviction." *Id*. at 126.  But the Second Circuit reversed the district court's precluding the

State from re-prosecution, and on that issue the court of appeals reasoned:

> It is true that in special circumstances federal courts may bar retrial
> of a successful habeas corpus petitioner without his having first
> sought protection from retrial in the state courts. In all but the most
> extreme circumstances, this would be appropriate only when the grant
> of habeas corpus is premised on a theory which inevitably precludes
> further trial. . . .
>
> In this case, the grant of habeas corpus relief vacating DiSimone's
> conviction was not predicated on a ground that inevitably precludes
> retrial.  It was grounded on the State's failure to turn over exculpatory
> evidence in violation of *Brady*.  A *Brady* violation . . . is remediable
> upon a future trial.

*Id*. at 127-128.

DiSimone has not been questioned or departed from in subsequent Second Circuit cases.  On

the contrary: in *Young v. Conway*, 698 F.3d 69, 89 (2d Cir. 2012), a New York State robbery

conviction case, the Second Circuit cited *DiSimone* in affirming the district court's granting of habeas

relief based on the robbery victim's unreliable in-court identification of the defendant-petitioner, but

reversing as premature the district court's order precluding the prosecution from retrying petitioner

on the charge.  Judge Parker said in the court of appeals' opinion: "If the State seeks to retry Young

(without, of course, the eyewitness identification of Mrs. Sykes), Young is free to argue in state court

that the re-prosecution is barred." 698 F.3d at 89.  Cases like *DiSimone* and *Young* reflect the

awareness that "[b]ecause it would be unseemly in our dual system of government for a federal

66

district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation, federal courts apply the doctrine of comity." *DiSimone*, 518 F.3d at 127 (citations and internal quotation marks omitted).

In *Lopez v. Miller*, 915 F.Supp. 2d 373, 432-435 (E.D.N.Y. 2013), Judge Garaufis of the Eastern District of New York granted habeas relief in a New York State prosecution for murder, ordered the petitioner's immediate release from State custody, and barred the State from any retrial. The circumstances in that case were extreme and not replicated in the case at bar. In the case at bar, I think it right to follow the example of Judge Gleeson of the Eastern District of New York, who in *Williams v. Artus*, No. 11-CV-5541(JG), 2013 WL 4761120 (E.D.N.Y. Sept. 4, 2013), granted the New York State custody petitioner convicted of murder habeas relief on the basis of prosecutorial misconduct, and directed the State prison warden "to release [Petitioner] within 45 days of this order, unless the [S]tate declares its intention, within those 45 days, to retry [Petitioner] on the charges against him." 2013 WL 4761120, at *34.

That form of remedy is appropriate in the case at bar because the trial jury in Lewis's case was entitled to believe the testimony of Ovil Ruiz, despite vigorous efforts on cross-examination to impeach him. In consequence, the jury was entitled in law to convict Lewis on that testimony. The *Brady* violation requiring habeas relief involves the suppression of impeachment evidence bearing directly upon the credibility of the account of events Ruiz gave in his trial testimony. If the State decides to retry Lewis on these charges – a decision for the State to make, in the totality of the circumstances of the case – and Ruiz repeats his testimony implicating Lewis in the Turner-Fields homicides, then that impeachment evidence, derived principally from the testimony of former NHPD Detective Sweeney, will be available to the defense in challenging Ruiz's credibility. That is the

67

proper remedy for the State's violation of Lewis's constitutional right to a fair trial.  It is appropriate for this Federal court to fashion a remedy which ensures that any later trial in a State court will not violate Lewis's rights under the United States Constitution.  It would not be appropriate, in the particular circumstances of this case, for this Court to order that the State cannot retry Lewis for these crimes even if the State should desire to do so.

*          *          *          *          *

For the foregoing reasons, the petition of Petitioner Scott Talmadje Lewis for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) is GRANTED.

Respondent Commissioner of Correction of the State of Connecticut is directed to release the Petitioner from the custody of the State of Connecticut within sixty (60) days of the date of this Ruling and Order, unless the State of Connecticut within those 60 days declares its written intention, addressed to this Court and counsel for Petitioner, to retry Petitioner on the charges against him that are referred to in this Ruling.

It is SO ORDERED.

Dated:   New Haven, Connecticut
             December 16, 2013


*/s/Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge